**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

GEORGE K. YOUNG, JR.,
*Plaintiff-Appellant*,

v.

STATE OF HAWAII; NEIL
ABERCROMBIE, in his capacity as
Governor of the State of Hawaii;
DAVID MARK LOUIE I, Esquire, in
his capacity as State Attorney
General; COUNTY OF HAWAII, as a
sub-agency of the State of Hawaii;
WILLIAM P. KENOI, in his capacity as
Mayor of the County of Hawaii;
HILO COUNTY POLICE DEPARTMENT,
as a sub-agency of the County of
Hawaii; HARRY S. KUBOJIRI, in his
capacity as Chief of Police; JOHN
DOES, 1–25; JANE DOES, 1–25; DOE
CORPORATIONS, 1–5; DOE ENTITIES,
1–5,
*Defendants-Appellees.*

No. 12-17808

D.C. No.
1:12-cv-00336-
HG-BMK

OPINION

Appeal from the United States District Court
for the District of Hawaii
Helen W. Gillmor, District Judge, Presiding

Argued and Submitted En Banc September 24, 2020
San Francisco, California

Filed March 24, 2021

Before:  Sidney R. Thomas, Chief Judge, and Diarmuid F.
O'Scannlain, M. Margaret McKeown, Kim McLane
Wardlaw, William A. Fletcher, Richard R. Clifton, Jay S.
Bybee, Consuelo M. Callahan, Sandra S. Ikuta, Michelle T.
Friedland and Ryan D. Nelson, Circuit Judges.

Opinion by Judge Bybee;
Dissent by Judge O'Scannlain;
Dissent by Judge R. Nelson

# SUMMARY[*]

## Civil Rights

The en banc court affirmed the district court's dismissal of an action challenging Hawaiʻi's firearm licensing law, Hawaiʻi Revised Statutes § 134-9(a), which requires that residents seeking a license to openly carry a firearm in public must demonstrate "the urgency or the need" to carry a firearm, must be of good moral character, and must be "engaged in the protection of life and property."

Appellant George Young applied for a firearm-carry license twice in 2011, but failed to identify "the urgency or the need" to openly carry a firearm in public. Instead, Young relied upon his general desire to carry a firearm for self-defense. Both of Young's applications were denied. Young brought a challenge to Hawaiʻi's firearm-licensing law under the Second Amendment and the Due Process Clause of the Fourteenth Amendment. The district court upheld Hawaiʻi's statute.

The en banc court first held that the scope of its review would be limited to Young's facial challenge to HRS § 134-9. There was no need to determine whether Hawaiʻi County properly applied § 134-9, because Young did not bring an as-applied challenge.

The en banc court noted that this Court has previously held that individuals do not have a Second Amendment right

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

to carry concealed weapons in public.  *Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc).  The question presented in this case, accordingly, was limited to whether individuals have a right to carry weapons openly in public.  To answer that question, and consistent with the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the en banc court first considered whether Hawaiʻi's law affects conduct protected by the Second Amendment.

After careful review of the history of early English and American regulation of carrying arms openly in the public square, the en banc court concluded that Hawaiʻi's restrictions on the open carrying of firearms reflect longstanding prohibitions, and therefore, the conduct they regulate is outside the historical scope of the Second Amendment.   The en banc court held that the Second Amendment does not guarantee an unfettered, general right to openly carry arms in public for individual self-defense. Accordingly, Hawaiʻi's firearms-carry scheme is lawful.

The en banc court rejected Young's argument that HRS § 134-9 is invalid as a prior restraint because it vests chiefs of police with unbridled discretion to determine whether a permit is issued. Joining its sister circuits, the en banc court held that the prior restraint doctrine does not apply to Second Amendment challenges to firearm-licensing laws.

The en banc court also rejected, as premature, Young's due process argument that HRS § 134-9 does not provide adequate process to challenge the denial of a carry-permit application.   The en banc court noted that Young did not seek review under HRS § 91-9 before bringing suit.  So,

Hawaiʻi has not yet denied him the opportunity for appellate review. Because Young has not actually been denied a hearing, his procedural due process claim was speculative, and there was no need to reach it.

Dissenting, Judge O'Scannlain, joined by Judges Callahan, Ikuta, and R. Nelson, would hold that both HRS § 134-9 and the 1997 County regulation destroy the core right to carry a gun for self-defense outside the home and are unconstitutional under any level of scrutiny. Judge O'Scannlain stated that the majority holds that while the Second Amendment may guarantee the right to keep a firearm for self-defense within one's home, it provides no right whatsoever to bear—i.e., to carry—that same firearm for self-defense in any other place. In his view, the majority's decision undermines not only the Constitution's text, but also half a millennium of Anglo-American legal history, the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and the foundational principles of American popular sovereignty itself.

Dissenting, Judge R. Nelson, joined by Judges Callahan and Ikuta, concurred with Judge O'Scannlain's dissent concluding that Hawaii Revised Statute 134-9 violates the Second Amendment. Judge R. Nelson wrote that the majority erred not only in holding the statute facially constitutional, but also in rejecting Young's as-applied challenge. He also wrote separately to highlight the brazenly unconstitutional County of Hawaii Regulations applying HRS § 134-9, stating that there should be no dispute that any law or regulation that restricts gun ownership only to security guards violates the Second Amendment.

**COUNSEL**

Alan Alexander Beck (argued), San Diego, California; Stephen D. Stamboulieh, Stamboulieh Law PLLC, Madison, Mississippi; for Plaintiff-Appellant.

Neal Kumar Katyal (argued), Colleen E. Roh Sinzdak, Mitchell P. Reich, and Sundeer Iyer, Hogan Lovells US LLP, Washington, D.C.; Clare E. Connors, Attorney General; Kimberly T. Guidry, Solicitor General; Robert T. Nakatsuji and Kaliko'Onalani D. Fernandes, Deputy Solicitors General; Department of the Attorney General, Honolulu, Hawaii; Joseph K. Kamelamela, Corporation Counsel; Laureen L. Martin, Litigation Section Supervisor; D. Kaena Horowitz, Melody Parker, Christopher P. Schlueter, Michael J. Udovic, and Kimberly K. Angay, Deputies Corporation Counsel; Office of the Corporation Counsel, Hilo Hawaii; for Defendants-Appellees.

Kimberly T. Guidry, Solicitor General; Robert T. Nakatsuji, Deputy Solicitor General; Department of the Attorney General, Honolulu, Hawaii; for Amicus Curiae State of Hawaii.

Deepak Gupta and Jonathan E. Taylor, Gupta Wessler PLLC, Washington, D.C.; Eric Tirschwell and Mark Anthony Frassetto, Everytown for Gun Safety Support Fund, New York, New York; Janet Carter, William J. Taylor Jr., and Lisa M. Ebersole, Everytown Law, New York, New York; for Amicus Curiae Everytown for Gun Safety.

Simon J. Frankel, Covington & Burling LLP, San Francisco, California; Paulina K. Slagter, Covington & Burling LLP, Los Angeles, California; J. Adam Skaggs and David Pucino,

Giffords Law Center to Prevent Gun Violence, New York, New York; Hannah Shearer, Giffords Law Center to Prevent Gun Violence, San Francisco, California; for Amicus Curiae Giffords Law Center to Prevent Gun Violence.

Gurbir S. Grewal, Attorney General; Andrew J. Bruck, Executive Assistant Attorney General; Jeremy M. Feigenbaum, Assistant Attorney General; Claudia Joy Demitro, Adam D. Klein and Tim Sheehan, Deputy Attorneys General; Attorney General's Office, Trenton, New Jersey; Xavier Becerra, Attorney General, Sacramento, California; William Tong, Attorney General, Hartford, Connecticut; Matthew P. Denn, Attorney General, Wilmington, Delaware; Kwame Raoul, Attorney General, Chicago, Illinois; Tom Miller, Attorney General, Des Moines, Iowa; Maura Healey, Attorney General, Boston, Massachusetts; Brian E. Frosh, Attorney General, Baltimore, Maryland; Letitia James, Attorney General, New York, New York; Ellen F. Rosenblum, Attorney General, Salem, Oregon; Peter F. Neronha, Attorney General, Providence, Rhode Island; Mark R. Herring, Attorney General, Richmond, Virginia; Karl A. Racine, Attorney General, Washington, D.C.; for Amici Curiae New Jersey, California, Connecticut, Delaware, Illinois, Iowa, Massachusetts, Maryland, New York, Oregon, Rhode Island, Virginia, and the District of Columbia.

Xavier Becerra, Attorney General; Michael J. Mongan, Solicitor General; Thomas S. Patterson, Senior Assistant Attorney General; Samuel P. Siegel and Helen H. Hong, Deputy Solicitors General; Jonathan M. Eisenberg and P. Patty Li, Deputy Attorneys General; Department of Justice, Sacramento, California; for Amicus Curiae State of California.

John W. Dillon, Gatzke Dillon & Ballance LLP, Carlsbad, California, for Amicus Curiae San Diego County Gun Owners Political Action Committee.

Richard L. Holcomb, Holcomb Law LLLC, Honolulu, Hawaii, for Amicus Curiae Hawai'i Rifle Association.

Donald L. Wilkerson, Laupahoehoe, Hawaii, for Amicus Curiae Hawaii Firearms Coalition.

Herbert W. Titus, Robert J. Olson, William J. Olson, and Jeremiah L. Morgan, William J. Olson P.C., Vienna, Virginia; Joseph W. Miller, Restoring Liberty Action Committee, Fairbanks, Alaska; for Amici Curiae Gun Owners of America, Gun Owners Foundation, Heller Foundation, Virginia Citizens Defense League, Conservative Legal Defense and Education Fund, and Restoring Liberty Action Committee.

David G. Sigale, Law Firm of David G. Sigale P.C., Glen Ellyn, Illinois, for Amicus Curiae Second Amendment Foundation.

Donald E. J. Kilmer Jr., Law Offices of Donald Kilmer APC, San Jose, California, for Amici Curiae Madison Society Inc. Calguns Foundation, Firearms Policy Coalition Inc., and Firearms Policy Foundation.

John Cutonilli, Garrett Park, Maryland, pro se Amicus Curiae.

Neal Goldfarb, Washington, D.C., pro se Amicus Curiae.

Adita Dynar and Mark Chenoweth, New Civil Liberties Alliance, Washington, D.C., for Amicus Curiae New Civil Liberties Alliance.

Jeff Landry, Attorney General; Elizabeth Baker Murrill, Solicitor General; Josiah M. Kollmeyer, Assistant Solicitor General; Department of Justice, Baton Rouge, Louisiana; Steven T. Marshall, Attorney General, Alabama; Mark Brnovich, Attorney General, Arizona; Leslie Rutledge, Attorney General, Arkansas; Christopher M. Carr, Attorney General, Georgia; Lawrence G. Wasden, Attorney General, Idaho; Aaron Negangard, Chief Deputy Attorney General, Indiana; Derek Schmidt, Attorney General, Kansas; Daniel Cameron, Attorney General, Kentucky; Lynn Fitch, Attorney General, Mississippi; Timothy C. Fox, Attorney General, Montana; Douglas J. Peterson, Attorney General, Nebraska; Wayne Stenehjem, Attorney General, North Dakota; Dave Yost, Attorney General, Ohio; Mike Hunter, Attorney General, Oklahoma; Alan Wilson, Attorney General, South Carolina; Jason Ravnsborg, Attorney General, South Dakota; Ken Paxton, Attorney General, Texas; Sean D. Reyes, Attorney General, Utah; Patrick Morrisey, Attorney General, West Virginia; for Amici Curiae States of Louisiana, Alabama, Arizona, Arkansas, Georgia, Idaho, Indiana, Kansas, Kentucky, Mississippi, Montana, Nebraska, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Utah, and West Virginia.

Dan Jackson, Special Deputy Corporation Counsel, Keker Van Nest & Peters LLP, San Francisco, California, for Amici Curiae City and County of Honolulu, County of Kaua'i, and County of Maui.

Brian R. Matsui and Samuel B. Goldstein, Morrison & Foerster LLP, Washington, D.C.; Jamie A. Levitt and Janie C. Buckley, Morrison & Foerster LLP, New York, New York; for Amici Curiae Corpus Linguistics Professors and Experts.

Michael T. Jean, National Rifle Association of America—Institute for Legislative Action, Fairfax, Virginia, for Amicus Curiae National Rifle Association of America.

Matthew J. Silveira, Jones Day, San Francisco, California, for Amici Curiae Social Scientists and Public Health Researchers.

Mark D. Selwyn, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, California; Nicholas G. Purcell, Wilmer Cutler Pickering Hale and Dorr LLP, Los Angeles, California; for Amici Curiae Professors of History and Law.

Antonio J. Perez-Marques, Sushila Rao Pentapati, Victor Obasaju, Korey Boehm, and Thomas Dec, Davis Polk & Wardwell LLP, New York, New York, for Amicus Curiae Prosecutors Against Gun Violence.

Joseph G.S. Greenlee, Firearms Policy Coalition, Sacramento, California; David B. Kopel, Independence Institute, Denver, Colorado; for Amici Curiae Professors of Second Amendment Law, Firearms Policy Coalition, Firearms Policy Foundation, Cato Institute, Madison Society Foundation, California Gun Rights Foundation, Second Amendment Foundation, and Independence Institute.

C.D. Michel, Sean A. Brady, and Matthew D. Cubeiro, Michel & Associates P.C., Long Beach, California; James

Hochberg, James Hochberg Attorney at Law LLLC, Honolulu, Hawaii; for Amici Curiae Hawaii Rifle Association, California Rifle & Pistol Association Inc., and Gun Owners of California.

Mark M. Murakami, Damon Key Leong Kupchak Hastert, Honolulu, Hawaii; Jonathan Lowy, Kelly Sampson, and Christa Nichols, Brady, Washington, D.C.; for Amicus Curiae Brady.

## OPINION

TABLE OF CONTENTS

I.   BACKGROUND AND PROCEEDINGS . . . . . . . . . 15
     A.  *Hawaiʻi's Licensing Scheme*. . . . . . . . . . . . . . . . . 15
         1.  History of Firearm Regulation in Hawaiʻi . . . 15
         2.  Hawaiʻi's Current Scheme . . . . . . . . . . . . . . 18
             a.  *The statute*. . . . . . . . . . . . . . . . . . . . . . . . 18
             b.  *The County of Hawaiʻi's regulations* . . . . 19
             c.  *Hawaiʻi Attorney General Opinion
                 Letter* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     B.  *Facts and Proceedings* . . . . . . . . . . . . . . . . . . . . . 22
II.  THE STANDARDS FOR OUR REVIEW . . . . . . . . . 25
     A.  *Standards of Review of Law and Fact* . . . . . . . . . 25
     B.  *Scope of Our Review*. . . . . . . . . . . . . . . . . . . . . . . 25
     C.  *Substantive Standards for the Second
         Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
         1.  *Heller* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
         2.  Our Post-*Heller* Framework . . . . . . . . . . . . . 34
III. PUBLIC CARRY OF FIREARMS AND THE
     SCOPE OF THE SECOND AMENDMENT . . . . . . . 36
     A.  *The English Right to Bear Arms in Public*
         . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
         1.  The Royal Decrees . . . . . . . . . . . . . . . . . . . . . 40
         2.  The Statute of Northampton . . . . . . . . . . . . . . 43
             a.  *The statute*. . . . . . . . . . . . . . . . . . . . . . . . 43
             b.  *Enforcement* . . . . . . . . . . . . . . . . . . . . . . . 47
             c.  *Cases*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
             d.  *Treatises* . . . . . . . . . . . . . . . . . . . . . . . . . . 52
         3.  The English Bill of Rights . . . . . . . . . . . . . . . 55
     B.  *Colonial Restrictions on the Right to Bear
         Arms in Public* . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    C. *Post Second Amendment Restrictions on the Right to Bear Arms* . . . . . . . . . . . . . . . . . . . . . . . . 62
        1. Post-Ratification Restrictions . . . . . . . . . . . . . 64
        2. Nineteenth-Century Restrictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
            a. *The statutes* . . . . . . . . . . . . . . . . . . . . . . . 65
            b. *The cases* . . . . . . . . . . . . . . . . . . . . . . . . . 73
            c. *Treatises* . . . . . . . . . . . . . . . . . . . . . . . . . . 87
        3. Twentieth-Century Restrictions . . . . . . . . . . . 92
    D. *The Power to Regulate Arms in the Public Square* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
        1. The Basic Rule . . . . . . . . . . . . . . . . . . . . . . . 96
        2. The Exceptions . . . . . . . . . . . . . . . . . . . . . . 107
            a. *Classes of persons* . . . . . . . . . . . . . . . . . 107
            b. *Places* . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
            c. *Licensing and good-cause requirements* 108
            d. *Surety* . . . . . . . . . . . . . . . . . . . . . . . . . . . 109
    E. *Response to the Dissent* . . . . . . . . . . . . . . . . . . . 113
    F. *Application to HRS § 134-9* . . . . . . . . . . . . . . . . 122
IV. OTHER CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123
    A. *Prior Restraint* . . . . . . . . . . . . . . . . . . . . . . . . . . 124
    B. *Procedural Challenge* . . . . . . . . . . . . . . . . . . . . . 126
V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

BYBEE, Circuit Judge:

The State of Hawaiʻi requires its residents to obtain a license to carry a firearm in public.  To satisfy the statutory requirements for an open-carry license, residents must demonstrate "the urgency or the need" to carry a firearm, must be of good moral character, and must be "engaged in the protection of life and property."  Appellant George Young applied for a firearm-carry license twice in 2011, but failed to identify "the urgency or the need" to openly carry a firearm in public.  Instead, Young relied upon his general desire to carry a firearm for self-defense.     Both of Young's applications were denied.  Young brought a facial challenge to Hawaiʻi's firearm-licensing law under the Second Amendment and the Due Process Clause of the Fourteenth Amendment.  The district court upheld Hawaiʻi's statute.

We have previously held that individuals do not have a Second Amendment right to carry *concealed* weapons in public.  *Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc).  The question presented in this case is whether individuals have a right to carry weapons *openly* in public.  In order to answer that question, and consistent with the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), we ask, first, whether Hawaiʻi's law affects conduct protected by the Second Amendment.  If so, we then determine if the law can survive the appropriate level of scrutiny.  After careful review of the history of early English and American regulation of carrying arms openly in the public square, we conclude that Hawaiʻi's restrictions on the open carrying of firearms reflect longstanding prohibitions and that the conduct they regulate is therefore outside the historical scope of the Second

Amendment.  Accordingly, Hawai'i's firearms-carry scheme is lawful.  We affirm the judgment of the district court.

## I.  BACKGROUND AND PROCEEDINGS

### A.  *Hawai'i's Licensing Scheme*

#### 1.  History of Firearm Regulation in Hawai'i

Hawai'i law began limiting public carriage of dangerous weapons, including firearms, more than 150 years ago—nearly fifty years before it became a U.S. territory and more than a century before it became a state.  Hawai'i enacted its first statutory regulation of public carry in 1852.  The aptly named "Act To Prevent the Carrying of Deadly Weapons" recognized that "the habit of carrying deadly weapons is dangerous to life and the public peace."  Act of May 25, 1852, 1852 Haw. Sess. Laws 19.  To combat those risks, Hawai'i's pre-territorial legislative council prescribed fines and imprisonment for "[a]ny person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon."  *Id.* § 1.  The Act of May 25, 1852 categorically exempted certain professionals "authorized to bear arms," such as those "holding official, military, or naval rank . . . when [the firearm was] worn for legitimate purposes."  *Id.* § 2.

Hawai'i's regulation of dangerous weapons remained in effect after Hawai'i consented to annexation as a U.S. territory in 1898.  Under the Newlands Resolution, "[t]he municipal legislation of the Hawaiian Islands . . . not inconsistent with this joint resolution nor contrary to the Constitution of the United States nor to any existing treaty of

the United States, shall remain in force until the Congress of the United States shall otherwise determine." Resolution of July 7, 1898, 30 Stat. 750. *See Territory of Hawai'i v. Mankichi*, 190 U.S. 197, 209 (1903). Hawai'i's territorial legislature renewed its 1852 limitations on the carrying of dangerous weapons in a 1905 Act, as amended in 1913. Haw. Rev. Laws, ch. 209, § 3089 (1905), *as amended* 1913 Haw. Sess. Laws 25, act 22, § 1. Like its predecessors, the 1913 statute made it unlawful to carry deadly weapons unless "authorized by law." *Id.* The statute imposed civil and criminal penalties on anyone who carried a "deadly weapon" without prior authorization "unless good cause be shown for having such dangerous weapon." *Id.*

In 1927, Hawai'i implemented its first restriction on firearms specifically, as opposed to restrictions on the broader class of "deadly weapons." In a section entitled "Carrying or keeping small arms by unlicensed person," the law provided:

> Except as otherwise provided in Sections 7 and 11 hereof in respect of certain licensees, no person shall carry, keep, possess or have under his control a pistol or revolver; provided, however, that any person who shall have lawfully acquired the ownership or possession of a pistol or revolver may, for purposes of protection and with or without a license, keep the same in the dwelling house or business office personally occupied by him, and, in the case of an unlawful attack upon any person or property in said house or office, said pistol or revolver may be carried in any lawful, hot pursuit of the assailant.

Act 206, § 5, 1927 Haw. Sess. Laws 209, 209–211. The 1927 Act, which was modeled in part on the Uniform Firearms Act, required a person to obtain a license to carry a "pistol or revolver concealed upon his person or to carry one elsewhere than in his home or office." *Id.* § 7. Carry licenses could be issued by the sheriff or a sitting judge after either had determined that applicant was "suitable . . . to be so licensed." *Id.* An applicant was deemed "suitable" to carry a firearm upon meeting a citizenship and age requirement and showing a "good reason to fear an injury to his person or property, or . . . other proper reason for carrying a pistol or revolver." *Id.*

In 1933, the Hawai'i legislature further refined its concealed-carry licensing scheme. Act 26, § 8, 1933–1934 Haw. Sess. Laws Spec. Sess. 35, 39. To carry a concealed weapon, the applicant had to demonstrate an "exceptional case" and a "good reason to fear injury to his person or property." *Id.*

The "exceptional case" and "good reason to fear injury" requirements included in the 1933 Act became staples of Hawai'i's future firearm regulations. The Hawai'i legislature included those requirements in its 1961 Act "Relating to Permits to Carry Firearms." Act 163, 1961 Haw. Sess. Laws 215. The 1961 regulations mirrored those in the 1933 statute and required an applicant to demonstrate an "exceptional case" and a "good reason [for the applicant] to fear injury to his person or property" before publicly carrying a firearm. *Id.* § 1. Whereas the 1933 Act only applied to *concealed* carry, however, the 1961 Act announced a new regulatory scheme for *open* carry. An individual seeking to carry a firearm openly in public was required to demonstrate "the urgency of the need" to carry and must be "engaged in the protection of life and property." *Id.* If the applicant made such a showing

and was not otherwise prohibited from possessing a firearm, the chief of police had discretion to grant the carry application. *Id.* ("[T]he respective chiefs of police may grant a license . . . .").

2.   Hawai'i's Current Scheme

*a.   The statute.*   Hawai'i's current scheme allows individuals to possess firearms under a variety of circumstances. First, individuals who are not members of law enforcement, the armed forces, or certain federal agencies and wish to carry firearms in places outside of their homes, places of business or sojourns must obtain a license from the county chief of police. Hawai'i Revised Statutes (HRS) § 134-9(a). Second, individuals may possess firearms in their homes, places of business, and sojourns. *Id.* § 134-23. Third, persons who are authorized by their public employers, including law enforcement, the armed forces, and certain federal agencies, are exempt from other restrictions and may carry in public. *Id.* § 134-11(a). Fourth, any person, sixteen years or older "may carry and use any lawfully acquired rifle or shotgun and suitable ammunition while actually engaged in hunting or target shooting." *Id.* § 134-5(a). Additionally, "[a] person may carry unconcealed and use a lawfully acquired pistol or revolver while actually engaged in hunting game mammals." *Id.* § 134-5(c).

Hawai'i's public carry licensing scheme is substantially the same today as it was in 1961. Hawai'i continues to distinguish between concealed carry and open carry, although it is not clear that the difference is particularly significant. To obtain a concealed carry license from a county chief of police, a person must first show "an exceptional case" and a "reason to fear injury to [his or her] person or property."

HRS § 134-9(a).  As to open carry, the statute states in relevant part:

> Where the urgency or the need has been sufficiently indicated, the respective chief of police may grant to an applicant of good moral character who is a citizen of the United States of the age of twenty-one years or more, is engaged in the protection of life and property, and is not prohibited under section 134-7 from the ownership or possession of a firearm, a license to carry a pistol or revolver and ammunition therefor unconcealed on the person within the county where the license is granted.

*Id.*  Many of the statute's requirements are objective.  For instance, whether the applicant meets the citizenship, age, or legal-ownership requirements may be determined by the reviewing chief of police by a simple review of the application and law enforcement databases.  On the other hand, "the urgency or the need" for the license and the applicant's participation in "the protection of life and property" appear to be subjective requirements not discoverable by reference to a law enforcement database.

   *b.  The County of Hawaiʻi's regulations.*  In October 1997, the County of Hawaiʻi—where Young lives and where he applied for several carry permits—promulgated county-wide rules to evaluate permit applications under § 134-9.  *See* HRS § 91-3 (detailing the rule-making process for county boards, county commissions, and other agencies authorized by law to make rules).  These "Rules and Regulations Governing the Issuance of Licenses to Carry Concealed and

Unconcealed Weapons" outline the process the chief of police would follow in reviewing carry applications under § 134-9.

The county regulation imposed different rules for concealed arms and for unconcealed arms consistent with § 134-9's bifurcation, but a brief review of the regulations reveals several inconsistencies between the state statute and the county's administration. At the outset, it is clear that Hawai'i County's regulations are more demanding than § 134-9. For instance, the regulations seem to consider open-carry permit applications to be available only to "private detectives and security guards." In fact, the first subheading reads "Rules and Regulations Governing the Carrying of Concealed Weapons and the Carrying of Weapons *by Private Detectives and Security Guards*." The regulation also provides the chief of police a mechanism by which to cancel a previously issued carry permit upon termination of the applicant's employment. Meanwhile, § 134-9 does not impose a professional requirement on the applicant, nor does it distinguish between applications by security guards and applications by other citizens.

The county regulation also applies to a broader class of weapons than does § 134-9. Whereas § 134-9 applies only to the public carry of "a pistol or revolver and ammunition therefor," the county regulation defines "firearm" to include "rifles, shotguns, automatic firearms, noxious gas projectors, mortars, bombs, and cannon[s]." Section 134-9 did not contemplate any of those classes of arms. Similarly, the county regulation also applies to non-firearm "weapons" that could be concealed on the person, including "knives, blackjacks, batons, night sticks, and chemical agents designed to temporarily subdue or incapacitate a person." Again, § 134-9 is silent on such weapons.

*c. Hawaiʻi Attorney General Opinion Letter*.  After this litigation began, the Hawaiʻi Attorney General issued a formal opinion interpreting § 134-9's requirements and clarified that § 134-9 does not reserve open-carry permits to security guards. *See* State of Haw., Dep't of the Att'y Gen., Opinion Letter No. 18-1, Availability of Unconcealed-Carry Licenses (Sept. 11, 2018) (https://ag.hawaii.gov/wp-content /uploads/2018/09/AG-Opinion-No.-18-1.pdf) (Att'y Gen. Letter).   The Attorney General unequivocally rejected Hawaiʻi County's interpretation that an open-carry permit applicant must demonstrate a professional need to carry, such as being a private investigator or security guard. *Id.* at 3–4. The Attorney General concluded that such a showing would be inconsistent with § 134-9, which "does not limit unconcealed-carry licenses to individuals employed as private security officers." *Id.* at 6.  All that the statute requires is that the applicant (1) meet the objective qualifications; (2) be of good moral character; (3) demonstrate "sufficient need"; and (4) present no other reason to be disqualified. *Id.* at 6–7.

According to the Attorney General's Opinion Letter, an applicant's need is "sufficient" if it is urgent and is related to "engage[ment] in the protection of life and property." *Id.* at 7 (citing HRS § 134-9).  The urgency requirement "connote[s] an immediate, pressing, and heightened interest in carrying a firearm." *Id.* at 8.  Coupled with the requirement that the applicant be "engaged in the protection of life and property," an applicant must demonstrate more than a "generalized concern for safety."  *Id.*; *see also id.* at 7 (noting that the statute only requires an applicant to show a need for armed self-defense "that substantially exceeds the need possessed by ordinary law-abiding citizens") (citing *Drake v. Filko*, 724 F.3d 426, 428 & n.2 (3d Cir. 2013)).  The Attorney General provided several examples of applicants who would

plausibly qualify for an open-carry license regardless of their profession.[1]

The Attorney General's Opinion Letter did not repeal Hawaiʻi County's regulations, but its interpretation of state law is considered "highly instructive." *See Kepoʻo v. Watson*, 952 P.2d 379, 387 n.9 (Haw. 1998). And even without the Attorney General's clarification, the statute—not the county's regulation—would control. *See Ruggles v. Yagong*, 353 P.3d 953, 964 (Haw. 2015) (citing HRS § 46-1.5(13)) (Hawaiʻi law "authorizes county ordinances 'to protect health, life, and property . . .' as long as they are 'not inconsistent with'" state law.). Further, each of Hawaiʻi's other counties agree that § 134-9 does not require consideration of an applicant's profession when evaluating a carry-permit application. *See* Brief of City and County of Honolulu, *et. al.*, as Amici Curiae 4–6 ("The Attorney General's interpretation of section 134-9, HRS, comports with [Honolulu, Kauaʻi, and Maui] Counties' past and current practice[s].").

## B. *Facts and Proceedings*

George Young wishes to carry a firearm in public—concealed or unconcealed—but does not fall into one of Hawaiʻi's categorical exceptions for law enforcement and military personnel. In 2011, Young applied twice for a license in the County of Hawaiʻi. In both applications, Young cited a general need for "personal security, self-preservation and defense, and protection of personal family

---

[1] This non-exhaustive list included: (1) a victim of domestic abuse whose former spouse has violated protective orders; (2) a victim of stalking with credible threats of bodily harm; and (3) a witness to a crime who has received credible threats to her safety. Att'y Gen. Letter at 8.

members and property." Hawaiʻi County police chief, Henry Kubojiri, denied both of Young's applications. Chief Kubojiri determined that Young had neither shown an "exceptional case[] or demonstrated urgency."

In 2012 Young filed a pro se complaint under 42 U.S.C. § 1983 against the State of Hawaiʻi, the governor, the attorney general, the County of Hawaiʻi, the mayor of the County of Hawaiʻi, the Hilo County Police Department, the County of Hawaiʻi chief of police, and unnamed persons and corporations.[2] He brought separate counts under the Bill of Attainder Clause, the Contracts Clause, the Second Amendment, the Ninth Amendment, and the Privileges or Immunities and Due Process Clauses of the Fourteenth Amendment. Young asked for the permanent enjoining of HRS § 134, the issuance of a permit, and compensatory and punitive damages.

The district court dismissed all of Young's claims in a published order. *Young v. Hawaiʻi*, 911 F. Supp. 2d 972 (D. Haw. 2012). Although the district court dismissed Young's claims on various grounds, the only grounds relevant here relate to his Second Amendment and Due Process claims; his other claims have been abandoned on appeal. With respect to the Second Amendment, the district court first determined that Hawaiʻi's firearm licensing scheme did not implicate conduct that is protected by the Second Amendment. *Young*, 911 F. Supp. 2d at 987–91. Looking to "[t]he weight of authority in the Ninth Circuit, other Circuits, and state courts," the district court concluded

---

[2] Young has filed two prior actions. *See Young v. Hawaiʻi*, 73 Fed. R. Serv. 3d 1635 (D. Haw. 2009); *Young v. Hawaiʻi*, 548 F. Supp. 2d 1151 (D. Haw. 2008). Both actions were dismissed.

that "*Heller* and *McDonald* establish[] only a narrow individual right to keep an operable handgun at home for self-defense." *Id.* at 989. Because Hawai'i's law permits individuals to possess firearms in the home and in a place of business, HRS § 134-9 did not impose on a right protected by the Second Amendment. *Id.* at 989–90.

Alternatively, the district court found that even if Hawai'i's statute implicated conduct protected by the Second Amendment, the statute would survive intermediate constitutional scrutiny. *Id.* at 991–92. The district court determined that Hawai'i's law "protects an important and substantial interest in safeguarding the public from the inherent dangers of firearms." *Id.* at 991. And because Hawai'i's law did not burden in-home possession of firearms and was not an outright ban on the firearms, the district court concluded that Hawai'i's restrictions reasonably fit its substantial interest in protecting the public from gun violence. *Id.* The court rejected Young's related argument that Hawai'i's statute vested in the chief of police unbridled discretion as to whether to grant a carry permit, reasoning that the "prior restraint doctrine is applicable only in the First Amendment context." *Id.*

The district court also dismissed Young's due process claim on the ground that he had no liberty or property interest in carrying a firearm in public. *Id.* at 993. The district court dismissed Young's complaint, *id.* at 995–96, and issued a final judgment.

Young timely appealed, and a divided panel of our court reversed in part and dismissed in part the district court's judgment. *Young v. Hawai'i*, 896 F.3d 1044 (9th Cir. 2018). We granted rehearing en banc to determine whether

Hawaiʻi's regulation of open carry violates the Second Amendment right to keep and bear arms. *Young v. Hawaiʻi*, 915 F.3d 681 (9th Cir. 2019).

## II. THE STANDARDS FOR OUR REVIEW

### A. *Standards of Review of Law and Fact*

The district court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291. We review de novo a district court's dismissal under Rule 12(b)(6). *Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1151 (9th Cir. 2019). We accept the allegations in Young's complaint as true and construe the pleadings in the light most favorable to him. *See Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029–30 (9th Cir. 2009).

### B. *Scope of Our Review*

Having identified the applicable standard of review, we must now consider the scope of our review. During the supplemental briefing that we allowed after granting en banc review, the parties disputed what claims Young actually raised before the district court.[3] Young argued that his claims

---

[3] In the district court, Young argued that § 134-9 violated the Bill of Attainder Clause, the Contracts Clause, the Ninth Amendment, and the Privileges or Immunities Clause. He has abandoned those claims on appeal.

Young's lengthy and rambling complaint focused on firearms. Nevertheless, in the relief section, Young referred to other arms, "*e.g.*, stun gun, tasers, mace spray, switch blade etc." He did not raise these in any briefing before the district court. In his panel briefing, Young, for the first time, referred to Hawaiʻi's prohibitions on the possession of electric

before the district court included both a facial challenge and an as-applied challenge to HRS § 134-9.  Young pointed to several instances where, he claimed, he preserved an as-applied challenge both before the district court and at his panel-stage briefing.  Hawaiʻi[4] countered that Young raised only a facial challenge to the statute below and, to the extent that Young brought an as-applied challenge, he had forfeited that claim.

The difference between the two claims is potentially important for Young.  It is no secret that a facial challenge to a statute is more difficult to prove than an as-applied challenge.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987).  A facial challenge is a claim that the legislature has violated the Constitution, while an as-applied challenge is a claim directed at the execution of the law.  *See* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1235–42 (2010); *see also* Henry Paul Monaghan, *Overbreadth*, 1981 Sup. Ct. Rev. 1, 5, 32 n.134 ("[I]f a federal statute is found facially defective it 'is void *in*

---

guns, HRS § 134-16; switchblades, *id.* § 134-52; and butterfly knives, *id.* § 134-53.  He also argued that Hawaiʻi prohibits the carrying of rifles and shotguns publicly, *id.* § 134-23, § 134-24, in violation of the Second Amendment.  He did not raise these arguments in his supplemental briefing after we granted en banc review.  Because Young did not raise these arguments properly before the district court, we deem them forfeited.

[4] The district court dismissed the State of Hawaiʻi, the governor, and the attorney general as defendants. *Young*, 911 F. Supp. 2d at 983.  Young does not challenge that ruling, but has pressed his claims against the County of Hawaiʻi, the mayor and the chief of police.  The State has appeared as amicus, not as a party to the appeal.  For convenience, because this is a facial challenge to a Hawaiʻi statute, we will refer to the State as the party; in fact the remaining defendants are the County of Hawaiʻi and its officials charged with following state law.

*toto*, barring all further actions under it, in this, and every other case,'" but an as-applied challenge is "wholly fact dependent: Do the determinative facts shown by the evidence fall on the protected side of the applicable rule of constitutional privilege?") (footnote and citation omitted). Because a facial challenge is directed to the legislature, the plaintiff must show that "no set of circumstances exists under which the [statute] would be valid," *Hotel & Motel Ass'n of Oakland v. City of Oakland*, 344 F.3d 959, 971 (9th Cir. 2003) (citing *Salerno*, 481 U.S. at 745) (alteration in original), and our review of the Hawaiʻi statute would be limited to the text of the statute itself. *Calvary Chapel Bible Fellowship v. County of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020). On the other hand, if Young raised and preserved an as-applied challenge to the Hawaiʻi law, our review would include the circumstances surrounding the chief of police's decision to deny Young a license. *See id.*

We need not determine whether Hawaiʻi County properly applied § 134-9, because Young did not bring an as-applied challenge. Our review of the record demonstrates that, although Young peppered his pleadings with the words "application" and "enforcement," he never pleaded facts to support an as-applied challenge. He did not brief such a question to the district court. When the district court dismissed his complaint and treated it as exclusively a facial challenge, *Young*, 911 F. Supp. 2d at 991, Young did not request reconsideration by the district court to address an as-applied claim.[5] To be sure, the district court acknowledged

---

[5] We agree with Judge Nelson that Young was not required to seek reconsideration to preserve his claims for appeal. *See* R. Nelson Dissent at 205. We merely note that Young did not raise the issue of his allegedly

that Young was denied a license, *id.* at 979–80, but referred to the fact as relevant to Young's standing, *id.* at 987, not to his causes of action. As we explain in greater detail below, Young did not set out such a claim as an issue before our court in his panel appeal, in which he was represented by counsel. Those briefs were filed in 2013. He did not raise the issue in supplemental briefs lodged with the court in 2016, and ordered filed in 2018, also submitted by counsel. The panel's 2018 opinion noted the various arguments Young raised in his complaint that he abandoned on appeal and "several new arguments on appeal." Because "Young failed properly to raise these arguments before the district court," the panel deemed them forfeited. *Young*, 896 F.3d at 1050 n.3. Like the district court before it, the panel did not recognize any as-applied challenge in Young's complaint or briefings. Young's as-applied argument appears for the first time in his supplemental briefing to the en banc court, which was filed in June 2020—more than seven years after his opening brief was filed.

We will not consider the claim. At best, Young's putative as-applied challenge was buried in his complaint and not well pleaded. At worst, even assuming he pleaded it, Young has long forfeited the challenge.[6] The relaxed pleading standard

---

mischaracterized as-applied challenge to the district court below or to the panel on appeal.

[6] If we were to take seriously a claim that Young properly pleaded, and preserved, an as-applied challenge, then the district court should not have issued a final judgment. In that case, Young's appeal was premature, and we should have dismissed his appeal for lack of jurisdiction. *See Galaza v. Wolf*, 954 F.3d 1267, 1272 (9th Cir. 2020) (dismissing appeal for lack of subject matter jurisdiction where a claim remained before the district court); *Chacon v. Babcock*, 640 F.2d 221, 222 (9th Cir. 1981) (an

we afford pro se litigants does not apply to counseled filings. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (Pro se filings "must be held to less stringent standards than formal pleadings drafted by lawyers.") (citation omitted); *Mann v. Boatright*, 477 F.3d 1140, 1148 n.4 (10th Cir. 2007) ("While we generally construe pro se pleadings liberally, the same courtesy need not be extended to licensed attorneys.") (internal citation omitted). Young's counsel never raised or argued an as-applied challenge even when he was permitted a supplemental brief. We do "not ordinarily consider matters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief." *See Hayes v. Idaho Corr. Ctr.*, 849 F.3d 1204, 1213 (9th Cir. 2017) (quoting *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 979 F.2d 721, 726 (9th Cir. 1992)).

If, as our dissenting colleagues claim, Young raised an as-applied challenge that the district court mischaracterized or ignored, *see* O'Scannlain Dissent at 188; R. Nelson Dissent at 196, the point appears nowhere in his panel-stage briefing. Young's opening brief mentions the application of HRS § 134-9 twice in passing but presents no further argument to support an as-applied challenge. Instead, Young challenges HRS § 134-9 exclusively on its face, arguing, for example, that HRS § 134-9's "exceptional case" requirement renders the statute unconstitutional, that HRS § 134-9 violates the broad right to carry firearms in public, and that HRS § 134-9 impermissibly vests a chief of police with discretion to deny

---

order is not appealable unless it disposes of each of the parties' claims or is appropriate under Fed. R. Civ. P. 54(b)). No one has raised the argument that Young's appeal was premature or that the district court's judgment was anything but a final decision on the merits. We decline to manufacture jurisdictional issues.

carry permits.   At one point, Young even compares his challenge to HRS § 134-9 to *State v. Delgado*, 692 P.2d 610 (Or. 1984), where "[t]he Plaintiff . . . *like Mr. Young, made a facial challenge*" to an Oregon switchblade ban.  None of Young's counseled arguments in his opening brief suggest that he had brought an as-applied challenge.   Nor did Young's panel-stage reply brief argue that the district court mischaracterized or ignored an as-applied challenge.

We think it is more likely that Young brought no as-applied challenge at all, and thus he may pursue whatever remedies remain to him.  In either case, we are under no obligation to consider arguments unless they are "specifically and distinctly argued."   *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986); *Hayes*, 849 F.3d at 1213. Young did not meet that standard.  Even affording Young's arguments the deference we typically give to pro se pleadings, *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000), a party's "bare assertion[s]," without more, will not preserve an argument for review, especially where "a host of other issues are presented for review," *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (citation omitted).

We are cognizant of our dissenting colleagues' reservations about our holding that Young did not raise an as-applied challenge and what that might mean for future pro se litigants.  R. Nelson Dissent at 197–98; *see also* O'Scannlain Dissent at 188.  Today's opinion, however, does not alter in any way the relaxed pleading standard we regularly afford pro se litigants.  We merely hold that in this case, Young has not met that standard.

The scope of our review will be limited to Young's facial challenge to HRS § 134-9.   Young brought a Second

Amendment claim, which he supported in part with arguments based on the First Amendment's prior restraint doctrine, and a claim under the Due Process Clause of the Fourteenth Amendment. We address his primary Second Amendment claim in Part III and his other claims in Part IV.

## C. *Substantive Standards for the Second Amendment*

The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Our review of Hawaiʻi's firearm regulation is guided by the Supreme Court's landmark decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). Both parties contend that *Heller* supports its view of the Second Amendment. According to Young, *Heller* identified a broad right to possess and carry firearms in public because the Second Amendment protects one's right to self-defense, wherever that need arises. On the State of Hawaiʻi's reading, *Heller* said no such thing. According to the State, *Heller* narrowly defined the right to keep and bear arms to self-defense in the home and, accordingly, prohibitions on firearms that do not interfere with self-defense in the home are valid. We will begin with a discussion of *Heller* and then review the two-step approach we developed after *Heller*.

### 1. *Heller*

The Court in *Heller* considered a District of Columbia statute prohibiting the possession of loaded firearms inside the home. The statute required residents to keep their firearms unloaded and secured with a trigger lock unless

being used for approved recreational activities or held in a place of business. *Heller*, 554 U.S. at 574–75 (citing D.C. Code § 7-2507.02). The requirement that a firearm be unloaded and bound by trigger lock rendered a lawfully possessed firearm inoperable. *Id.* at 628. Dick Heller, a resident of the District of Columbia and special police officer, sought to enjoin enforcement of the D.C. statute insofar as it prohibited the lawful possession of firearms within his own home. *Id.* at 576.

Heller's challenge to the D.C. statute presented the Court with its "first in-depth examination of the Second Amendment." *Id.* at 635. In an extensive opinion, the Court determined that the right to keep and bear arms is an individual right held by the people, and not limited by the prefatory clause—"a well regulated Militia"—only to "the right to possess and carry a firearm in connection with militia service." *Id.* at 596, 577, 599. The Court also concluded that the "right to keep and bear Arms" was not a new right created by the Second Amendment but "codified a right 'inherited from our English ancestors.'" *Id.* at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)). The right to keep and bear arms was thus recognized, but not granted, in the Constitution, "for it had always existed." *Id.* at 619 (citing John Ordronaux, *Constitutional Legislation in the United States* 241–42 (1891)). Since the right to keep and bear arms is an ancient one, the Court evaluated the history of the Second Amendment starting with English history, and continuing with American legal materials through the ratification of the Fourteenth Amendment. *Id.* at 581–92, 606–19.

Although it was clear to the Court that the history of the Second Amendment supported an individual right to bear

arms that did not depend on militia service, the Court did not undertake to explain how far the protection to bear arms extended.  That is, *Heller* was not an "exhaustive historical analysis . . . of the full scope of the Second Amendment." *Id.* at 626.  The Court acknowledged that the right to keep and bear arms, "[l]ike most rights, . . . [is] not unlimited," and that it is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id. Heller* recognized that the Second Amendment necessarily accepted certain "longstanding prohibitions" on the possession of firearms; such restrictions are "presumptively lawful." *Id.* at 626–27, 627 n.26.  Although the Court declined to create an exhaustive list of such longstanding prohibitions, it identified three classes of lawful prohibitions:  bans on possession by felons and the mentally ill; bans on possession in sensitive places; and regulations on the commercial sale of firearms.  *Id.* at 626–27.  The Court also determined that the Second Amendment only protected weapons in "common use," *id.* at 627, including the handgun, which *Heller* called the "quintessential self-defense weapon." *Id.* at 629.

*Heller* held that an outright ban of firearms in the home violates the Second Amendment.  *Id*. at 628–29 ("The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose. . . . Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home 'the most preferred firearm in the nation to keep and use for protection of one's home and family,' would fail constitutional muster." (citation and footnote omitted)).   The extent to which the Second Amendment protects the right to keep and bear arms outside the home is less clear.  To that issue, *Heller* posed more questions than it answered.  By tying the Second Amendment

to the need to defend one's self, *Heller* implied that some right to bear arms may exist outside the home. *See id*. at 599 (the right to self-defense is a "*central component* of the right itself").    But the Court's caveats left open questions concerning state restraints on persons, weapons, and other restrictions for possessing arms outside the home.    *Id*. at 626–27.

Two years after *Heller*, the Supreme Court reaffirmed that "[s]elf-defense is a basic right [and] . . . 'the *central component*' of the Second Amendment right," whose exercise was "'most acute' in the home." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599, 628). *McDonald* answered a different question than *Heller*, namely, whether the Second Amendment applies to the states.  The Court held that the Second Amendment was incorporated through the Due Process Clause of the Fourteenth Amendment and, thus, applies to the states.  *Id.*  In reaching that conclusion, the Court once again looked to history, but this time to the post-ratification history of the Second Amendment and the place of the Second Amendment in the debates over the Fourteenth Amendment.  *Id.* at 767–80.

### 2.   Our Post-*Heller* Framework

Following *Heller* and *McDonald*, we have created a two-step framework to review Second Amendment challenges. *See Silvester v. Harris*, 843 F.3d 816, 820–21 (9th Cir. 2016); *Peruta*, 824 F.3d at 939; *Jackson v. City and County of San Francisco*, 746 F.3d 953, 960–61 (9th Cir. 2014); *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013).  Our two-step test is similar to tests adopted by other circuits. *Chovan*, 735 F.3d at 1134–37; *Drake*, 724 F.3d at 429; *Woollard v. Gallagher*, 712 F.3d 865, 874–75 (4th Cir. 2013);

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of ATFE (NRA)*, 700 F.3d 185, 194 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1252 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010). First, we ask if the challenged law affects conduct that is protected by the Second Amendment. *Silvester*, 843 F.3d at 821. We base that determination on the "'historical understanding of the scope of the right.'" *Id.* (quoting *Heller*, 554 U.S. at 625). We are to inquire

> whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood. Laws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis.

*Id.* (internal citations omitted); *see also Jackson*, 746 F.3d at 960. Accordingly, a regulation "does not burden conduct protected by the Second Amendment if the record contain[s] evidence that [the subjects of the regulations] have been the subject of longstanding, accepted regulation." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015). We are looking for "historical prevalence." *Id.* Similarly, we may uphold a law without further analysis if it falls within the "presumptively lawful regulatory measures" that *Heller* identified. *Silvester*, 843 F.3d at 821; *see Heller*, 554 U.S. at 626–27, 627 n.26.

If the challenged restriction burdens conduct protected by the Second Amendment—either because "the regulation is neither outside the historical scope of the Second Amendment, nor presumptively lawful"—we move to the second step of the analysis and determine the appropriate level of scrutiny. *Silvester*, 843 F.3d at 821. We have understood *Heller* to require one of three levels of scrutiny: If a regulation "amounts to a destruction of the Second Amendment right," it is unconstitutional under any level of scrutiny; a law that "implicates the core of the Second Amendment right and severely burdens that right" receives strict scrutiny; and in other cases in which Second Amendment rights are affected in some lesser way, we apply intermediate scrutiny. *Id.*

## III. PUBLIC CARRY OF FIREARMS AND THE SCOPE OF THE SECOND AMENDMENT

Consistent with this scheme, our first task is to determine whether the right to carry a firearm openly in public is protected by the Second Amendment. We have been down a similar road before. In *Peruta*, we addressed the question of whether the Second Amendment protected the right of individuals to carry concealed arms. After canvassing the historical record, we concluded that "the Second Amendment does not protect the right of a member of the general public to carry concealed firearms in public." *Peruta*, 824 F.3d at 939. The question we address here is a variation on that theme: whether the Second Amendment guarantees individuals the right to carry arms openly in public. It is a question we specifically reserved in *Peruta*. *Id.* ("There may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public. The Supreme Court has not answered that question, and we do not

answer it here."). And it is a question that has divided the circuits. *Compare Gould v. Morgan*, 907 F.3d 659 (1st Cir. 2018) (upholding Massachusetts licensing scheme restricting open carry); *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012) (same; New York licensing scheme); *Drake*, 724 F.3d 426 (same; New Jersey licensing scheme); *Woollard*, 712 F.3d 865 (same; Maryland licensing scheme), *with Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) (holding Illinois licensing scheme for open carry unconstitutional); *Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) (same; District of Columbia licensing scheme).

Our sister circuits have, in large part, avoided extensive historical analysis. The Second Circuit skimmed a handful of American statutes and cases and decided against looking solely "to this highly ambiguous history and tradition." *Kachalsky*, 701 F.3d at 91. The Third Circuit likewise was "not inclined to . . . engag[e] in a round of full-blown historical analysis." *Drake*, 724 F.3d at 431; *see Gould*, 907 F.3d at 670 (concluding, without citation to historical sources, that "the national historical inquiry does not dictate an answer"); *Woollard*, 712 F.3d at 876. Each of these circuits instead assumed that there was some Second Amendment right to carry firearms in public and applied intermediate scrutiny to the regulations at issue. *Gould*, 907 F.3d at 670–72; *Drake*, 724 F.3d at 435; *Woollard*, 712 F.3d at 876; *Kachalsky*, 701 F.3d at 93. The two circuits that struck down state or D.C. licensing rules also largely avoided the historical record. The D.C. Circuit thought that *Heller* resolved the question so it could "sidestep the historical debate." *Wrenn*, 864 F.3d at 660. With little review of historical materials, the Seventh Circuit announced that "one doesn't have to be a historian to realize that a right

to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. Both courts concluded that *Heller* protected a broad right to self-defense that extended beyond the home. *Wrenn*, 864 F.3d at 659; *Moore*, 702 F.3d at 937. To be clear, most of these courts cited some historical materials, but no court undertook a systematic review of the historical right to carry weapons in public. *See, e.g.*, *Wrenn*, 864 F.3d at 659–61; *Drake*, 724 F.3d at 432–34; *Moore*, 702 F.3d at 936–37; *Kachalsky*, 701 F.3d at 90–91, 94–96.

We do not think we can avoid the historical record. *Heller* relied heavily on history, and we do not think that it exhausted all subsequent need to confront our history in resolving challenges to other firearm regulations. *See Peruta*, 824 F.3d at 929–39 (reviewing the historical materials related to concealed-carry restrictions). Indeed, the Court was explicit on this point:

> Justice Breyer chides us for leaving so many applications of the right to keep and bear arms in doubt, and for not providing extensive historical justification for those regulations of the right that we describe as permissible. *But since this case represents this Court's first in-depth examination of the Second Amendment, one should not expect it to clarify the entire field*, any more than *Reynolds v. United States*, 98 U.S. 145 (1879), our first in-depth Free Exercise Clause case, left that area in a state of utter certainty. *And there will be time enough to expound upon the historical justifications for the exceptions we have*

> *mentioned if and when those exceptions come*
> *before us.*

*Heller*, 554 U.S. at 635 (internal citation omitted) (emphasis added).

We begin with a review of the historical record, starting with the English tradition, and then review the Colonial era and the post-Second Amendment era. Our focus on the American sources will be on state laws and cases. As the Court explained in *Heller*, "[f]or most of our history, the Bill of Rights was not thought applicable to the States, and the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens." 554 U.S. at 625. As we review these records, we are well aware that we are jurists and not historians. That creates the risk that we are engaged in Professor Kelly's "law office history."[7] That is not only a risk we must assume; after *Heller*, it is our duty to confront such history. In an effort to get the history right, we have also honored the history of common law advocacy: We have looked to the parties to shape the arguments and call to the court's attention the appropriate precedents. We have also relied on the parties and amici to direct our focus to the principal historical sources and any important secondary sources they would like us to consider. We have tried to be as complete as possible in recounting this history, but this is a legal opinion, not a dissertation, so we are likely to fall short in some way.

---

[7] Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 Sup. Ct. Rev. 119, 122 n.13 ("By 'law-office history,' I mean the selection of data favorable to the position being advanced without regard to or concern for contradictory data or proper evaluation of the relevance of the data proffered.").

As we might expect in this area, fraught with strong opinions and emotions, history is complicated, and the record is far from uniform. Nevertheless, we can discern the principal themes of the historical record. Our review of that history demonstrates that restrictions on carrying arms openly have long been a part of our legal tradition.

A. *The English Right to Bear Arms in Public*

We start, as did the Court in *Heller*, with the English concept of the right to bear arms. Our purpose in exploring the English tradition is not to import its law wholesale to our modern jurisprudence. Indeed, the evolution of the right to keep and bear arms is a valuable tool for discerning the Second Amendment's meaning. But as *Heller* made clear, the Second Amendment did not create a new right; it codified a pre-existing one that we "inherited from our English ancestors." 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).

1.  The Royal Decrees

As we recognized in *Peruta*, English law restricted public firearm possession as early as the thirteenth century. 824 F.3d at 929. King Edward I and his successor, King Edward II, issued a series of orders to local sheriffs that prohibited "going armed" without the king's permission. In 1299, Edward I ordered the sheriffs of Salop and Stafford to prohibit any one "from tourneying, tilting . . . or jousting, or making assemblies, *or otherwise going armed within the realm without the king's special licen[s]e*." 4 Calendar Of The Close Rolls, Edward I, 1296–1302, at 318 (Sept. 15, 1299, Canterbury) (H.C. Maxwell-Lyte ed., 1906) (emphasis added). The punishment for violating the order included

"forfeiture of life and limb, lands," and any other holdings in the king's realm. *Id.* Although the 1299 order was only addressed to the sheriffs of Salop and Stafford, the king intended the order to apply to "to all the sheriffs of England." *Id.*

Three years later, Edward I similarly instructed the sheriff of York to prohibit "any knight, esquire or any other person from . . . going armed without the king's special licen[s]e." *Id.* at 588 (July 16, 1302, Westminster). Any person "found thus going with arms after the proclamation" should have his "horses and armour" arrested. *Id.* In 1304, Edward I ordered the sheriffs of Leicester and York to issue a proclamation prohibiting any person from "going armed in any way without the king's licen[s]e." 5 Calendar Of The Close Rolls, Edward I, 1302–1307, at 210 (June 10, 1304, Stirling) (H.C. Maxwell-Lyte ed., 1908).

Edward II issued several similar orders. In the months leading up to Edward II's coronation in 1308, he issued an order prohibiting any "knight, esquire, or other" from going "armed at Croydon or elsewhere before the king's coronation." 1 Calendar Of The Close Rolls, Edward II, 1307–1313, at 52 (Feb. 9, 1308, Dover) (H.C. Maxwell-Lyte ed., 1892). Two years later Edward II issued an order to the sheriff of York, and to all the sheriffs of England, prohibiting any "earl, baron, knight, or other" from "go[ing] armed, under pain of forfeiture." *Id.* at 257 (Apr. 9, 1310, Windsor). Two years after that, the king ordered the sheriffs in Warwick and Leicester to proclaim that "no one shall, under pain of forfeiture, . . . go armed . . . without the king's special licen[s]e." *Id.* at 553 (Oct. 12, 1312, Windsor). He also ordered "[t]he like to all the sheriffs of England." *Id.*

The frequency and consistency of the royal orders and their subsequent local proclamations demonstrated a regulated approach to going armed in public. There was some ability to do so, but it was subject to first obtaining the "king's special license." 4 Calendar Of The Close Rolls, Edward I, 1296–1302, at 588 (July 16, 1302, Westminster) (H.C. Maxwell-Lyte ed., 1906). Absent the king's permission, any person going armed in public was subject to punishment.

In 1326 Edward II again ordered the sheriff of Huntington to arrest anyone going armed without the king's license. The king commanded:

> Whereas the king lately caused proclamation to be made throughout his realm prohibiting any one going armed without his licence, except the keepers of his peace, sheriffs, and other ministers, willing that any one doing the contrary should be taken by the sheriff or bailiffs or the keepers of his peace and delivered to the nearest gaols, to remain therein until the king ordered his will concerning them.

4 Calendar Of The Close Rolls, Edward II, 1323–1327, at 560 (April 28, 1326, Kenilworth) (H.C. Maxwell-Lyte ed., 1898). The 1326 edict reinforced that no person could carry arms publicly unless he fell within a certain group of peace keepers ("sheriffs, and other ministers") or unless he obtained the king's permission. *Id.*

Other orders from 1326 enforced a ban on publicly carrying arms unless engaged in law enforcement or with

permission. In a November 1326 order, Edward II prohibited any person in London from "go[ing] armed by night or day, save officers and other good men of the City assigned by the Mayor and Aldermen in their wards to keep watch and preserve the peace . . . ." 1 Calendar of Plea & Memoranda Rolls of the City of London, 1323–1364, at 15 (November 1326) (A.H. Thomas ed., 1926). The purpose of the restriction on arms was to maintain the king's peace and allow "all manner of men . . . [to] come and go in safety." *Id.* Three months later, public arms carrying was more forcefully banned in London. A proclamation from January of 1327 stated that "*[t]he bearing of arms is forbidden*, except to the officers of the City assigned by the Mayor and Aldermen to keep watch in the Wards, and to the Hainaulters of the Queen, who are accustomed to go armed in the manner of their country." *Id.* (emphasis added). Although the king regularly granted the sheriffs authority to disarm the people while in public, it is unclear from these royal orders whether that authority was absolute or if it was tied to times of potential upheaval and possible affray. *See* Patrick J. Charles, *The Faces of the Second Amendment Outside the Home: History Versus Ahistorical Standards of Review*, 60 Clev. St. L. Rev. 1, 12 (2012).

2. The Statute of Northampton

*a. The statute.* Any doubt as to the scope of government's authority to disarm the people in public was dispelled with Parliament's 1328 enactment of the Statute of Northampton, which effectively codified the firearms restrictions that preceded it. The statute provided:

> That no Man great nor small, of what Condition soever he be, except the King's

Servants in his presence, and his Ministers in executing of the King's Precepts, or of their Office, and such as be in their Company assisting them, and also [upon a Cry made for Arms to keep the Peace, and the same in such places where such Acts happen,] be so hardy to come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, *nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure*.

2 Edw. 3, 258, ch. 3 (1328) (emphasis added). The Statute of Northampton prohibited all people ("great [or] small") from going armed in places people were likely to gather ("Fairs, Markets, [and] in the presence of the Justices or other Ministers"). *Id.* The prohibition was not limited to those enumerated places, but extended to other public places ("[any] part elsewhere"). *Id.* Like the royal orders preceding the statute, Parliament excepted certain people (the "king's Servants") from the ban on being armed in public while on the king's business ("in [his] presence" and "executing of the King's Precepts"). *Id.*

To the majority of fourteenth-century Englishmen, the Statute of Northampton was generally understood to be "a complete prohibition on carrying weapons in public, at least in populated areas." Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment*, 43 S. Ill. U.

L.J. 61, 67 (2018). But its effects were more wide ranging than a mere public-arms prohibition. The Statute of Northampton "was to have long-term importance for the maintenance of law and order" in the realm, by helping keep the king's peace. *See* Anthony Verduyn, *The Politics of Law and Order During the Early Years of Edward III*, 108 Eng. Hist. Rev. 842, 850 (1993).[8] The statute applied to anyone

---

[8] We have referred generally to the "king's peace" as a shorthand for the king's responsibility to maintain the peace in his domain. But the notion of the king's peace evolved in England over time. Originally the king's peace covered only those within the king's castle or household. *See* David Feldman, *The King's Peace, the Royal Prerogative and Public Order: The Roots and Early Development of Binding Over Powers*, 47 Cambridge L.J. 101, 105 (1988). Just as the king had his "peace," so did others: "the peace of the king was one thing, [but] the peace of the lord of the manor, the peace of the churches, the peace of the sheriff, [and] the peace of the homestead, were all quite other things." A.H.F. Lefroy, *Anglo-Saxon Period of English Law*, 26 Yale L.J. 388, 388 (1917). Each head of household had a "duty to protect his household, and an attack on any member of the household wronged him." Feldman, 47 Cambridge L.J. at 105.

The expansion of the king's peace began in the eleventh century. At first, the king extended his peace to the three-mile radius surrounding his court. *Id*. That expansion continued through the fourteenth century and was especially strong in areas of special importance to the king. *Id.* at 106. The king could also extend his peace to any individuals who were on his errand or otherwise needed the king's blessing, and "[a]ny assault on them in their travels would be regarded as a direct affront to the king's own personal peace, as if it had happened in his residence." *Id.*

Over time, the king's peace expanded so significantly that it became the general peace. This "movement of absorption" has "long since practically concluded in England." Lefroy, 26 Yale L.J. at 389. As the king's peace extended to a larger portion of the kingdom, it increased both the king's responsibility to protect his subjects and his jurisdiction to punish wrongdoers. *Id.* ("The violation of the king's peace was the original offence from which the jurisdiction of the sovereign in criminal

carrying arms, without specifying whether the arms were carried openly or secretly.  In 1350, Parliament specifically banned the carrying of concealed arms.  *See* 25 Edw. 3, 320, st. 5, c. 2, § 13 (1350) ("[I]f percase any Man of this Realm ride armed [covertly] or secretly with Men of Arms against any other . . . it shall be judged . . . Felony or Trespass, according to the Laws of the Land." (alteration in original)).

The Statute of Northampton was amended in 1396.  The amended statute retained all the prohibitions on public carriage of arms found in the original version and also expanded the types of armor that could not be carried in public.  As amended, the statute provided "[t]hat no Man shall ride armed within the Realm, against the Form of the Statute of Northampton" and that "no Lord, Knight nor other, little nor great, shall go nor ride by Night nor by Day armed, nor bear [Sallet] nor Skull of Iron, nor [of] other Armour, upon the pain aforesaid; save and except the King's Officers and Ministers in doing their Office."  20 Ric. 2, 92–93, ch. 1 (1396) (internal footnotes omitted).

---

matters arose.").  "Slowly the idea of a 'general peace' embracing the 'peace' of the various customary jurisdictions was evolved."  *Id.*; *see* Feldman, 47 Cambridge L.J. at 107 ("It was the Norman kings who used the idea of the king's peace as a means of extending their jurisdiction at the expense of local courts.").

When the king's justices of the peace tried criminal matters, those matters were tried as an offense against the king.  "In modern pleading [in the United States], the phrase 'against the peace of the commonwealth' or 'of the people' is used."  *Contra pacem*, *Black's Law Dictionary* (rev. 4th ed., 1968).  Hence, our cases are charged as an offense against the "United States" or the "State."

*b. Enforcement.*  We have record of few indictments under the Statute of Northampton, but there is evidence that Edward III and his successors regularly instructed sheriffs to enforce the statute.**[9]**  For instance, in 1328, Edward III ordered the sheriff of Southampton to "cause the statute [of Northampton] prohibiting men coming armed before justices or other ministers of the king, or going armed, etc., to be observed in all its articles throughout the whole of his bailiwick."  1 Calendar Of The Close Rolls, Edward III, 1327–1330, at 420 (November 10, 1328 Walingford) (H.C. Maxwell-Lyte ed., 1896).  The sheriff was further ordered to "take and imprison all found contravening" the statute. *Id.* The king similarly ordered sheriffs to enforce the Statute of Northampton if he learned that the people were not compliant with its restrictions on arms.  For example, when the king discovered that the people of Surrey and Sussex were "going about armed in the sheriff's bailiwick, contrary to the form of the statute made in the late parliament of Northampton," he instructed the sheriffs to imprison "all those whom he shall find going armed, with their horses and armor."  2 Calendar Of The Close Rolls, Edward III, 1330–1333, at 131 (April 3,

---

**[9]** There is some dispute among historians over the extent to which the Statute of Northampton was enforced as a broad ban on public carry of arms.  For example, historian Joyce Lee Malcolm argues that the statute, and other firearms prohibitions, were rarely enforced.  She claims that "[a]lthough men were occasionally indicted for carrying arms to terrorize their neighbours, the strict prohibition against going armed 'by Night nor by Day . . . in Fairs, Markets . . . nor in no part elsewhere' had never been enforced."  Joyce Lee Malcolm, *To Keep and Bear Arms* 104 (1994). Other historians argue that the lack of indictments under the statute is not probative of its overall enforcement in fourteenth-century England. *See, e.g.*, Charles, 60 Clev. St. L. Rev. at 13–16 (identifying several royal edicts that instructed sheriffs to enforce the Statute of Northampton and noting that Richard II amended the statute in 1396 but retained the prohibition on going armed in public).

1330, Woodstock) (H.C. Maxwell-Lyte ed., 1898). Four years later, the king issued another order consistent with the Statute of Northampton, which reinforced the statute's exceptions for those on the king's errand. 3 Calendar Of The Close Rolls, Edward III, 1333–1337, at 294 (January 30, 1334, Woodstock) (H.C. Maxwell-Lyte ed., 1926) ("[I]n the statute of Northampton . . . it was ordained that no one except a minister of the king should use armed force or go armed in fairs, markets, etc. . . . ).

The Statute of Northampton's restrictions on carrying also permeated public life. For example, in preparation for the Feast of St. Thomas in 1343, Edward III ordered London hostelries to warn their guests "against going armed in the City." 1 Calendar of Plea & Memoranda Rolls of the City of London, 1323–1364, at 156 (December 19, 1343) (A.H. Thomas ed., 1898). The guests' violation of the arms prohibition would have subjected them to arrest and forfeiture of their arms. *Id.*

The Statute of Northampton continued in force after Edward III was succeeded by King Richard II in 1377. Like his predecessor, Richard II issued orders to county sheriffs to enforce the Statute of Northampton and keep the king's peace. Months after Richard II's coronation, he reminded the mayor and bailiffs of Newcastle upon Tyne that the Statute of Northampton provided the vehicle to keep the peace by prohibiting the public carry of arms. The king's order stated that the "statute published at Norhampton [*sic*] in 2 Edward III . . . contained that . . . no man of whatsoever estate or condition shall go with armed force, lead any force to the disturbance of the peace, *ride or go armed by day or night in fairs, markets or in presence of justices or other the king's ministers*" without risking arrest and forfeiture of their arms.

1 Calendar Of The Close Rolls, Richard II, 1377–1381, at 34 (December 1, 1377, Westminster) (H.C. Maxwell-Lyte ed., 1914) (emphasis added).

*c. Cases*.  We have been pointed to two cases that may shed light on the restrictions in the Statute of Northampton. The first is *Chune v. Piott* (1615), 80 Eng. Rep. 1161 (K.B.), in which the Statute of Northampton is not mentioned. *Chune* was a false-arrest case that challenged the sheriff's authority to arrest people who had not actually breached the peace.   The King's Bench concluded that sheriffs had authority "without all question" to arrest anyone carrying a weapon "in the high-way, in terrorem populi Regis." *Id.* The phrase *in terrorem populi Regis*—"to the terror of the king's people"—might suggest one of two things:  First, that there must be some proof of the carrier's *intent* to terrorize the people or, second, that there must be some proof of the *effect* (whether intended or not) on the people.   But the court ultimately concluded that neither was an element of the crime of unlawful carrying.   The sheriff could arrest a person carrying arms in public "notwithstanding he doth not break the peace." *Id.*

The second is *Sir John Knight's Case*, which is important because it was one of the few prosecutions under the Statute of Northampton for which we have some record, even if there are some disputes about what that record signifies.  Sir John Knight was accused of "going armed, to the terror of the public" and charged under the Statute of Northampton and the common law crime of "affray." *Sir John Knight's Case* (1686), 87 Eng. Rep. 75–76 (K.B.).[10]   According to one

---

[10] An "affray" was a "noisy fight . . . in some public place, to the terror of onlookers."  Affray, *Black's Law Dictionary* (10th ed. 2014).

report, the crown alleged that Knight went armed in public, and more specifically, that he "went into the church of St. Michael . . . in the time of divine service, with a gun, to terrify the King's subjects." *Id.* at 76. A second report states that he went into a church "with pistols," *Rex v. Sir John Knight* (1686), 90 Eng. Rep. 330, 330 (K.B.), while an unofficial report states that he was "goeing with a blunderbus in the streets, to the terrifyeing his majesties subjects," 1 Narcissus Luttrell, *A Brief Historical Relation of State Affairs, September 1678 to April 1714*, at 380 (Oxford Univ. Press 1857).

Whatever Knight was doing, the sources agree that Knight was acquitted, but they disagree on what grounds. According to one report, the Statute of Northampton was "almost gone in [desuetude]," but Knight could still be punished if he carried arms with mal-intent to terrify the people. Presumably, his acquittal was due to this lack of such intent. *Knight's Case*, 90 Eng. Rep. at 330. Similarly, the unofficial report claimed that Knight was "tried by a jury of his own citty [*sic*], that knew him well, [and] he was acquitted, not thinking he did it with any ill design, to the great disappointment of some persons." Luttrell, *A Brief Historical Relation* at 389. According to another reporter, the Chief Justice of the King's Bench opined that the meaning of the Statute of Northampton was to punish those who go armed. *Knight's Case*, 87 Eng. Rep. at 76. The Chief Justice explained that publicly carrying arms was not just an act that could terrify the people but was also an affront to the king's peace because the act of carrying arms in public suggested that "the King [was] not able or willing to protect his subjects," *id.*—indicating perhaps that Knight was acquitted because he had not intended criticism of the king's authority or ability to keep the peace. *See* Frassetto, 43 S. Ill. U. L.J.

at 70 ("Notably, Knight defended himself on the grounds of his 'active loyalty' to the crown rather than by denying that he had created a public terror."). We cannot resolve this dispute in the original sources, much less in the academic literature.[11] What is curious is that according to two reporters, Knight was "acquitted, yet bound to good behaviour." *Knight's Case*, 90 Eng. Rep. at 331; *see Knight's Case*, 87 Eng. Rep. at 76 n.(a) ("But on the motion of the Attorney General he was bound to his good behaviour."). It thus seems that Knight was required to pay a surety for good behavior—making Knight's "acquittal" more of a conditional pardon.[12]

---

[11] Scholars continue to disagree about the reasons underlying Knight's acquittal. There seem to be two current schools of thought. Either the Statute of Northampton required the prosecution to show that Knight intended to terrorize others by publicly carrying arms, or Knight was acquitted by virtue of his aristocratic status. *Compare* David B. Kopel, *The First Century of Right to Arms Litigation*, 14 Geo. J. L. & Pub. Pol'y 127, 135–37 (2016) ("[O]nly malicious, terrifying carry was illegal" under the statute.), *with* Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 Law & Contemp. Probs. 11, 26–27 (2017) (positing that aristocrats were "the one group expressly exempted from the Statute of Northampton"). Relying on the former explanation, some scholars have argued that *Sir John Knight's Case* shifted English jurisprudence towards a more permissive open-carry regime. *See* Eugene Volokh, *The First and Second Amendments*, 109 Colum. L. Rev. Sidebar 97, 101–02 (2009); Kopel, 14 Geo. J. L. & Pub. Pol'y at 137–38. Other scholars are unsurprised by Knight's acquittal as he was of the class of Englishman that the Statute of Northampton would not have reached anyway. *See* Frassetto, 43 S. Ill. U. L.J. at 64 & n.15.

[12] The development of a system of "surety" was closely related to the development of the "king's peace." There were two types of sureties: sureties for good behavior and sureties of the peace. Feldman, 47 Cambridge L.J. at 102–03. They had different goals. The surety of good behavior was "a form of conditional pardon given by the king to

*d.    Treatises.*    English treatises also recognized the prohibition on publicly carrying arms in England.  In one of England's first treatises, John Carpenter observed that public carriage of arms was dependent upon first obtaining the king's license.  In the aptly titled section "That no one go armed," Carpenter stated:

> *that no one, of whatever condition he be, go armed in the said city or in the suburbs, or carry arms, by day or by night*, except the vadlets of the great lords of the land, carrying the swords of their masters in their presence, and the serjeants-at-arms of his lordship the King, of my lady the Queen, the Prince, and the other children of his lordship the King,

malefactors," similar to posting bail as a condition of probation.  *Id.* at 103.  So, for a surety of good behavior, there had to be some sort of charge of wrongdoing that preceded the surety.  The surety for good behavior essentially allowed those accused of crimes—who could afford it—to avoid punishment while allowing the crown to "rehabilitate and make use of military men who were urgently needed . . . ."  *Id.* at 121.

The surety of the peace was administered by the Keepers (Justices) of the Peace and was employed to keep the king's peace in areas where a centralized police force did not exist.  The surety of the peace followed an accusation by someone that an individual would likely violate the law in the future.  It was either a money payment or pledge by others "in support of his future good conduct."  *Id.* at 104.  *See* Kopel, 14 Geo. J. L. & Pub. Pol'y at 131 n.14 (citing Y.B. Trin. 14 Hen. 7 (1499), *reported in* Y.B. 21 Henry 7, fol. 39, Mich., pl. 50 (1506) ("Anonymous."  No case name) ("[A] man's house is his castle and defense," but "if one were threatened that if he should come to such a market . . . he should there be beaten, in that case he could not assemble persons to help him go there in personal safety, for he need not go there, and he may have a remedy by surety of the peace.")).  The money payment (or the pledge by others) was released after a period of time in which the person did not violate the law.

and the officers of the City, and such persons
as shall come in their company in aid of them,
at their command, for saving and maintaining
the said peace; under the penalty aforesaid,
and the loss of their arms and armour.

John Carpenter, *Liber Albus: The White Book of the City of London* 335 (Henry Thomas Riley ed., 1862) (footnote omitted) (emphasis added).

Other English treatises weigh in on whether prosecution under the Statute of Northampton required proof that carrying arms caused terror. William Hawkins, a seventeenth century barrister and jurist, stated that a person may commit an "affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people." 1 William Hawkins, *A Treatise of the Pleas of the Crown* 488 (John Curwood ed., 1824). On the other hand, Hawkins also stated that wearing arms—perhaps those that were not "dangerous and unusual"—alone was not enough to warrant prosecution. "[N]o wearing of arms is within the meaning of this statute [of Northampton], unless it be accompanied with such circumstances as are apt to terrify the people . . . ." *Id.* at 489. Hawkins continued that "persons of quality" did not risk violating the statute by wearing "common weapons . . . for their ornament or defence." *Id.* Some have interpreted Hawkins's reference to "persons of quality" as an indication that certain classes of people could carry arms consistent with their status because that would be neither uncommon nor overtly terrifying to the people. *See* Frassetto, 43 S. Ill. U. L.J. at 67–69 (describing Hawkins's statement that public carry was not threatening when it was done by the wealthy whose carrying of arms would not be out of the ordinary).

Hawkins, however, also recognized that the lawful public carry of arms required some particular need. The desire for proactive self-defense was not a good enough reason to go armed openly. "[A] man cannot excuse the wearing [of] such armour in public, by alleging that such a one threatened him, and [that] he wears it for the safety of his person from his assault." 1 Hawkins, *A Treatise of the Pleas of the Crown* at 489.

Joseph Keble, another seventeenth-century English barrister, recognized that public terror resulted from witnessing arms unexpectedly. While examining the crime of affray in a 1683 treatise, Keble noted "if a man shall shew himself furnished with Armour or Weapon which is not usually worn, it will strike a fear upon others that be not armed." Joseph Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of their Duty* 147 (1689). Keble's reference to weapons "not usually worn" could refer either to "unusual weapons" or to common weapons worn when one would not expect it.

Sir William Blackstone and Lord Edward Coke strongly suggested that carrying arms openly was a status offense and that the law did not require proof of intent or effect. Blackstone clarified the principle, stating that the mere act of going armed in and of itself terrified the people. He stated that "[t]he offence of riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land, and is particularly prohibited by the Statute of Northampton." 4 William Blackstone, *Commentaries* *148–49 (1769). According to Blackstone, going armed with dangerous or unusual weapons was all that was required to terrify the people of the land, and thus the law required neither proof of intent to terrify nor

proof that actual terror resulted from the carrying of arms.[13] Lord Coke observed that the Statute of Northampton meant that no one could "goe nor ride armed by night nor by day . . . in any place what[s]oever." Edward Coke, *The Third Part of the Institutes of the Laws of England* 160 (E. and R. Brooke ed., 1797). Coke continued that "he cannot assemble force, *though he be extremely threatened*, to go with him to church, or market, or any other place, but that is prohibited by this [a]ct." *Id.* at 161 (emphasis added). He also noted that the Statute did not apply to a man who must "assemble force to defend his house." *Id.* at 161.

### 3. The English Bill of Rights

Following the Glorious Revolution, the English right to bear arms changed with the enactment of the English Bill of Rights in 1689.[14] The English Bill of Rights created, for the first time, a right for certain people to possess arms, but it was a conditional right. It provided "[t]hat the [s]ubjects which are Protestants may have [a]rms for their [d]efence suitable to their [c]onditions and as allowed by [l]aw." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689). The new provision was important, for several reasons. First, for the first time, English law explicitly tied the carrying of arms

---

[13] Subsequent royal edicts suggest that merely carrying firearms caused terror even absent an intent to cause terror. *See* By the Quenne Elizabeth I: *A Proclamation Against the Carriage of Dags, and for Reformation of Some Other Great Disorders* (London, Christopher Barker, 1594) (the public carry of arms caused "terrour [to] all people professing to travel and live peaceably").

[14] The Glorious Revolution overthrew James II, who was Catholic. In his place William and Mary took the throne. Mary, also known as Queen Mary II, was James's daughter, but she was Protestant.

to a right of self-defense.  Second, it recognized that even the right of self-defense could be curtailed by government action "as allowed by law."  Third, the right was not guaranteed to the people generally, and the full exercise of the right was occasionally contingent upon the religion of the monarch in power.  *See* Diarmuid F. O'Scannlain, *Glorious Revolution to American Revolution:  The English Origin of the Right to Keep and Bear Arms*, 95 Notre Dame L. Rev. 397, 404–06 (2019).

Blackstone characterized the new right as one to bear arms in the interest of self-defense, but he acknowledged that the right was not absolute.  The right to carry arms was subject to government regulation, and thus the right of the people to "hav[e] arms for their defense" only extended as far as the right was "*allowed by law*."  1 William Blackstone, *Commentaries* \*130 (emphasis added).  Blackstone continued that "these rights and liberties [are] our birthright to enjoy . . . unless where the laws of our country have laid them under necessary restraints."  *Id.* at \*131 (language modernized).  Indeed, the right to carry arms was a "public allowance under due restrictions."  *Id.* at \*130.  Blackstone's example of such a "due restriction[]," was the prohibition on publicly carrying weapons, codified in the Statute of Northampton.  *See* 4 William Blackstone, *Commentaries* \*148–49.

B.  *Colonial Restrictions on the Right to Bear Arms in Public*

Early American colonists brought to the New World the English sensibilities over the carrying of arms in public.  A number of colonies implemented restrictions on the carrying of arms similar to those found in the Statute of Northampton.  Indeed, some colonies adopted the Statute of Northampton almost verbatim.  The colonists shared the English concern

that the mere presence of firearms in the public square presented a danger to the community.

New Jersey acted first. In 1686 (three years prior to the English Bill of Rights), the colony passed "An Act against wearing Swords, &c." in response to the "great complaint by the inhabitants of [the] Province, that several persons [were] wearing swords, daggers, pistols, dirks, stilladoes, skeines, or any other unusual or unlawful weapons." An Act against Swords, &c., 1686 N.J. Laws 289, 289, ch. IX.[15] Accordingly, the statute provided that "no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilladers, daggers or dirks, or other unusual or unlawful weapons within [the] Province." *Id.* at 290. The law further provided that "no planter shall ride or go armed with sword, pistol, or dagger, upon the penalty of five pounds." *Id.* The law exempted two groups: "all officers, civil and military, and soldiers while in actual service" and "all strangers, travelling upon their lawful occasion thro' this Province, behaving themselves peaceably." *Id.*

---

[15] We have not been pointed to any English counterpart for the New Jersey statute. The closest was a proclamation of King James I that banned the sale, wearing, or carrying of "Steelets, pocket Daggers, pocket Dags and Pistols, which are weapons utterly unserviceable for defence, Militarie practise, or other lawfull use, but odious, and noted Instruments of murther, and mischiefe." *By the King James I: A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols*, reprinted in 1 *Stuart Royal Proclamations* 359–60 (James F. Larkin & Paul L. Hughes eds., 1973). The weapons listed in the proclamation were of particular concern because they were so easily concealed. *See Peruta*, 824 F.3d at 931. Nothing in the proclamation or the New Jersey statute, however, limited the prohibition to concealed carry.

Six years after New Jersey enacted its restriction on arms, Massachusetts Bay enacted its own restrictions. The Massachusetts law was patterned after the Statute of Northampton. It outlawed affray, rioting, and disturbing or breaching the peace. An Act for the Punishing of Criminal Offenders, 1692 Mass. Laws No. 6, at 11–12. In addition, the statute authorized justices of the peace to arrest those that "ride or go armed Offensively before any of Their Majesties Justices . . . by Night or by Day . . . ." *Id.* (spelling modernized). The punishment for such action varied, but the offender could be fined, have his or her armor and weapons seized, be imprisoned until paying a surety, or even be bound over to answer the charge before a justice of the peace. *Id*. at 12.

New Hampshire enacted a similar restriction in 1699, which punished any person who went "armed offensively" or "put his Majesty's subjects in fear" and outlawed affray, rioting, and disturbing the peace. 1699 N.H. Laws. 1. Punishment ranged from imprisonment to payment of a surety. *Id.* at 1–2. The offender also risked forfeiture of the arms or weapons, to be "sold for his Majesty's use." *Id.*

To the examples of prohibitions on public carry, we must add examples of colonial laws that not only permitted public carry, but mandated it. Some colonies required men to carry arms while attending church or other public gatherings. They also protected travelers passing through the several colonies and those assembled as a militia. For example, Virginia required colonists to carry arms to church. In a 1619 statute, it instructed "[a]ll persons whatsoever upon the Sabaoth daye [who] frequente divine service and sermons . . . [to] beare armes [and] bring their pieces swordes, poulder and shotte." *Proceedings of the Virginia Assembly, 1619*, in *Narratives of*

*Early Virginia*, 1606–25, at 273 (Lyon Gardiner Tyler ed., 1907).  Any colonist refusing to carry arms to church was subject to a fine of three shillings, paid to the church.  *Id.*

Virginia's mandate was a model for several other colonies.  Connecticut, Maryland, South Carolina, and Georgia all required men to carry arms at church.  *See* 1 *The Public Records of the Colony of Connecticut* 95 (1850) ("[O]ne person in every several house wherein is any soldier or soldiers, shall bring a musket, pistol or some piece, with powder and shot, to each meeting . . . ." (spelling modernized)); *Proceedings of the Council of Maryland, 1636–1667, reprinted in* 3 *Archives of Maryland* 103 (1885) ("No man able to bear arms to go to church or Chappell . . . without fixed gun and 1 Charge at least of powder and shot." (spelling modernized)); 7 *The Statutes at Large of South Carolina* 418 (1840) (requiring any person able to do so to bear arms to "places of public worship" to secure against slave insurrections); 19 *The Colonial Records of the State of Georgia* (pt. 1) 137–38 (1911) (requiring every male, white militiaman to carry firearms "on any Sunday or other times, to any church, or other place of divine worship").  Plymouth Colony, prior to its merger with Massachusetts Bay, had also enacted a church-based firearm requirement in 1636, but its mandate was seasonal.  *See The Compact with the Charter and Laws of the Colony of New Plymouth* 102 (1836) (requiring arms at churches between April and November annually).

At least two colonies required carrying arms to other public gatherings.  *See* 1 *Records of the Governor and Company of the Massachusetts Bay in New England* 190 (1853) (All eligible persons "shall come to the public assemblies with their muskets, or other pieces fit for service."

(spelling modernized));  1 *Records of the Colony of Rhode Island and Providence Plantations in New England* 94 (1856) ("It is ordered, that no man . . . shall come to any public Meeting without his weapon." (spelling modernized)).

Several colonies also required persons traveling outside of the public square to arm themselves.  Virginia, Massachusetts, Rhode Island, and Maryland all enacted some requirements for travelers to carry arms. *See* 1 *The Statutes at Large; Being a Collection of all the Laws of Virginia* 127 (1823) ("That no man go or send abroad without sufficient partie will armed."); 1 *Records of the Governor and Company of the Massachusetts Bay in New England* 85 (1853) ("[I]t is ordered, that no person shall travel single betwixt [Massachusetts] and Plymouth, nor without some arms . . . ." (spelling modernized)); 1 *Records of the Colony of Rhode Island and Providence Plantations in New England* 94 (1856) ("It is ordered, that no man shall go two miles from the Town unarmed." (spelling modernized)); *Proceedings of the Council of Maryland, 1636–1667*, *reprinted in* 3 Archives *of Maryland* 103 (1885) ("No man able to bear arms to go . . . any considerable distance from home without fixed gun and 1 Charge at least of powder and Shot." (spelling modernized)).**[16]**

---

**[16]** Historical context offers some possible explanations for the tension. Some colonies' issuance of carry requirements—especially to church, public gatherings, and other travel—reflects "adaptation to the realities of colonial life, especially [considering] the ongoing hostile relationship with Native Americans."  Cornell, 80 Law & Contemp. Probs. at 28.  In addition to tense relations with Native Americans, southern colonies also feared the possibility of slave uprisings.  *Id.*  South Carolina's church-carry mandate expressly acknowledged that risk.  7 *Statutes at Large of South Carolina* 418 (requiring parishioners to carry arms to church so that

The overall effect that these various carry mandates had on the right to bear arms is unclear, and there is some tension between the various ordinances. What is clear is that the colonies assumed that they had the power to *regulate*—whether through *mandates* or *prohibitions*—the public carrying of arms. This history may also evince a general acceptance by local governments of some firearms in the public square. *See* Brief of Professors of Second Amendment Law *et al.*, as Amici Curiae 17. But the public carrying of arms was always subject to conditions prescribed by the legislature.

The Statute of Northampton continued to influence state law in the interregnum between the Revolutionary War and the adoption of the Constitution. Three years after the Treaty of Paris, Virginia enacted prohibitions on public carriage of firearms that tracked the Statute of Northampton. Virginia's statute provided that "no man, great nor small, . . . [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country." 1786 Va. Laws 33, ch. 21.

Early American history thus strongly suggests that colonists brought with them the English acquiescence to firearm limitations outlined in the Statute of Northampton. The colonies and early American states enacted facsimiles of the Statute of Northampton's broad prohibitions on the public carriage of firearms. And where the colonies did allow public carry—or even mandated it—those laws were tied to the overarching duty to bear arms in defense of the community, and it was the role of local government, not individuals, to

---

South Carolinians "may be the better secured and provided against the insurrections and other wicked attempts of negroes and other slaves").

decide when that duty justified or mandated public carry.  At bottom, restrictions on firearms in public were prevalent in colonial law.

## C.  *Post Second Amendment Restrictions on the Right to Bear Arms*

The Constitution was ratified in 1789.  Almost immediately, Congress began work on a bill of rights, a promise the Federalists had made as a condition for ratification.  As the Court observed in *Heller*, "[d]uring the 1788 ratification debates, the fear that the Federal Government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric."  554 U.S. at 598.  The amendments that became our Bill of Rights were proposed in 1789 and ratified by 1791.

At the time of its adoption, the Bill of Rights did not apply to the states. *Barron v. Mayor & City Council of Baltimore*, 32 U.S. (7 Pet.) 243 (1833); *see United States v. Cruikshank*, 92 U.S. 542, 553 (1875) ("The second amendment . . . means no more than that it shall not be infringed by Congress.  This is one of the amendments that has no other effect than to restrict the powers of the national government, leaving the people to look for their protection [to state law].").  Prior to the adoption of the Constitution, the states—at the urging of the Continental Congress in anticipation of a declaration of independence—had adopted their own constitutions, some of which expressly provided some protection for the right to keep and bear arms. *See Heller*, 554 U.S. at 585–86, 585 n.8, 600–03 (discussing state constitutional provisions); Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev.

L. & Pol. 191 (2006) (compiling provisions by state and by date).[17]  Accordingly, we have few relevant federal materials. As the Court explained in *Heller*, "[f]or most of our history the Bill of Rights was not thought applicable to the states, and the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens."  *Heller*, 554 U.S. at 625.  Therefore, the majority of the nineteenth-century cases we discuss in this section feature challenges to firearms regulations that were made under state constitutional analogues to the Second Amendment, not the Second Amendment itself, although some decisions refer to the Second Amendment.[18]  As we discuss state regulation of

---

[17] Not all the states adopted such a measure.  California, Iowa, Maryland, Minnesota, New Jersey, and New York have never adopted a constitutional guarantee to keep and bear arms.  And some of the states did not adopt a guarantee until the twentieth century.  Volokh, *State Constitutional Rights*, 11 Tex. Rev. L. & Pol. at 193–204.  Although Maryland did not adopt a formal guarantee, the Maryland Declaration of Rights stated that "the inhabitants of Maryland are entitled to the common law of England, . . . and to the benefit of such of the English statutes, as existed at the time of their first emigration."  Md. Decl. of Rights, art. III (1776).

[18] In some respects, the Second Amendment is less important than state constitutions and laws in helping us determine the scope of any pre-existing right to keep and bear arms.  Congress had no general power over crime, except in federal enclaves or territories.  The Constitution gave Congress authority over three enumerated crimes:  counterfeiting, piracy and felonies on the high seas, and treason.  U.S. Const. art. I, § 8, cls. 6, 10; *id.* art. III, § 3, cl. 2.  Any other authority over crime that Congress asserts must be tied to an enumerated power—such as the Commerce Clause—through the Necessary and Proper Clause.  *Id.* art. I, § 8, cl. 18. *See United States v. Lopez*, 514 U.S. 549, 561 n.3 (1995) ("Under our federal system, the States possess primary authority for defining and enforcing the criminal law.") (quotation marks and citations omitted); *Screws v. United States*, 325 U.S. 91, 109 (1945) (plurality opinion) ("[T]he administration of criminal justice rests with the States except as

firearms, we will note where the state had an applicable guarantee in its own constitution.

### 1.   Post-Ratification Restrictions

After ratification of the U.S. Constitution, and subject to their own state constitutions, the states continued to adopt laws that restricted the public carrying of arms. *See* Saul Cornell & Nathan DeDino, A *Well Regulated Right:   The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 505 (2004) (examining "[a] variety of laws regulating firearms . . . already in place during the Founding Era"). Many of these laws were influenced by the Statute of Northampton.   North Carolina provides us with a prime example.   Just a year after the ratification of the Bill of Rights, North Carolina adopted, nearly verbatim, the Statute of Northampton.   Indeed, the statute had a heading that recited that these were "Statutes made at Northampton . . . in the Second Year of the Reign of Edward the Third, and in the Year of our Lord 1328."   *See* 1792 N.C. Laws 60, ch. 3. Ironically, notwithstanding its recent independence, North Carolina did not even remove the references to the king:

> It is enacted, that no man great nor small, or what condition soever he be, except the King's servants in his presence . . . go nor ride armed by night nor by day, in fairs, markets,

---

Congress, acting within the scope of those delegated powers, has created offenses against the United States.").   Given that relationship between the federal government and the states, early state constitutions, laws, and practices may be a more reliable indicator of what we thought the states could and could not do under the "pre-existing [right]" that we "inherited from our English ancestors."   *Heller*, 554 U.S. at 599 (quoting *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).

nor in the presence of the King's Justices, or
other ministers, nor in no part elsewhere.

*Id.* at 60–61.[19]   As we have noted, Massachusetts had first
enacted a law based on the Statute of Northampton in 1692.
In 1795, it repealed a portion of the 1692 Act but kept the
firearms restrictions. 1795 Mass. Acts 436, ch. 2. The 1795
version had strong echoes of the Statute of Northampton and
authorized its justices of the peace to arrest "all affrayers,
rioters, disturbers, or breakers of the peace, and such as shall
ride or go armed offensively, to the fear or terror of the good
citizens of this Commonwealth." *Id.*[20]

2.  Nineteenth-Century Restrictions

*a. The statutes*. Early American versions of the Statute
of Northampton continued into the nineteenth century. In

---

[19] North Carolina's Declaration of Rights, adopted in 1776, provided:
"That the people have a right to bear arms, for the defence of the State
. . . ." N.C. Decl. of Rights § XVII (1776).

North Carolina's reliance upon English law would prove to be
controversial over the next century. In 1836, the North Carolina
legislature explicitly repealed "all the statutes of England or Great Britain"
in use in the state, 1 N.C. Rev. Stat. 52–53, ch. 1, § 2 (1837), which
prompted a challenge to its Northampton analogue. The Supreme Court
of North Carolina upheld the statute, however, finding that the Statute of
Northampton did not create the substantive prohibitions therein. *State v.
Huntly*, 25 N.C. 418, 420–21 (1843). Citing Blackstone and Hawkins, the
court concluded that the statute's prohibitions "[had] been always an
offen[s]e at common law." *Id.* at 421 (citation and emphasis omitted).

[20] The Massachusetts Constitution of 1780 provided: "The people
have a right to keep and to bear arms for the common defence." Mass.
Const. of 1780, pt. 1, art. 17.

1801, Tennessee prohibited any person from "go[ing] armed to the terror of the people, or privately carry[ing] any dirk, large knife, pistol, or any other dangerous weapon, to the fear or terror of any person." 1801 Tenn. Pub. Acts 260, ch. 22 § 6.[21] Anyone carrying a firearm in violation of the statute was subject to a fine and potential imprisonment. *Id.* at 261. Repeat offenders could be indicted and prosecuted for breaching the peace. *Id.* Other states followed. Louisiana punished "any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view." La. Acts, 1st Legis., 2d Sess. 172 (1813). Maine also enacted a version of the Statute of Northampton in the early nineteenth century, outlawing "affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State." 1821 Me. Laws 285, ch. 73 § 1.[22] It also imposed a surety system whereby potential offenders would pay a fine to ensure their future good behavior. *Id.*

The early nineteenth century saw new restrictions on firearms that incorporated broader prohibitions than the one found in the Statute of Northampton. These restrictions more forcefully prohibited the mere act of carrying a firearm instead of coupling going armed with affray, rioting, or

---

[21] The Tennessee Constitution of 1796 provided: "That the freemen of this State have a right to keep and to bear [a]rms for their common defence." Tenn. Const. of 1796, art. XI, § 26.

[22] Maine had adopted a constitution only two years earlier. It provided: "Every citizen has a right to keep and bear arms for the common defence; and this right shall never be questioned." Me. Const. of 1819, art. I, § 16.

disturbing the peace. The major changes began with Tennessee and Massachusetts. Recall that Tennessee had enacted a firearm restriction in 1801 that prohibited going armed "to the terror of the people." 1801 Tenn. Pub. Acts 260, ch. 22, § 6. It revised that restriction in 1821, stating that "every person so degrading himself, by carrying . . . belt or pocket pistols, either in public or in private" was subject to a fine for each offense. 1821 Tenn. Pub. Acts 15, ch. 13. There was no question of whether proof of terror or intent was required. The statute simply outlawed such carry. It did exempt the carrying of "a knife of any size in a conspicuous manner on the strop of a shot pouch." *Id.* at 16.

Massachusetts adopted a more generous change and became a template for other states. As we have observed, in 1795 Massachusetts renewed its colonial firearms restrictions, enacting a firearms regulation that resembled the Statute of Northampton. *See* 1795 Mass. Acts 436, ch. 2 (allowing every justice of the peace to arrest all that "ride or go armed offensively, to the fear or terror of the good citizens of [the] Commonwealth"). In 1836 Massachusetts broadly revamped its criminal law; in the process it abandoned the Northampton framework in favor of a good-cause restriction. In Chapter 134, entitled "Of Proceedings to Prevent the Commission of Crimes," Massachusetts added eighteen sections dealing with complaints, arrests, trials, appeals, penalties and sureties.[23] Section 16 provided:

> If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and

---

[23] We discuss the details of the Massachusetts surety law in greater detail, *infra* at note 40 and accompanying text. We covered the English practice of requiring a surety of the peace *supra* at note 12.

dangerous weapon, without reasonable cause
to fear an assualt [sic] or other injury, or
violence to his person, or to his family or
property, he may, on complaint of any person
having reasonable cause to fear an injury, or
breach of the peace, be required to find
sureties for keeping the peace, for a term not
exceeding six months, with the right of
appealing as before provided.

1836 Mass. Acts 750, ch. 134, § 16.  The 1836 Massachusetts
statute permitted public carry, but limited it to persons who
could demonstrate their need to carry for the protection of
themselves, their families, or their property.  In effect, the
Massachusetts law provided that such weapons could not be
carried in public *unless* the person so armed could show
"reasonable cause."

A number of states followed Massachusetts and adopted
some version of Chapter 134, including Section 16.  Many of
those states adopted Section 16 verbatim.  For example, in
1839 Wisconsin adopted "An Act to prevent the commission
of crimes."  Section 16 was a word-for-word (with minor
changes in punctuation) replication of Section 16 of the 1836
Massachusetts statute.  1838 Wis. Sess. Laws 381, § 16.
Other states and territories followed.  If they did not adopt
Section 16 verbatim, the changes were minor, but the
references to the 1836 Massachusetts law were unmistakable.
*See* 1841 Me. Laws 709, ch. 169, § 16; 1846 Mich. Laws 692,
ch. 162, § 16;[24] 1847 Va. Laws 129, ch. XIV, § 16; 1851

---

[24] The Michigan Constitution of 1835 provided:  "Every person has
a right to bear arms for the defense of himself and the State."  Mich.
Const. of 1835, art. I, § 13.

Minn. Pub. Acts 528, ch. 112, § 18; 1854 Or. Laws 220, ch. XVI, § 17; 1870 W. Va. Acts 703, ch. CLIII, § 8. The giveaway was Massachusetts' distinctive phrase "dirk, dagger, sword, pistol, or other offensive and dangerous weapon." Of these states, only Virginia and West Virginia did not use the phrase. Instead they simply prohibited the carrying of "any dangerous or offensive weapon" or of a "deadly and dangerous weapon," respectively.

Other states followed Massachusetts' formulation but qualified the right in some other way. Pennsylvania, for example, provided an introductory exemption: "*If any person, not being an officer on duty in the military or naval service of the state or of the United States*, shall go armed with dirk, dagger, sword or pistol . . . ." 1862 Pa. Laws 250, § 6 (emphasis added).[25] Texas expanded the list of prohibited items. In a statute entitled "An Act to Regulate the Keeping and Bearing of Deadly Weapons," Texas regulated the carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife." 1874 Tex. Gen. Laws 1322, art. 6512; *see also id.* art. 6511 (entitled "An Act Regulating the Right to Keep and Bear Arms;" prohibiting anyone carrying "a bowie-knife, dirk, or butcher-knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind" from entering "any church or religious assembly, any school-room or other place where persons are assembled for educational, literary, or scientific purposes, or into a ballroom, social party, or other social gathering . . . or to any election precinct . . . or to any other place where people may be assembled . . . , or any other

---

[25] The Pennsylvania Constitution of 1790 provided: "The right of citizens to bear arms in defence of themselves and the State shall not be questioned." Pa. Const. of 1790, art. IX, § XXI.

public assembly").[26]   The Territories of Arizona and Idaho each enacted some version of the expanded Texas list.  1889 Ariz. Sess. Laws 16–17, No. 13, §§ 1, 3; 1889 Idaho Laws 23, § 1.[27]

A number of other states regulated the carrying of arms, even though they did not follow the Massachusetts model. Delaware, for example, continued to follow the outline of the Statute of Northampton.  1852 Del. Stat. 333, ch. 97, § 13 (making subject to arrest "all affrayers, rioters, breakers and disturbers of the peace, and all who go armed offensively to the terror of the people").   Kansas and the Territory of Wyoming also prohibited both the concealed and open carrying of weapons, although with more modern language. 1881 Kan. Sess. Laws 80, ch. XXXVII, § 23 ("The [city] council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise . . . .");[28] 1876 Wyo. Sess. Laws 352, ch. 52, § 1 (prohibiting the "bear[ing] upon his person, concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village").

---

[26] The Texas Constitution of 1869 provided:  "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the legislature may prescribe."   Tex. Const. of 1869, art. I, § 13.

[27] Idaho was admitted to the Union in 1890.  The Idaho Constitution of 1889 provided:   "The people have the right to bear arms for their security and defence; but the legislature shall regulate the exercise of this right by law."  Idaho Const. of 1889, art. I, § 11.

[28] The Kansas Bill of Rights, adopted in 1859, provided:  "The people have the right to bear arms for their defense and security . . . ."   Kan. Const. of 1859, Bill of Rights § 4.

Most, but not all, of the weapons enumerated in these statutes were capable of being concealed. The statutes we have discussed thus far, however, did not prohibit only the *concealed* carrying of such weapons. Some states, however, did so limit their laws. Alabama, for example, punished "any one who carrie[d] concealed about his person a pistol, or any other description of fire arms, not being threatened with, or having good reason to apprehend an attack, or travelling . . . ." 1852 Ala. Laws 588, art. VI, § 3274.[29] Georgia prohibited "[a]ny person having or carrying about his person, unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives . . . ." 1861 Ga. Laws 859, div. 9, § 4413.

On the other hand, two territories had nominal concealed weapons prohibitions that also applied to open carry. New Mexico made it "unlawful for any person to carry *concealed* weapons on their persons, of any class of pistols whatever, bowie knife . . . Arkansas toothpick, Spanish dagger, sling-shot, or any other deadly weapon." 1860 N.M. Laws 94, § 1 (emphasis added). However, in the following section, it prescribed the punishment for any person who "carr[ies] about his person, either *concealed or otherwise*, any deadly weapon of the class and description mentioned in the preceding section . . . ." *Id.* § 2 (emphasis added). The Territory of Oklahoma had a complex series of prohibitions in an article entitled "Concealed Weapons," but some of the prohibitions applied to open carry. For instance, one provision made it "unlawful for any person in the Territory of

---

[29] The Alabama Constitution of 1819 provided: "Every citizen has a right to bear arms in defence of himself and the State." Ala. Const. of 1819, art. I, § 23.

Oklahoma to carry concealed . . . any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife . . . ."  1891 Okla. Sess. Laws 495, art. 47, § 1.  But the next section prohibited "any person . . . to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, *except as in this article provided.*"  *Id.* § 2 (emphasis added).  The article then made exceptions for "[P]ublic officers while in the discharge of their duties," *id*. § 4, and persons carrying "shot-guns or rifles for the purpose of hunting," *id.* § 5.  Additionally, the statute made it "unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room . . . or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article."  *Id.* § 7.  In the end, section 7 was a broad prohibition on carrying arms into public places.

Before we discuss the state cases, we have several observations on the statutes.  First, the states broadly agreed that small, concealable weapons, including firearms, could be banned from the public square.  Although the record is not uniform, the vast majority of the states did not distinguish between regulation of concealed carry and regulation of open carry of weapons that were *capable* of being concealed.  None of the statutes we have discussed in this section makes any mention of long-barreled guns, such as muskets, rifles, or shotguns.   Second, although many of the states had constitutional provisions that guaranteed some kind of right to keep and bear arms, state legislatures evidently did not

believe that the restrictions we have discussed here were inconsistent with their state constitutions. At the same time, the territories enacted similar restrictions, and the territories—unlike the states—would have been subject to the Second Amendment. U.S. Const. art. IV, § 3, cl. 2.

The Territory of Hawai'i's enumerated restrictions on carrying weapons were well within this tradition. Hawai'i's 1852 law punished "[a]ny person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon." 1852 Haw. Sess. Laws 19, § 1. Like many states, Hawai'i exempted persons "authorized to bear arms," including persons "holding official, military, or naval rank" so long as the weapon was "worn for legitimate purposes." *Id.* § 2.

*b. The cases.* The parties have directed our attention to a number of reported state cases that address the right to keep and bear firearms. They are largely from Southern states; even then, they are far from uniform in their reasoning and conclusions. We will start with the cases in which the state courts adopted the most generous protections for those bearing arms. Our first such case is *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822). Like many statutes we have seen, Kentucky law banned the carrying of concealed weapons, including pocket pistols, dirks, large knives and sword-canes. *Id.* at 90. Bliss was charged with carrying a sword in a cane and contended that the Kentucky Constitution prohibited such restrictions.[30] *Id.* A divided Kentucky Court of Appeals, Kentucky's highest court, held the statute unconstitutional.

---

[30] The Kentucky Constitution provided: "That the right of the citizens to bear arms in defence of themselves and the State shall not be questioned." Ky. Const. of 1799, art. X, § 23.

The court determined that the right to bears arms "existed at the adoption of the constitution . . . [and] consisted in nothing else but in the liberty of the citizens to bear arms." *Id.* at 92. The court took a bright-line position on any difference between the state regulating and prohibiting the carrying of arms: "in principle, there is no difference between a law prohibiting the wearing concealed arms, and a law forbidding the wearing such as are exposed; and if the former be unconstitutional, the latter must be so likewise." *Id.* The court held the act "unconstitutional and void." *Id.* at 93. One judge dissented, but did not file an opinion. *Id.* at 94.

*Bliss*'s expansive view of the right to carry firearms was short lived. Following the Kentucky Court of Appeals' opinion, the legislature amended the constitution to allow the type of restriction the court had struck down. Ky. Const. of 1850, art. XIII, § 25 ("That the rights of the citizens to bear arms in defence of themselves and the State shall not be questioned; but the general assembly may pass laws to prevent persons from carrying concealed arms."). *See Peruta*, 824 F.3d at 935–36 (citing Robert M. Ireland, *The Problem of Concealed Weapons in Nineteenth-Century Kentucky*, 91 Reg. Ky. Hist. Soc'y 370, 373 (1993) (discussing the aftermath of the decision; noting that the Governor criticized the court for reading the state constitution so literally)). *Bliss* appears to be an isolated decision. The decision was not followed by any other court, and it was considered and rejected by state courts in Alabama, Arkansas, Georgia, and Tennessee. *See Peruta*, 824 F.3d at 936; *Strickland v. State*, 72 S.E. 260, 261 (Ga. 1911) ("[*Bliss*] has

not been followed, but severely criticised.  The decisions are practically unanimous to the contrary."); *id.* (citing cases).[31]

No other court went as far as the Kentucky court in *Bliss*; indeed, courts in Georgia, Alabama, and Louisiana deviated from *Bliss* by holding that restrictions on concealed weapons were permissible.  Georgia drew its line between open and concealed carry in reversing a conviction for carrying firearms.  In *Nunn v. State*, 1 Ga. 243 (1846), Nunn was charged with carrying pistols, but the indictment failed to state whether he carried them in secret.  Discussing *Bliss*, the Georgia Supreme Court relied largely on the Second Amendment of the U.S. Constitution, denying that "because the people withheld this arbitrary power of disfranchisement from Congress [in the Second Amendment], they ever intended to confer it on the local legislatures."  *Id.* at 250.  The court concluded that

> so far as the [challenged state] act . . . seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms *openly*, is in conflict with the Constitution, and *void*.

---

[31] The decision, however, is notable for another reason.  Prompted by the decision, Kentucky became the first state to write into its constitution what had long been implicit:  that "the general assembly may pass laws to prevent persons from carrying concealed arms."  Ky. Const. of 1850, art. XIII, § 25.

*Id.* at 251. Because Nunn had not been charged with carrying his pistol in secret, the judgment of conviction was reversed.**[32]** *See also In re Brickey*, 70 P. 609, 609 (Idaho 1902) (holding unconstitutional under both the state and federal constitutions a statute prohibiting the carrying of deadly weapons in the city; suggesting that a statute prohibiting concealed carry would be constitutional).

---

**[32]** When *Nunn* was decided, there was no Georgia provision concerning the right to keep and bear arms. Following the Civil War, the Georgia Constitution was revised to read: "A well regulated Militia being necessary to the security of a free people, the right of the people to keep and bear arms shall not be infringed; but the General Assembly shall have power to prescribe by law the manner in which arms may be borne." Ga. Const. of 1868, art. I, § XIV. In *Hill v. State*, 53 Ga. 472 (1874), the Georgia Supreme Court upheld against a state constitutional challenge a statute prohibiting the carrying of a pistol or revolver, among other "deadly weapon[s]," in courts, places of worship, and public gatherings. *Id.* at 480–81 ("The manner of bearing arms includes not only the particular way they may be carried upon the person, that is openly or secretly, on the shoulder or in the hand, loaded or unloaded, cocked or uncocked, capped or uncapped, but it includes, also, the time when, and the place where, they may be borne.").

In 1877, the Georgia Constitution was revised again, and the right to bear arms lost its prefatory clause. Ga. Const. of 1877, art. I, § 1, para. XXII ("The right of the people to keep and bear arms shall not be infringed, but the General Assembly shall have power to prescribe, the manner in which arms may be borne."). In *Strickland*, the Georgia Supreme Court upheld against a state constitutional challenge a law requiring a license for any person to "carry[] about his person" a pistol or revolver. 72 S.E. at 260. The court cited the Statute of Northampton and other English sources. The court observed that "no one will contend that children have a constitutional right to go to school with revolvers strapped around them, or that men and women have a right to go to church, or sit in the courtrooms, or crowd around election precincts, armed like desparadoes, and that this is beyond the power of the Legislature to prevent." *Id.* at 264.

The Alabama Supreme Court changed its views over time on the state's power to regulate open carry. Like Georgia, Alabama first upheld the power of the state legislature to prohibit carrying concealed weapons. In *State v. Reid*, 1 Ala. 612 (1840), the Alabama Supreme Court affirmed Reid's conviction for carrying a concealed pistol.[33] The court considered *Bliss*, but refused to go so far. Instead, it was "incline[d] to the opinion that the Legislature cannot inhibit the citizen from bearing arms openly, because [the Constitution] authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence." *Id.* at 619. But the court also understood the right to bear arms openly to be subject to some degree of regulation. The Alabama Constitution had not "denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guarantied to the citizen, is not to bear arms upon all occasions and in all places, but merely 'in defence of himself and the State.'" *Id.* at 616. As a result, the legislature retained "the authority to adopt such regulations of police, as may be dictated by the safety of the people and advancement of public morals." *Id.*

An early twentieth-century case from Alabama, although outside our current historical discussion, shows that this limiting principle first articulated in *Reid* had teeth. In *Isaiah v. State*, 176 Ala. 27 (1911), the Alabama Supreme Court upheld, under the same provision of the Alabama Constitution, a statute prohibiting the carrying of a pistol "about his person on premises not his own or under his

---

[33] The Alabama Constitution stated that "[e]very citizen has a right to bear arms in defence of himself and the State." Ala. Const. of 1819, art. I, § 23.

control." *Id.* at 28. The court concluded that the statute properly restricted the manner and places in which arms could be carried. *Id.*; *see also id.* at 34 (McClellan, J., concurring) (stating that the legislature could prohibit a person "to carry a pistol off one's premises"). In his concurrence, and citing *Reid*, Justice McClellan made clear what is unstated in the majority: that the legislature retained the authority to regulate where and how a person could legally carry a firearm in Alabama. *Id.* at 37–38 (McClellan, J., concurring) ("To deny the validity of [the regulation] would, without doubt, restrict the legislative right to regulate . . . to the *manner* only of bearing arms; and this would clothe the constitutional right to bear arms with an effect to deny to legislative function the power to determine . . . what are *arms* proper to be borne . . . [or] at what *places* arms of a defined character should not be borne."). *Isaiah* tells us that Alabama's right to carry openly, even if constitutionally protected, was nevertheless amenable to even severe restrictions by the state legislature.

The Louisiana Supreme Court also marked the difference between concealed carry and open carry, albeit in dicta. An 1813 statute prohibited concealed carriage of enumerated dangerous weapons. Chandler was charged with murder using a Bowie knife; he claimed it was in self defense. In the course of describing the statute, the Louisiana Supreme Court observed that the prohibition on concealed weapons was "absolutely necessary to counteract a vicious state of society . . . and to prevent bloodshed and assassinations committed upon unsuspecting persons. It interfered with no man's right to carry arms . . . 'in full open view,' which places men upon an equality." *State v. Chandler*, 5 La. Ann. 489, 489–90 (1850). In *State v. Smith*, 11 La. Ann. 633 (1856), Smith was charged with carrying a concealed weapon. The statute

specified that a weapon was concealed when it did not appear "in full open view." *Id.* at 634. Smith contended that the weapon was partially exposed and, therefore, not concealed. The Louisiana Supreme Court disagreed. Citing the Second Amendment, the court commented that the amendment was "never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence . . . ." *Id.* at 633. As to the question before it, the court held that partial concealment was a violation of the statute. It appeared to exempt from the statute "the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes," but not "where the partial exposure is the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon." *Id.* at 634. Finally, in *State v. Jumel*, 13 La. Ann. 399 (1858), the Louisiana Supreme Court upheld a conviction for carrying a concealed weapon and commented that the statute "does not infringe the right of the people to keep or bear arms. It is a measure of police, prohibiting only a particular mode of bearing arms which is found dangerous to the peace of society." *Id.* at 399–400.

In contrast to these states, other states—also from the South—upheld good-cause restrictions on the open carry of certain dangerous firearms. The Texas Supreme Court did so in a pair of cases. In *English v. State*, 35 Tex. 473 (1871), English had been charged under the Act of April 12, 1871, which prohibited the carrying of deadly weapons, including "pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives," unless the carrier could show an "exceptional case[]" of self-defense. *Id.* at 474, 477.

At trial, English proved that the pistol was not loaded and was inoperable. *Id.* at 473. The court took note of various state decisions, including the Alabama and Georgia decisions. It also referred to the Statute of Northampton, *Sir John Knight's Case*, and Blackstone. *Id.* at 476. Analyzing the Second Amendment, the court concluded that its intended scope was limited to arms that were "useful and proper to an armed militia." *Id*. at 474 ("Can it be understood that these [deadly weapons named in the statute] were contemplated by the framers of our bill of rights? Most of them are the wicked devices of modern craft."). The Texas Supreme Court rejected as "simply ridiculous" the idea that the specific weapons banned in the statute were "proper or necessary arms of a 'well-regulated militia.'" *Id.* at 476; *see id.* ("The word 'arms' . . . refers to the arms of a militiaman or soldier, and the word is used in its military sense."). Turning next to English's challenge under the state constitution, the court determined that the Texas Constitution "confers upon the legislature the power to regulate the privilege [to bear arms]" so long as it does not "tak[e] it away." *Id.* at 478.[34] The court concluded that Texas law restricted, but did not deprive, its residents of the right to bear arms. No one "should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together." *Id.* at 478–79.

---

[34] The Texas Constitution provided: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the legislature may prescribe." Tex. Const. of 1869, art. I, § 13.

In a later case, the Texas Supreme Court clarified that the use of "arms" in the Texas Constitution does not refer "only to the arms of a militiaman or soldier." Rather, the weapons "secured [in] the right to keep and bear" arms "must be such arms as are commonly kept, according to the customs of the people, and are appropriate for open . . . use in self-defense." *State v. Duke*, 42 Tex. 455, 458 (1875) (upholding the same good-cause restriction challenged in *English*). The court counted among such defensive weapons "the double-barreled shot-gun, the huntsman's rifle, and such pistols at least as are not adapted to being carried concealed," such as "the dragoon or holster pistol." *Id.* at 458–59.

Other, more extensive firearms regulations were held constitutional, including restrictions on open carry that were tailored to small and concealable weapons. In *Andrews v. State*, 50 Tenn. 165 (1871), Andrews was charged with carrying a pistol in violation of state law. The Tennessee statute in question made it unlawful "for any person to publicly or privately carry a dirk, swordcane, Spanish stiletto, belt or pocket pistol or revolver." *Id.* at 171 (quoting Act of June 11, 1870, § 1).[35] Andrews argued that the weapon he was charged with carrying was not one encompassed by the statute. The Tennessee Supreme Court agreed and overturned his conviction. The court reasoned that the right to bear arms was "the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country." *Id.* at 178. Keeping in mind "a knowledge of the habits of our people, and of the arms in the use of which a soldier should

---

[35] Tennessee's Constitution of 1870 provided: "That the citizens of this State have a right to keep and to bear arms for their common defense; but the [L]egislature shall have power by law, to regulate the wearing of arms with a view to prevent crime." Tenn. Const. of 1870, art. I, § 26.

be trained," the court held that "the rifle of all descriptions, the shot gun, the musket, and repeater," were "the usual arms of the citizen of the county." *Id*. at 179. Although the court concluded that "the right to keep such arms, can not be infringed or forbidden by the Legislature," it acknowledged that their use could "be subordinated to such regulations and limitations as are or may be authorized by the law of the land." *Id.* at 179–80. The court declared the statute constitutional, at least insofar as it prohibited "belt or pocket pistol[s]." It reserved judgment on the statute's prohibition against "revolvers" because the evidence was unsettled as to whether the term referred to a "repeater[,which] is a soldier's weapon," the carrying of which could not be constitutionally prohibited. *Id.* at 186–87. The court acknowledged that even the weapons lawfully prohibited by the statute might be used in one's self-defense. Nevertheless, the court found that

> [t]he law allows ample means of self-defense, without the use of the weapons which we have held may be rightfully prescribed by this statute. The object being to banish these weapons from the community by an absolute prohibition for the prevention of crime, no man's particular safety, if such case could exist, ought to be allowed to defeat this end.

*Id.* at 189; *see also Aymette v. State*, 21 Tenn. 154, 160–61 (1840) (suggesting, in dicta, that "swords, muskets, rifles, etc., must necessarily be borne openly . . . to bear arms in defence of themselves [and the state]"). For the court in *Andrews*, the right of individual self-defense did not trump the legislature's ability to regulate—or even "banish"—certain types of firearms from the public square. In a companion case, *Page v. State*, 50 Tenn. 198 (1871), the

court upheld Page's conviction for carrying a revolver.  The "revolver" was only about eight inches long, and the court concluded it was not a "an arm for war purposes" and thus could be constitutionally prohibited by the state legislature under *Andrews*.  *Id.* at 198.  In a subsequent case, the court upheld an indictment for carrying an army pistol that was not displayed in hand.  *State v. Wilburn*, 66 Tenn. 57 (1872).

Like Tennessee, Arkansas upheld a ban on open carry of certain dangerous weapons.  In *Fife v. State*, 31 Ark. 455 (1876), the Arkansas Supreme Court upheld Fife's conviction for carrying a pistol in hand.  The court looked at "the prohibited list of weapons," under the relevant state law—including the pistol, dirk, Bowie knife, swordcane and brass knuckles—and found that the state legislature intended to prevent "known public mischief," the pistol being "usually carried in the pocket, or of a size to be concealed about the person, and used in private quarrels and brawls."  *Id.* at 461.  It upheld the law under Arkansas's Constitution, which guaranteed that "[t]he citizens of this State shall have the right to keep and bear arms for their common defense."  Ark. Const. of 1874, art. II, § 5.  In a later case, *Haile v. State*, 38 Ark. 564 (1882), the court confirmed the legislature's power to prescribe the permissible manner of carrying a weapon in public, including weapons used in war.  Haile was carrying a pistol at his waist.  An Arkansas law, adopted in 1881, prohibited the carrying of "such pistol as is used in the army or navy of the United States, in any manner, except uncovered, and in the hand."  *Id.* at 565.  The court rejected the claim that the right to keep and bear arms guaranteed "protection to the citizen, in going, with convenience to himself, and after his own fashion, prepared at all times to inflict death upon his fellow-citizens, upon the occasion of any real or imaginary wrong."  *Id.* at 566.  Although the

Arkansas Constitution did not expressly reserve to the legislature the right to regulate arms, the court thought it followed "from the undefined police powers, inherent in all governments." *Id.* at 567.**[36]**

The cases, much more so than the statutes, are divided. As the Supreme Court of Georgia so eloquently put it "'*tot homines, quot sententiae*'—so many men, so many opinions!" *Nunn*, 1 Ga. at 248. *Cf. Isaiah*, 176 Ala. at 35 (McClellan, J., concurring) ("There is wide and fundamental divergence of opinion upon the scope and effect of constitutional provisions [concerning the right to bear arms].") ; *City of Salina v. Blaksley*, 83 P. 619, 620 (Kan. 1905) ("[T]he carrying of deadly weapons has been the subject of much dispute in the courts. The views expressed in the decisions are not uniform, and the reasonings of the different courts vary."). In a trenchant decision summarizing

---

**[36]** *Fife* and *Haile* were not the only cases from the Arkansas Supreme Court to evaluate the constitutionality of a firearms restrictions under the state constitution. Both cases built on an 1842 concealed-carry decision, which concluded that the "[l]egislature possesses competent powers to prescribe, by law, that any and all arms, kept or borne by individuals, shall be so kept and borne as not to injure or endanger the private rights of others . . . ." *State v. Buzzard*, 4 Ark. 18, 27 (1842) (op. of Ringo, C.J.). *See* Ark. Const. of 1836, art. II, § 21 ("That the free white men of this State shall have a right to keep and to bear arms for their common defence.").

Though *Buzzard* did not involve open carry, the court's reasons for upholding the statute reveal an expansive understanding of the legislature's authority to regulate public-arms carriage. In the court's view, "if the right to keep and bear arms be subject to no legal control or regulation whatever, it might, and in time to come doubtless will, be so exercised as to produce in the community disorder and anarchy." *Id.* at 21 (op. of Ringo, C.J.).

the debates, the Supreme Court of Georgia commented that there were

> two general lines of reasoning [that] have been employed in upholding [statutes regulating the carrying of certain weapons]: First, that such provisions are to be construed in the light of the origin of the constitutional declarations . . . ; and[] second, that the right to bear arms, like other rights of person and property, is to be construed in connection with the general police power of the state, and as subject to legitimate regulation thereunder.

*Strickland*, 72 S.E. at 262. The court noted that some states expressly reserved to the legislature the power to regulate arms, but the court thought that "even where such expressions do not occur," the state retains some general police power "unless the language of the instrument itself should exclude such a construction." *Id.* Critically, the court observed that "if the right to bear arms includes deadly weapons of every character, . . . [then] the citizen [is] guaranteed the right to carry weapons or arms, in the broadest meaning of that term, whenever, wherever, and however he please[s]"—a possibility that the court dismissed by holding that the licensing regulation at issue was "legitimate and reasonably within the police power." *Id.* at 262–63. The court also rejected the contention that the right to bear arms was uniquely immune from reasonable regulation. *See id.* at 264 ("Many persons are required to obtain a license before engaging in certain businesses or performing certain acts; where a legitimate exercise of the police power of the state, it has never been thought that this was a violation of any constitutional right as to person or property.").

The cases that we have just discussed largely confirm *Strickland*'s understanding of the historical scope of the right to bear arms openly in public. There are divisions between state courts and even some disagreements within state courts. Moreover, we should repeat here that the cases represent a limited cross-section of the courts of the United States. Here is what we can say. Only one state court (Kentucky, *Bliss*) has held that there is a constitutional right to carry arms publicly, whether concealed or openly. Outside of that one case, the state courts generally agree that the legislature can prohibit the carrying of concealed weapons.[37] Beyond concealed carry, the courts diverge in their views. At least three state courts (Georgia, *Nunn*; Idaho, *Brickey*; Louisiana, *Chandler*, *Jumel*, *Smith*) have stated that the legislature can prohibit concealed carry, but suggested, in dicta, that it cannot prohibit open carry. At least five state courts have said that the legislature can prohibit the open carrying of firearms at least to the extent that the regulations forbid open carrying in certain places (Alabama, *Reid*, *Isaiah*; Georgia, *Hill*); forbid most open carrying of certain types of firearms or weapons (Arkansas, *Fife*, *Haile*; Tennessee, *Andrews*, *Page*; Texas, *English*, *Duke*), or forbid open carrying without a license on conditions set forth by the legislature (Georgia, *Strickland*). Our survey has yielded no firm consensus in American courts.

---

[37] There are a number of cases we have not reviewed here that discuss only the question of concealed carry, without addressing, in a holding or dicta, the question of open carry. *See, e.g.*, *State v. Mitchell*, 3 Blackf. 229 (Ind. 1833); *Wright v. Commonwealth*, 77 Pa. 470 (1875); *State v. Wilforth*, 74 Mo. 528 (1881); *State v. Speller*, 86 N.C. 697 (1882); *State v. Workman*, 35 W. Va. 367 (1891).

*c. Treatises*.  Nineteenth-century American legal treatises provide some insight into the scope of the right to carry arms in public.   Like the English commentators, American commentators drew a distinction between the carrying of concealable arms and military arms suitable for militia service.  St. George Tucker discussed the English concept of treason, which was levying war against the king.  Quoting Matthew Hale, Tucker observed that an assembly, armed with weapons suitable for military service and "'without the king's licen[s]e, unless in some lawful and special cases, carries a terror with it, and a *presumption of warlike force*[.]'  The bare circumstance of having arms, therefore, of itself, creates a *presumption* of warlike force."   5 St. George Tucker, *Blackstone's Commentaries* app'x 19 (William Young Birch & Abraham Small eds. 1803) (quoting 1 Matthew Hale, *The History of the Pleas of the Crown* 150 (1736)) (emphasis added).  Tucker then commented,

> But ought that circumstance of itself, to create any such presumption in America, where the right to bear arms is recognized and secured in the constitution itself?  In many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side.

*Id.*   Where St. George Tucker addressed the Second Amendment specifically, and stated that "[t]he right of self defence is the first law of nature," it is clear from context that he is principally concerned with the regulation of military arms, such as muskets, rifles, or shotguns, which were prohibited for a time in England "under the specious pretext of preserving the game."  1 St. George Tucker, *Blackstone's*

*Commentaries*, at app'x 300.  Joseph Story's comments on the Second Amendment bear a similar concern with depriving the people of arms, on the logic that bearing arms acted as "a strong moral check against the usurpation and arbitrary power of rulers."  3 Joseph Story, *Commentaries on the Constitution of the United States* 746 (1833); *see also* William Rawle, *A View of the Constitution of the United States of America* at 125 (1829) ("No clause in the Constitution could by any rule of construction be conceived to give to congress a power to disarm the people.").

Most nineteenth-century American authors assumed that the state had the right to regulate arms in the public square. William Rawle, for example, agreed with Blackstone's criticism of governmental attempts to disarm the people in the guise of forest and game regulations.  But he then drew a line between the use of firearms for hunting and their possession in other public places:

> This right ought not, however, in any government, to be abused to the disturbance of the public peace. . . . [E]ven the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace.  If he refused he would be liable to imprisonment.

*Id.* at 126.  Francis Wharton in his criminal law treatise quotes the Statute of Northampton and then comments:

> A man cannot excuse wearing such armour in public, by alleging that such a one threatened

> him, and that he wears it for the safety of his
> person against his assault; but it is clear that
> no one incurs the penalty of the statute for
> assembling his neighbours and friends in his
> own house, against those who threaten to do
> him any violence therein, because a man's
> house is his castle.

Francis Wharton, *A Treatise on the Criminal Law of the United States* 932, § 2497 (1857) (citing 1 Hawkins, *A Treatise of the Pleas of the Crown* at 489).  He adds "that the public and open exhibition of dangerous weapons by an armed man, to the terror of good citizens, is a misdemeanor at common law."  *Id.* at 933 (footnote omitted).  In his discussion of the Second Amendment, Dean Pomeroy observed that

> a militia would be useless unless the citizens
> were enabled to exercise themselves in the use
> of warlike weapons. . . . But all such
> provisions, all such guaranties, must be
> construed with reference to their intent and
> design.  This constitutional inhibition is
> certainly not violated by laws forbidding
> persons to carry dangerous or concealed
> weapons . . . .

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152–53 (1868).  One of the most influential commentators of the nineteenth century, Thomas Cooley opined that "[t]he meaning of the provision undoubtedly is, that the people, from whom the militia must be taken, shall have the right to keep and bear arms; and they need no permission or regulation of law for the purpose."

Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880). At the same time, Cooley suggested that "[t]he arms intended by the Constitution are such as are suitable for the general defence of the community against invasion or oppression, and the secret carrying of those suited merely to deadly individual encounters may be prohibited." *Id.* at 271–72 (footnote omitted). And one of the principal reporters of New York's penal code and a prolific author, Benjamin Vaughan Abbott, offered this practical guide to the Second Amendment:

> The Constitution secures the right of the people to keep and bear arms. No doubt, a citizen who keeps a gun or pistol under judicious precautions, practises in safe places the use of it . . . exercises his individual right. No doubt, a person whose residence or duties involve peculiar peril may keep a pistol for prudent self-defence. But . . . carrying them carelessly in the pocket; toying with them at picnics, on board steamers, and in saloons . . . . These are practices upon which every good citizen will frown, and which the law of the land is every year more explicitly discouraging.

Benjamin Vaughan Abbott, *Judge and Jury* 333 (1880). Abbott concludes: "Carrying [pistols] for defence, in the more settled parts of the land, savors of cowardice rather than of prudence; a well-behaved man has less to fear from violence than from the blunders of himself and friends in managing the pistol he might carry as a protection." *Id.* at 333–34.

One commentator distinguished between what the Second Amendment prohibits Congress from doing and more general constitutional principles applicable to the states, and in the course of his discussion offered perhaps the strongest endorsement for the right to carry firearms openly in public. Distilling principles from some of the early Southern cases that distinguished between concealed carry and open carry, Professor Ordronaux wrote:

> [I]t was not necessary that the right to bear arms should be granted in the Constitution, for it had always existed. It is not in consequence dependent upon that instrument, and is only mentioned therein as a restriction upon the power of the national government against any attempt to infringe it. In other words, it is a right secured and not created. But this prohibition is not upon the States, whose citizens are left free in respect to the extent of their enjoyment or limitation of the right. The word "arms" being used in its military sense alone, and as part of the equipment of a citizen in the public service, the provision does not prevent a State from enacting laws regulating the manner in which arms may be carried. Thus, the carrying of *concealed* weapons may be absolutely prohibited without the infringement of any constitutional right, while a statute forbidding the bearing of arms openly would be such an infringement. In order to prevent breaches of the peace . . . a State may, as part of its police regulations require that . . . a private citizen shall obtain a

license in order to be permitted to carry a concealed weapon.

John Ordronaux, *Constitutional Legislation in the United States* 242–43 (1891) (footnotes omitted). Ordronaux did not explain his reasoning, other than to drop a footnote with citations to five cases we have discussed: a Georgia case, *Nunn*; three Louisiana cases, *Chandler*, *Smith*, and *Jumel*; and a Tennessee case, *Andrews*. At least *Andrews* is contrary to Ordronaux's statement, because the Tennessee Supreme Court upheld Andrew's conviction for openly carrying. *See Andrews*, 50 Tenn. at 171, 186–87.

None of these commentaries, with the possible exception of Ordronaux, seriously questions the power of the government to regulate the open carrying of arms in public. And several of them reinforce the Court's holding in *Heller*, that there is a general right of self-defense in the home. No one suggested that those two conclusions are inconsistent with each other.

### 3. Twentieth-Century Restrictions

We are not inclined to review twentieth-century developments in detail, in part because they may be less reliable as evidence of the original meaning of the American right to keep and bear arms. We will review some early developments to place Hawaiʻi's statutes in context.

The first part of the twentieth century saw a change in approach in some states, as they adopted more detailed regulations, including licensing requirements. In 1906 Massachusetts adopted "An Act to Regulate by License the Carrying of Concealed Weapons." Although the title referred

to "concealed weapons," the legislation in fact prohibited carrying "a loaded pistol or revolver, without authority or permission, . . . or . . . any stiletto, dagger, dirk-knife, slung-shot or metallic knuckles." 1906 Mass. Acts 150, ch. 172, § 2. A license "to carry a loaded pistol or revolver" could be issued to an applicant who had "good reason to fear an injury to his person or property" and was otherwise "suitable." *Id.* at 150, § 1. Alabama prohibited persons from carrying a "pistol concealed," but it also made it "unlawful for any person to carry a pistol about his person on premises not his own or under his control." 1909 Ala. Laws 258 No. 215, §§ 1–2. Hawai'i adopted a similar provision: the territory's 1913 Act prohibited any person "not authorized by law" to "carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon." 1913 Haw. Laws 25, § 3089.

Most of the laws we have examined lumped firearms into the same category as knives, brass knuckles and similar weapons that could be concealed. In the early to mid-twentieth century, however, a number of states began to distinguish between firearms and other dangerous weapons that could be concealed. In 1911, New York adopted the Sullivan Law, which made it unlawful to possess without a license any pistol, revolver, or other firearm capable of being concealed. *See Kachalsky*, 701 F.3d at 84–85 (providing background). In 1913, New York amended the Sullivan Law "in relation to the carrying, use and sale of dangerous weapons." 1913 N.Y. Laws 1627–30, vol. III, ch. 608, § 1. The legislature made it a felony to carry or possess "any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell" and to carry or possess "with intent to use the same unlawfully against

another . . . a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon." *Id.* at 1627–28. The legislature, however, separately prohibited "possession in any city, village or town of this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, without a written license therefor." *Id.* at 1628. Openly carrying a concealable weapon was a misdemeanor; concealed carry was a felony. *Id.* New York's judges were authorized to issue a license to "any householder, merchant, storekeeper or messenger of any banking institution or express company" so long as the judge was "satisfied of the good moral character of the applicant" and that the householder intended "to have such weapon in his dwelling"; the "merchant, or storekeeper, to have such weapon in his place of business"; and the banking messenger intended "to have and carry such weapon concealed while in [his] employ." *Id*. at 1629. The law exempted law enforcement officials and "duly authorized military or civil organizations, when parading [and] . . . when going to and from the place of meeting of their respective organizations." *Id.*

A number of other states followed New York's model. In 1923 California adopted "An act to control and regulate the possession, sale and use of pistols, revolvers and other firearms capable of being concealed upon the person . . . ." 1923 Cal. Stat. 695, ch. 339. Like New York, and states before it, California banned possession of dangerous weapons, including "the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles" and concealed dirks and daggers. *Id.* at 696, § 1. Separately, it banned felons and aliens from possessing "any pistol, revolver or other firearm capable of being concealed upon the person." *Id.* at 696, § 2. Other persons were

prohibited from "carry[ing] concealed upon his person or within any vehicle . . . any pistol, revolver or other firearm capable of being concealed" without a license. *Id.* at 697, § 5. The licensing requirement, however, did not apply to persons "owning, possessing or keeping within his place of residence or place of business any pistol, revolver or other firearm capable of being concealed upon the person." *Id.* The act did not apply to law enforcement officials, members of the military, persons at target ranges, and licensed hunters.

Other states followed New York and California, although a number of them banned only concealed firearms. A standard provision would prohibit any person from carrying "a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a permit." 1925 Ind. Acts 496, ch. 207, § 5. *See* 1923 N.D. Laws 380 ch. 266, § 6. In 1926 the National Conference of Commissioners on Uniform State Laws issued the Uniform Firearms Act, and a number of states adopted the UFA. *See* Note, *The Uniform Firearms Act*, 18 Va. L. Rev. 887, 904 (1932). The UFA proposed licensing concealed firearms. *See, e.g.*, 1931 Pa. Laws 498, No. 158, § 5; 1935 S.D. Sess. Laws 355, ch. 208, § 5; 1935 Wash. Sess. Laws 599–60, ch. 172, § 5. The note in the *Virginia Law Review* praised the UFA, while noting that "[t]he provisions of the Act contain little that is startling in the way of new legislation. . . . [The Act] jealously guards the right of the honest citizen to bear arms." 18 Va. L. Rev. at 906.

Hawai'i's 1927 revisions tracked the UFA and became the basis for its current licensing scheme. In the 1927 Act, Hawai'i provided that

> no person shall carry, keep, possess or have
> under his control a pistol or revolver;
> provided, however, that any person who shall
> lawfully acquire the ownership or possession
> of a pistol or revolver may, for purposes of
> protection and with or without a license, keep
> the same in the dwelling house or business
> office personally occupied by him, and in case
> of an unlawful attack upon any person or
> property in said house or office, said pistol or
> revolver may be carried in any lawful, hot
> pursuit of the assailant.

Act 206, 1927 Haw. Sess. Laws 209–10, § 5.  A license "to
carry a pistol or revolver concealed upon his person or to
carry one elsewhere than in his home or office" could be
issued if "the applicant has good reason to fear an injury to
his person or property . . . and . . . is a suitable person to be so
licensed."  *Id.* at 210, § 7.

D.  *The Power to Regulate Arms in the Public Square*

1.  The Basic Rule

Our review of more than 700 years of English and
American legal history reveals a strong theme:  government
has the power to regulate arms in the public square.  History
is messy and, as we anticipated, the record is not uniform, but
the overwhelming evidence from the states' constitutions and
statutes, the cases, and the commentaries confirms that we
have never assumed that individuals have an unfettered right
to carry weapons in public spaces.  Indeed, we can find no
general right to carry arms into the public square for self-
defense.  *See Kachalsky*, 701 F.3d at 96 ("[O]ur tradition . . .

clearly indicates a substantial role for state regulation of the carrying of firearms in public."). To be sure, any one-sentence declaration that we might make will be subject to qualifications and exceptions (which we will address in the next section), but in the main, we have long distinguished between an individual's right of defense of his household and his business and his right to carry a weapon in public for his own defense, absent exceptional circumstances. "Like . . . the right secured by the Second Amendment," the government's right to regulate the carriage of weapons in public places "is not unlimited." *Heller*, 554 U.S. at 626. But we are persuaded that government regulations on open carry are "[l]aws restricting conduct that can be traced back to the founding era and are historically understood to fall outside of the Second Amendment's scope," and thus "may be upheld without further analysis." *Silvester*, 843 F.3d at 821.

The contours of the government's power to regulate arms in the public square is at least this: the government may regulate, and even prohibit, in public places—including government buildings, churches, schools, and markets—the open carrying of small arms capable of being concealed, whether they are carried concealed or openly. We need go no further than this, because the Hawaiʻi firearms licensing scheme Young challenges only applies to "a pistol or revolver and ammunition therefor." HRS § 134-9(a). This power to regulate is fully consonant with the Second Amendment right recognized in *Heller*. *Heller* found that the pre-existing right to keep and bear arms is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. "'[T]he *central component*' of the Second Amendment" is the "basic right" of self-defense, whose exercise is "'most acute' in the home." *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599, 628). The

heart of the Second Amendment is "defense of hearth and home." *Heller*, 554 U.S. at 635.

The power of the government to regulate carrying arms in the public square does not infringe in any way on the right of an individual to defend his home or business. In the English legal tradition, "every man's house is looked upon by the law to be his castle." 3 William Blackstone, *Commentaries* \*288; *see Semayne's Case* (1604), 77 Eng. Rep. 194, 194 (K.B.). *See also Carpenter v. United States*, 138 S. Ct. 2206, 2239 (2018) (Thomas, J., dissenting). The principle was colorfully expressed by William Pitt in Parliament:

> The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail, its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!

*See Miller v. United States*, 357 U.S. 301, 307 (1958) (quoting William Pitt) (citation omitted). The principle was further reinforced in the Bill of Rights, particularly by the Third and Fourth Amendments. *See* U.S. Const. amends. III ("No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner . . . ."), IV ("The right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures, shall not be violated . . . ."); *United States v. Craighead*, 539 F.3d 1073, 1077 (9th Cir. 2008) ("The home occupies a special place in the pantheon of constitutional rights." (citing the First, Second, Third, and Fourth Amendments.)).

Defense of the public square stands on entirely different footing. "One of the first duties of government is to afford [] protection." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803). Indeed, among the fundamental privileges of citizenship in the United States is "[p]rotection by the government." *Corfield v. Coryell*, 6 F. Cas. 546, 551 (C.C.E.D. Pa. 1823) (No. 3230). Protection is the *quid pro quo* for our allegiance to the government. As Blackstone explained, "the community should guard the rights of each individual member, and . . . (in return for this protection) each individual should submit to the laws of the community; without which submission of all it was impossible that protection could be certainly extended to any." 1 William Blackstone, *Commentaries* at *47–48; *see also Calvin's Case* (1609), 77 Eng. Rep. 377, 382 (K.B.) (Coke, J.) (stating that "the Sovereign is to govern and protect his subjects" and "the subject oweth to the King his true and faithful ligeance"); *English*, 35 Tex. at 477 ("It is useless to talk about personal liberty being infringed by laws such as that under consideration. The world has seen too much licentiousness cloaked under the name of natural or personal liberty; natural and personal liberty are exchanged, under the . . . social compact of states, for civil liberty."). The king who cannot guarantee the security of his subjects—from threats internal or external—will not likely remain sovereign for long.

The distinction between hearth and home and the public square is reinforced in the U.S. Constitution in another way: it is peculiarly the duty of the states to defend the public square. We should observe at this juncture that the American legal experience differed from the English tradition in two very important respects—written constitutions and federalism. Americans departed from their English forebears by creating written constitutions. "English colonists in

America became used to writing their own documents to flesh out the particulars of their governments." Donald S. Lutz, Colonial Origins of the American Constitution xx, xxi (1998). As a consequence, "[l]ocal government in colonial America was the seedbed of American constitutionalism." *Id.* Thus, Chief Justice Marshall wrote, "in America, . . . written constitutions have been viewed with so much reverence;" they were our "greatest improvement on political institutions." *Marbury*, 5 U.S. (1 Cranch) at 178. The U.S. Constitution was written against a background of existing state constitutions, charters, and laws; indeed, it borrowed generously from those constitutions. The U.S. Constitution did not displace such laws, U.S. Const. amend. X, except where it did so expressly, *see, e.g.*, *id.* art. I, § 8, cls. 1–3; art. VI, cl. 2. Thus, as we are looking for the meaning of "the right of the people to keep and bear Arms"—which owed its phrasing to the Massachusetts Constitution, Mass. Const. of 1780, pt. 1, art. 17 ("The people have a right to keep and to bear arms . . . .")—we should be looking to state constitutions and practices for the best evidence of how Americans viewed their inherited right to bear arms.

That brings us to the other American innovation: American federalism contemplated distinct roles for the federal government and the states, and it was the states that had responsibility for maintaining the public peace. The U.S. Constitution declared at the outset that the federal government would bear responsibility to "*provide* for the *common* defence." U.S. Const. pmbl. (emphasis added). To effect that, the Constitution conferred on the United States the power to raise and support armies and navies and imposed a duty to "protect [the states] against Invasion." *Id.* art. I, § 8, cls. 12–13; art. IV, § 4. Correspondingly, the states were forbidden to "keep Troops, or Ships of War," or to "engage

in War unless actually invaded, or in such imminent Danger as will not admit of delay." *Id*. art. I, § 10, cl. 3. On the other hand, the United States shared responsibility with the states for "*promot[ing]* the general Welfare," and thus was granted the power to "lay and collect Taxes . . . to provide . . . for the general Welfare of the United States." *Id.* pmbl.; art. I, § 8, cl. 1. By contrast, the United States was not enjoined to *secure* or *provide* "domestic Tranquility," but only to "*insure*" it. *Id.* pmbl. Accordingly, the United States was made the "guarant[or] . . . against domestic Violence," but only "on Application of the Legislature, or of the Executive (when the Legislature cannot be convened)." *Id.* art. IV, § 4. That meant that the states had the primary responsibility for securing what was formerly known as "the king's peace." *See* 1 St. George Tucker, *Blackstone's Commentaries*, at app'x 367 ("[E]very pretext for intermeddling with the domestic concerns of any state, under colour of protecting it against domestic violence is taken away, by that part of the provision which renders an application from the legislative, or executive authority of the state endangered, necessary to be made to the federal government, before it[]s interference can be at all proper.").

The states, in place of the king, assumed primary responsibility for maintaining the "king's peace,"[38] consistent

---

[38] St. George Tucker explained that "[u]pon dissolution of the regal government, all public offences became offences against that particular state in which they were committed." Accordingly, crimes in Virginia were "alledged to be committed against the peace and dignity of this commonwealth." 5 St. George Tucker, *Blackstone's Commentaries*, at app'x 20.

with their constitutions, laws, and traditions.  As we have seen, maintaining the "king's peace" was the king's duty and, in the English view, the carrying of weapons in public areas was an affront to the king's authority, for two reasons.  First, public carry threatened the king's peace because the mere presence of the weapons terrorized the people.  Second, it suggested that the king was unable or unwilling to protect the people.  Carrying arms in the public square infringes on states' police powers for similar reasons.  Thus, whether a man carried arms publicly as an open challenge to the king's peace, or did so as a vote of no confidence in the king's ability to maintain it, the Statute of Northampton was among the earliest efforts to assert formal authority over the public square.  And, in the English view, the Statute of Northampton did not infringe any right to defend one's castle, what the Supreme Court colloquially referred to in *Heller* as "hearth and home."  As Lord Coke explained, the Statute did not apply to the man who "assemble[s] force to defend his

---

The Supreme Court has further explained:

> [W]hen the Constitution was written the term 'breach of the peace' did not mean, as it came to mean later, a misdemeanor such as disorderly conduct but had a different 18th century usage, since it derived from breaching the King's peace and thus embraced the whole range of crimes at common law.

*United States v. Brewster*, 408 U.S. 501, 521 (1972). *See* U.S. Const. art. I, § 6, cl. 1 (granting Senators and Representatives privilege against arrest during and traveling to and from legislative sessions "except [for] Treason, Felony and Breach of the Peace"); *Williamson v. United States*, 207 U.S. 425, 446 (1908) ("[T]he term treason, felony and breach of the peace, as used in the constitutional provision relied upon, excepts from the operation of the privilege all criminal offenses" (internal quotation marks omitted)).

house." Coke, *The Third Part of the Institutes of the Laws of England* 161. Hearth and home and the public square were separate domains.

Even as the colonists broadly adopted the Statute of Northampton, they also adapted it, by enumerating the kinds of weapons that were banned. The lists vary from jurisdiction to jurisdiction, but what commonly appears on the lists are small, hand-held weapons, capable of being concealed, including pistols, revolvers, dirks, daggers, brass knuckles, and slung shots—which were, at the time of the colonies and early statehood, considered deadly and dangerous weapons. Throughout the nineteenth century, American courts continued to question the usefulness of such weapons, *see Andrews*, 50 Tenn. at 178; *Page*, 50 Tenn. at 201; *Hill*, 53 Ga. at 474–75; *English*, 35 Tex. at 476–77; *Duke*, 42 Tex. at 458–59; *Haile*, 38 Ark. at 565–66, characterizing them as given to "known public mischief," *Fife*, 31 Ark. at 461. Although some states only prohibited concealed carry, many more states banned the carrying of concealable weapons whether actually concealed or not.

The states broadly adopted restrictions on possessing arms in the public square, and they did so even in the face of the states' own constitutional provisions protecting the right to keep and bear arms. Four states had constitutional protections for arms-bearing that pre-date the U.S. Constitution. N.C. Decl. of Rights of 1776, § 17; Pa. Decl. of Rights of 1776, cl. XIII; Vt. Const. of 1777, ch. I, art. 15; Mass. Const. of 1780, part. 1, art. 17. North Carolina, Pennsylvania and Vermont characterized it as the "right to bear arms" to defend themselves and the state. Massachusetts called it the "right to keep and to bear arms for the common defence." Following independence and continuing to today,

forty-four of the fifty states have some kind of Second Amendment analogue. Most of those provisions have some kind of clause referring to the militia or the need to keep the militia under civilian control. Most of the provisions refer to the right to defend self and state. A number of states spelled out that the right to keep and bear arms extended to defense of self, family, and property. The Montana provision is typical: "The right of any person to keep or bear arms in defense of his own home, person, and property, or in aid of the civil power when thereto legally summoned, shall not be called in question . . . ." Mont. Const. of 1889, art. III, § 13; *see also* Neb. Const. of 1988, art. I, § 1; N.H. Const. of 1982, pt. 1, art. 2-a; N.D. Const. of 1984, art. I, § 1; Okla. Const. of 1907, art. II, § 26; Utah Const. of 1984, art. I, § 6; W. Va. Const. of 1986, art. III, § 22. Others added that the right to bear arms included a right to engage in hunting or other recreational use. *See* Neb. Const. of 1988, art. I, § 1; Nev. Const. of 1982, art. I, § 11(1); N.M. Const. of 1986, art. II, § 6; N.D. Const. of 1984, art. I, § 1; W. Va. Const. of 1986, art. III, § 22. The states divided over the line between the legislature's power to regulate concealed carry and its power to regulate the carrying of arms, concealed or open. A number of constitutions did not explain one way or the other, but nine state constitutions expressly referred to the legislature's power to regulate concealed carry. For example, the Louisiana Constitution provided that the right to keep and bear arms did "not prevent the passage of laws to punish those who carry weapons concealed." La. Const. of 1879, art. III, § 3; *see also* Colo. Const. of 1876, art. I, § 13; Idaho Const. of 1978, art. I, § 11; Ky. Const. of 1850, art. XIII, § 25; Ky. Const. of 1891, art. II, § 1; Miss. Const. of 1890, art. III, § 12; Mo. Const. of 1875, art. II, § 17; Mont. Const. of 1889, art. III, § 13; N.M. Const. of 1911, art. II, § 6; N.M. Const. of 1971, art. II, § 6; N.C. Const. of 1876, art. I, § 24;

N.C. Const. of 1971, art. I, § 30; *cf.* La. Const. of 1974, art. I, § 11 (removing any reference to the state's authority to regulate concealed carry); Mo. Const. of 1945, art. I, § 23 (same). Eight states recognized the legislature's power to regulate the carrying of arms, without limiting the express power to concealed carry. Perhaps the most explicit of these is the Oklahoma Constitution, which provides: "The right of a citizen to keep and bear arms in defense of his home, person, or property, or in aid of the civil power, when thereunto legally summoned, shall never be prohibited; but nothing herein contained shall prevent the Legislature from regulating the carrying of weapons." Okla. Const. of 1907, art. II, § 26; *see also* Fla. Const. of 1885, art. I, § 20; Fla. Const. of 1968, art. I, § 8; Ga. Const. of 1868, art. I, § 14; Ga. Const. of 1877, art. I, § 1, para. XXII; Idaho Const. of 1889, art. I, § 11; Ill. Const. of 1970, art. I, § 22; Tenn. Const. of 1870, art. I, § 26; Tex. Const. of 1869, art. I, § 13; Tex. Const. of 1876, art. I, § 23; Utah Const. of 1895, art. I, § 6; Utah Const. of 1984, art. I, § 6.**[39]**

Although "the [Second] Amendment did not originally apply to the States, . . . that does not make state practice

---

**[39]** Even when a state constitution was silent on the power of the legislature to regulate the carrying of weapons (openly or concealed), state courts upheld the power of the legislature to regulate carrying. *See, e.g.*, *Mitchell*, 3 Blackf. at 229; *Aymette*, 21 Tenn. at 161–62; *Buzzard*, 4 Ark. at 28 (op. of Ringo, C.J.), 33 (op. of Dickinson, J.); *Wright*, 77 Pa. at 471; *Blaksley*, 83 P. at 620–21; *Isaiah*, 176 Ala. at 28. The Supreme Court of Arkansas, reviewing the cases and acknowledging that the Arkansas Constitution lacked an express conferral of legislative power, referred to an express provision in the Tennessee Constitution as "a matter of superabundant caution, inserted to prevent a doubt, and that, unexpressed, it would result from the undefined police powers, inherent in all governments, and as essential to their existence as any of the muniments of the bill of rights." *Haile*, 38 Ark. at 567.

irrelevant in unearthing the Amendment's original meaning."
*Atwater v. City of Lago Vista*, 532 U.S. 318, 338–39 (2001)
(discussing the Fourth Amendment). We can, and should,
look to "early state practice," particularly where "[a] number
of state constitutional . . . provisions served as models for the
. . . Amendment." *Id.* at 339. Even after the adoption of the
Second Amendment, states continued to adopt constitutional
provisions protecting the right to keep and bear arms,
precisely because it was not clear that the Second
Amendment did bind them. And even as the states enshrined
a right to bear arms in their fundamental documents, they
continued to regulate the presence and use of arms in the
public square. The states themselves saw no inconsistency
between their citizens' right to keep and bear arms and the
states' duty to protect those citizens. When we look to those
early state practices, we must conclude that "history, if not
unequivocal, has expressed a decided, majority view," *id.* at
345, and it is one that comes with "an impressive historical
pedigree," *United States v. Villamonte-Marquez*, 462 U.S.
579, 585 (1983), and that is sufficient.

It would be anomalous in the extreme if, having gone to
the trouble of spelling out the respective responsibilities of
the new federal government and the states in 1789, the
framers of the Bill of Rights undid that relationship with the
Second Amendment (adopted in 1791) by overruling existing
state constitutions and statutes. And the Court has assured us
that the Second Amendment did no such thing, but merely
codified a pre-existing right to keep and bear arms. *Heller*,
554 U.S. at 599. For us, this powerfully suggests that the
Second Amendment should be read in light of state
constitutions and laws roughly contemporaneous with the
adoption of the Constitution; it should be seen as consistent
with pre-existing laws regarding the king's peace, and not as

a novel federal check on those laws.  *Cf. Atwater*, 532 U.S. at 336–37 (finding that the petitioner "has cited no particular evidence that those who framed and ratified the Fourth Amendment sought to limit peace officers' warrantless misdemeanor arrest authority" and citing "[t]he evidence of actual practice . . . . [d]uring the period leading up to and surrounding the framing of the Bill of Rights [by] colonial and state legislatures").

### 2.   The Exceptions

The American record is clear enough, but as we have said, it is not uniform.  States adapted the Statute of Northampton to fit their own needs.  Although they did not agree on all the particulars, they did agree that the state legislatures had power to regulate the carrying of arms in public.  In this section, we consider some of the general exceptions the states made to the no public carry rule to understand how it might affect any right to bear arms in the public square.

*a.   Classes of persons*.  The statutes exempted certain classes of persons from the restrictions.  For example, the statutes are nearly unanimous in stating, so that there would be no misunderstanding, that the restrictions on public carry did not apply to law enforcement officials.  As a nod to our federalism, the states generously made clear that their statutes also did not regulate *federal* law enforcement officials from carrying.  And the statutes exempt military personnel when on duty and required by the military to be armed.  Many of the statutes also took into account people who were travelling through the locale and, of necessity, were carrying their belongings, including firearms.  More recent statutes make clear that hunters and target shooters may carry their weapons

to and from the places where they may be lawfully discharged.

*b. Places*.  The statutes generally regulate carrying arms in public places such as fairs, markets, churches, and in places where the king's ministers or agents might be found, which we accept as a primitive reference to government buildings.  We do have a couple of colonial examples where, by statute, persons were required to carry their weapons to such public places, most notably churches.  We have explained that these early statutes were for the perceived need for protection from outside groups, such as slaves and Native Americans.  Although it might be argued that this demonstrates that early Americans had a *right* to carry their firearms, the statutes impose a *duty* to carry, which is quite different.  When the government imposes such a duty it assumes that it has the power to regulate the public carrying of weapons; whether it forbids them or commands them, the government is *regulating* the practice of public carrying.

So far as we can tell from the historical record, none of the early statutes forbade the possession of such weapons in the home.  And more modern statutes sometimes allow individuals to keep weapons in a place of business as well.

*c. Licensing and good-cause requirements*.  Some of the first English provisions forbade the carrying of arms unless licensed by the king.  We do not have much information on what criteria were used or how frequently such licenses were issued.  By the nineteenth century, some states authorized a form of licensure as an alternative to a ban on public carriage, although it was not a formal process such as we think of today.  The 1836 Massachusetts statute, which served as a model for many states, provided that any person who went

"armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, *without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property*," was subject to surety (which we discuss below). 1836 Mass. Acts 750, ch. 134, § 16 (emphasis added). One way of reading this statute is that it gave permission to people to carry concealable arms if they had "reasonable cause," which the statute defined as fear of assault, injury, or violence to themselves, their families, or their property. Unlike the modern practice, no advance permission needed to be obtained.

The modern practice of formal licensing of firearms appears to be a twentieth-century innovation. A number of the twentieth-century statutes granted a license to carry in public if the applicant had good cause, such as fear of injury to himself or his property. Some states generally authorized the carrying of firearms in the home or at a place of employment but forbade persons to carry elsewhere unless they could demonstrate good cause. The influential 1913 New York law allowed persons to carry a pistol, revolver, or other firearm to protect their home or business, but it required advance application to a magistrate. 1913 N.Y. Laws 1629, vol. III, ch. 608, § 1.

*d. Surety*. Both English and American law allowed the practice of surety as an alternative to a broad ban on open carry. Massachusetts provides a typical example. The surety was a form of "security to keep the peace, or . . . good behavior, or both." 1836 Mass. Acts 750, ch. 134, § 1. It was a form of prior restraint where "there [was] just cause to fear that any such offence may be committed." *Id.* § 3. If a person was found with one of the enumerated weapons, or any other "offensive and dangerous weapon," then "any

person having reasonable cause to fear an injury, or breach of the peace" could file a complaint. *Id*. § 16. Upon complaint, a magistrate could issue a warrant for the apprehension of the person accused of threatening the peace. The accused would be brought before the court where he could present his defense. If the person carrying the weapon did not have "reasonable cause" to fear for himself, his family, or his property, then the magistrate could require the accused to post "sufficient sureties . . . to keep the peace towards all the people of this Commonwealth, and especially towards the person requiring such security." The surety was known as a "recognizance." *Id.* §§ 3–4. Effectively, posting surety was similar to posting bail against one's future conduct. If surety was not posted, the person was imprisoned for the term for which the surety was to be posted, a term not to exceed six months. *Id.* § 4. If the person violated his recognizance, the surety was forfeited. *Id.* § 17.[40]

The surety provision allowed people against whom a complaint had been made to carry in public, but only if they could demonstrate good cause. The penalties for failing to show good cause were severe—including fines and imprisonment. Moreover, the law allowed "any person" who feared "injury, *or breach of the peace*" to file a complaint. *Id.* § 16 (emphasis added). Filing a complaint did not require proof that the person carrying was a threat to the complainant; it was sufficient for the complainant to show that there was a

---

[40] The Massachusetts law contemplated both sureties of the peace and sureties for good behavior, a practice with deep roots in English law. *See supra* note 12 (explaining the forms of surety). Section 16 required that a person accused of being a threat to the peace in the future "find sureties for keeping the peace." Section 18 referenced "[a]ny surety in a recognizance to keep the peace, *or for good behavior* . . . ." 1836 Mass. Acts 750, ch. 134, §§ 16, 18 (emphasis added).

threat to the peace—a standard that harkened to the Statute of Northampton.  The possibility of having to respond to such a complaint, much less having to post surety, appears to have been a severe constraint on anyone thinking of carrying a weapon in public.

We thus vigorously disagree with the D.C. Circuit's conclusion that "[u]nder surety laws, put simply, everyone started out with robust carrying rights."  *Wrenn*, 864 F.3d at 661.  This conclusion simply ignores the plainest of readings of English and American laws.  The English practice of surety of the peace, which carried over to the states, was a substantive restraint on anyone who was the subject of a complaint for openly carrying arms or other dangerous weapons.  The surety laws permitted courts to impose a bond requirement on people who had not actually violated any laws, but might do so in the future.  Surety was a means of keeping the peace in areas lacking a centralized police force.  *See supra* note 12.  No one would describe such regulations as "'akin to modern penalties for minor public-safety infractions like speeding or jaywalking,' which makes them . . . poor evidence of limits on the [Second] Amendment's scope."  *Id.* (quoting *Heller*, 554 U.S. at 633).[41]  The history of sureties shows that carrying arms in public was not treated as a fundamental right.

\* \* \*

None of the longstanding exceptions for certain types of public carry diminishes in any significant way the

---

[41] We note that the Court in *Heller* was not referring to surety provisions, but to provisions dealing with discharging weapons.  554 U.S. at 632–34.

government's power to regulate the carrying of arms in public places. The fact that we have recognized the need for law enforcement officials and military personnel to carry weapons; that we have understood the right of self-defense in our businesses; that we have made accommodations to reality by allowing persons in transit to cross public areas with their arms; that we have granted limited license to people to carry in the public square; and that we have, at times, employed sureties as an alternative to an outright ban on open carry does not detract in any way from the fundamental point that for centuries we have accepted that, in order to maintain the public peace, the government must have the power to determine whether and how arms may be carried in public places. There is no right to carry arms openly in public; nor is any such right within the scope of the Second Amendment. *Cf. Kachalsky*, 701 F.3d at 96 ("[S]tate regulation of the use of firearms in public was 'enshrined with[in] the scope' of the Second Amendment when it was adopted." (alteration in original) (quoting *Heller*, 554 U.S. at 634)).

We recognize that, although there have been few technological advances in the last centuries in dirks, daggers, slung shots, and brass knuckles, there clearly have been advances in the manufacture of pistols and revolvers. *Heller* observed that today the handgun is "an entire class of 'arms' that is overwhelmingly chosen by American society for . . . [a] lawful purpose." *Heller*, 554 U.S. at 628. Notwithstanding the advances in handgun technology, and their increasing popularity, pistols and revolvers remain among the class of deadly weapons that are easily transported and concealed. That they may be used for defense does not change their threat to the "king's peace." It remains as true today as it was centuries ago, that the mere presence of such weapons presents a terror to the public and that widespread

carrying of handguns would strongly suggest that state and local governments have lost control of our public areas. Technology has not altered those very human understandings.[42]

We may, of course, change our conception of what we need to do to protect ourselves. The Constitution does not impose the Statute of Northampton on the states. But the Second Amendment did not contradict the fundamental principle that the government assumes primary responsibility for defending persons who enter our public spaces. The states do not violate the Second Amendment by asserting their longstanding English and American rights to prohibit certain weapons from entering those public spaces as means of providing "domestic Tranquility" and forestalling "domestic Violence." U.S. Const. pmbl.; U.S. Const. art. IV, § 4. Any change we wish to make in our allocation of responsibility between ourselves and our governments may be had through ordinary legislation, amendment to state constitutions, or amendment to the U.S. Constitution.

E. *Response to the Dissent*

Before we apply our conclusion to the Hawai'i statute, we have several general observations to make on the views of our dissenting colleagues. We have tried to address all relevant materials—statutes, cases, and treatises—and we have labored to make sense of the whole record. We have

---

[42] Even if we were disposed to declare pistols and revolvers necessary for our own self-defense in public places, we see no reasonable stopping point at firearms. *See Strickland*, 72 S.E. at 263. If pistols and revolvers are useful for self-defense, so are dirks and daggers and "other dangerous and unusual weapons" such as Samurai swords or a trident and net.

recognized that the materials do not always agree in all the particulars, but we have worked to distill the central meaning from the record. The dissent, however, reviews a much more limited historical record. Where we referred to state constitutions as evidence of the meaning of the Second Amendment, the dissent finds them "entirely irrelevant" to the question presented in this case. O'Scannlain Dissent at 147. Where we worked through the history of legislation in the colonies, states, and territories—covering a variety of regulations from some thirty-one separate jurisdictions—the dissent dismisses the legislation as "regulation at its edges," *id.* at 132, from a "smattering of nineteenth-century gun regulations," *id.* at 160.[43] When we point out that three U.S.

---

[43] The history of legislation the dissent does cite is the post-Civil War history of the Black Codes. *See* O'Scannlain Dissent at 150–53. We do not disagree with the history the dissent recounts, but it is not clear how that history informs the issue before us. The Black Codes, for example, forbade black Americans (and others) from keeping arms. *See id.* at 150 n.8 (citing examples). The congressional reaction to these codes was the Civil Rights Act of 1866. That Act provided that all citizens, without regard to prior condition of slavery, would have "the same right . . . to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens . . . ." Act of Apr. 9, 1866, ch. 31, § 1, 14 Stat. 27. Concerned that the Act might be beyond Congress's powers, Congress proposed a new amendment, which became our Fourteenth Amendment. As he introduced the proposed amendment, Representative Thaddeus Stevens explained that it would guarantee that

> whatever law punishes a white man for a crime shall punish the black man precisely in the same way and to the same degree. Whatever law protects the white man shall afford "equal" protection to the black man. Whatever means of redress is afforded to one shall be afforded to all. Whatever law allows the white man to

territories, which were bound by the Second Amendment and whose own constitutions had to be approved by Congress, had firearms restrictions similar to those of the states, the dissent answers that they are "isolated, territorial statutes," *id*. at 169, from Western regions where "life on the frontier might have motivated territorial legislatures to undertake more severe measures against the use of weapons" than in other states, *id*. at 165–66. Where we carefully analyzed the full range of views expressed in the nineteenth-century state cases, the dissent begins with the cases that favor its view, *id.* at 138–44, and discards the remaining cases as "carry[ing] no interpretive weight after *Heller*," *id.* at 144. *See id.* at 144–49 (discussing and dismissing other state cases). Where we cited to all the treatises that were relevant to the parties, the dissent only relies on the treatises that agree with its bottom line. *Id.* at 135–38, 155–56, 164–65. Having dispensed with most of the resources available to us, it is of no surprise that the dissent concludes that "[t]he *important* Founding-era treatises, the *probative* nineteenth-century case law, and the *post-Civil War* legislative scene all reveal a single American voice." *Id.* at 153 (emphasis added).

---

testify in court shall allow the man of color to do the same.

Cong. Globe, 39th Cong., 1st Sess. 2459 (1866).

As equality provisions, the Privileges or Immunities Clause and the Equal Protection Clause of the Fourteenth Amendment guaranteed that all citizens would enjoy the same rights as "white citizens," including Second Amendment rights. But those provisions do not tell us anything about the substance of the Second Amendment, any more than an equal right to enter into contracts or inherit property tells us whether the state may alter the Statute of Frauds or the Rule Against Perpetuities, so long as it does so for all citizens.

The dissent's conclusion is, with respect, a modest thesis. And, more importantly, it is not history. We acknowledged from the very beginning that the historical record was mixed and that we were going to have to work through it—all of it—to discern the long-term trends. The dissent has picked its friends and come to a fore-ordained conclusion that its friends have spoken with a "single American voice." We deal below with some of the dissent's reasons for dismissing the evidence laid out before us, but one important point needs to be made here. The dissent dismisses out of hand many nineteenth-century sources as irrelevant because they "carr[y] no interpretive weight after *Heller*." *Id.* at 144. *See also id.* at 145–47, 163–65. Indeed, in the end, examining any evidence beyond that supporting the dissent "is foreclosed by *Heller*." *Id.* at 174. We do not believe that *Heller* has decided the issue presented to us in this case, nor do we believe that *Heller* has foreclosed our examination of the historical record. But we, and the dissent, should be clear: If *Heller* has answered these questions then there is no reason to review the historical record. In the end the dissent's view is not that our understanding of the history is wrong, but that history is now beside the point because *Heller* has reached a different conclusion. But that is an argument based on *Heller*, not an argument based on the historical evidence, and we ought not to pretend that selective citation of historical sources is itself good history.

We are thus content, in the main, to rest on our review of the historical record. There are a couple of points we should address. We will start with the relevance of legislation as evidence of the scope of a constitutional right. The dissent simply elides the substantial history of colonial, state, and territorial restrictions on the possession of firearms in the public square, most of it derived from the Statute of

Northampton and related English practices.  For the dissent, "the existence of historical regulations" is of little value, for two reasons: (1) "the majority offers no enforcement history" and (2) those regulations "largely evaded constitutional scrutiny." *Id.* at 160; *see also id.* at 166 ("[O]ne can learn little about the general understanding of the Second Amendment from such isolated statutes, which were enacted so distant from the Founding and for which we have no record of enforcement.").  The question of whether these statutes were actually enforced is a fair one.  There are many statutes on the books of American jurisdictions that have never been enforced or, having once been enforced, have fallen into desuetude.  There are several things in the record that make us think that these statutes were not merely symbolic.  The statutes adopted by the states owed much to their English antecedents.  Whatever deference the colonists thought they owed to England was severed in the Revolution.  Yet, shortly after the adoption of the Second Amendment, the states adopted statutes similar to the Statute of Northampton.  And the states, acting independently, copied statutes from each other.  And such statutes were updated and altered as necessary.  That strongly suggests that the states felt the need for such legislation.  How tightly each state or jurisdiction within a state decided to enforce the statute is beyond the materials that we have seen.  But even if a statute was not enforced, or was loosely enforced, the fact of the statute alone is some evidence that the state legislature believed that it was within its power to adopt the legislation.  The sheer breadth of firearms legislation in the United States suggests that its constitutionality was broadly accepted.  Moreover, the handful of cases we do have from various courts, based on fairly mundane facts, proves that the statutes *were* enforced.

Nevertheless, the dissent correctly points out that there are a relatively small number of state cases—largely from the South—testing the constitutionality of such statutes. There are several things that may explain this. Since *Marbury v. Madison*, we have come to accept the primacy of the judiciary in deciding the constitutionality of legislative acts. As twenty-first century Americans we believe that all constitutional questions not only will, but must, be resolved in the courts. Thus, we may be forgiven for believing that, if these statutes were enforced, there would be more reported appellate decisions. From this the dissent would have us conclude that the statutes were simply not enforced. But, on the other hand, our twenty-first century assumptions may not have been true of the nineteenth century. At least in the U.S. Supreme Court, the routine exercise of the *Marbury* power is largely a post-Civil War development. Until 1865, the Court struck down exactly two federal statutes, one in *Marbury* and one in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857). Whether there was a similar reluctance on the part of state supreme courts to address such questions, whether state courts routinely accepted the constitutionality of the statutes, or whether the statutes were sparingly enforced and challenged in court is not apparent, but it is clear that as a nation we became much more constitutionally litigious after the Civil War. *See Heller*, 554 U.S. at 625–26 (commenting on a number of "significant matter[s]" that have "been for so long judicially unresolved"). Without some basis for rejecting the extensive history of legislation, we are not free to ignore it. It is the best evidence we have of the American understanding of the interface between the right to keep and bear arms and the police power over the public square.

The scholarly commentary offers additional explanation. Military historian Patrick Charles points out that prior to the

Civil War, the states divided along sectional lines over how to regulate arms, with Northern and Western states following what has been called the "Massachusetts Model." He observes, consistent with the dissent's point, that "the constitutionality of the Massachusetts Model was never sufficiently called into question." Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* 143 (2018) (footnote omitted). He suggests three reasons why that is so. First, "Northerners, by and large, detested the practice of going habitually armed," and therefore accepted the legitimacy of this exercise of police power. *Id.* Second, even under the Massachusetts Model, individuals could "carry weapons for self-defense so long as they could show a pressing or imminent threat." *Id.* at 144. And third, "Northerners viewed the right to self-defense as a right of the last resort"; they simply did not feel the need to carry as often as their Southern counterparts, who "embrace[d] notions of vengeance and honor." *Id.* at 145. In the South, the states "differentiate[d] between the open and concealed carriage of arms. While open carriage was more often than not legally condoned, concealed carriage was prohibited." *Id.*

Even accepting the relatively small number of reported cases, we have an additional concern with the dissent's rejection of roughly half of the state cases that did address the constitutionality of firearms regulations. *Compare* O'Scannlain Dissent at 138–43 (citing with approval cases from Kentucky, Tennessee, Alabama, Georgia, and Louisiana), *with id.* at 144–49 (rejecting cases from Arkansas, Georgia, Texas, West Virginia, and Oklahoma).[44] Once the

---

[44] We have addressed all of these cases in Part III.C.2.b and will not repeat our discussion here.

dissent dismisses all the state cases that disagreed with its conclusion, it confidently concludes that "the majority has not cited a *single* apposite case in which any nineteenth-century court held to the contrary." *Id.* at 149. The trick, of course, is the word "apposite." The dissent rejects decisions from four states, Arkansas, Georgia, Texas, and West Virginia because "each decision was explicitly premised on a militia-focused view of the right to bear arms." *Id.* at 145. According to the dissent, *Heller* rejected a militia-based reading of the Second Amendment, and each of these cases "rests on the untenable militia-based view of the right." *Id.* at 144. The dissent has overstated its case. In *Heller*, the Court rejected the view that the Second Amendment's prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—was "the central component of the right," that is, that one might possess arms only in defense of the state. *Heller*, 554 U.S. at 599 (emphasis omitted); *see id.* at 577 ("Petitioners and today's dissenting Justices believe that [the Second Amendment] protects only the right to possess and carry a firearm in connection with militia service."). Rather, the Court held that the "entirely sensible" reading was that the Second Amendment prevented "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms." *Id.* at 599; *see id.* at 598 ("During the 1788 ratification debates, the fear that the Federal Government would disarm the people in order to impose rule through a standing army or select militia was pervasive in Antifederalist rhetoric.").

There is nothing in the state cases that the dissent rejects and, therefore, ignores that is inconsistent with *Heller*'s conclusion that the Second Amendment protects an individual right. None of those state decisions took the position disapproved by the Supreme Court in *Heller*. What they did

was refer to arms useful in service in the militia as way of distinguishing between constitutional regulations (small weapons traditionally prohibited under English and American law and not useful in military service) and a right to keep and bear arms that could be exercised in defense of self and state. *See id.* at 602 (referring to state constitutions that "referred to the right of the people to 'bear arms in defence of themselves and the State'"). The dissent's own quotations from the cases it rejects demonstrates the state courts' concerns. *See* O'Scannlain Dissent at 144–47. None of those cases could reasonably be read to support the ban of all weapons except when actually used in militia service, which was the theory *Heller* rejected. The militia clause helps us understand the contours of the Second Amendment. After *Heller*, the prefatory clause may not dictate the content of Second Amendment rights, but neither is it irrelevant to it.

Finally, the dissent's treatment of the state cases that do not agree with its conclusion reinforces the dissent's *Heller* problem. If the Second Amendment codifies an "existing right," we have to look to some source for the right. And unless we are willing to say that it is a natural right *without reference to English or American practice*, we have to look at all of the materials. The dissent can only get to its conclusion by rejecting the English practice, the entire history of American legislation, half of the state cases, and at least half of the scholarly commentary. That is not much of a "pre-existing right" if all the state legislatures and half of state supreme courts got it wrong. The dissent's argument thus contains the seeds of its own destruction, because if the dissent is correct that much of our history is, at best, irrelevant, but more likely just wrong, then perhaps there is no such pre-existing right. In which case, under the dissent's own reasoning, *Heller* is wrong. We are not willing to follow

the dissent down that road.  Either *Heller* has decided this
question, in which case there is no need for further historical
inquiry, or we need to examine the entire historical record
with care.

F.  *Application to HRS § 134-9*

Hawai'i's licensing scheme stands well within our
traditions.  Section 134-9 requires a license to carry a pistol
or revolver, concealed or unconcealed.  Consistent with
English and American legal history, Hawai'i exempts from its
firearms regulation scheme police officers, certain persons
employed by the state, and members of the armed forces
"while in the performance of their respective duties."  HRS
§ 134-11(a).  It permits hunters and target shooters to carry
openly and to transport their arms.  *Id.* § 134-5.  It recognizes
the right of persons to arm themselves in their "place of
business, residence, or sojourn" and transport unloaded arms
between those locales.  *Id.* § 134-23.  Persons who have
"reason to fear injury to . . . person or property" may apply
for a license to carry a pistol or revolver concealed and,
"[w]here the urgency or the need has been sufficiently
indicated" and the applicant is "engaged in the protection of
life and property," to carry a pistol or revolver openly.  *Id.*
§ 134-9(a).[45]

Hawai'i's restrictions have deep roots in the Statute of
Northampton and subsequent English and American

---

[45] Subject to the permissions outlined in § 134-5 and to other
enumerated exceptions, Hawai'i also prohibits the public carry of loaded
or unloaded firearms other than a pistol or revolver.  HRS §§ 134-23, 134-
24.  The state further prohibits the possession of automatic firearms,
certain types of rifles and shotguns, and most assault pistols.  *Id.* § 134-8.

emendations, and do not infringe what the Court called the "historical understanding of the scope of the right." *Heller*, 554 U.S. at 625. Those restrictions are within the state's legitimate police powers and are not within the scope of the right protected by Second Amendment. That means that Young's challenge to Hawai'i's restrictions fails at step one of our framework and "may be upheld without further analysis." *Silvester*, 843 F.3d at 821. We easily conclude that HRS § 134-9 is facially consistent with the Second Amendment.

## IV.  OTHER CLAIMS

In addition to Young's primary Second Amendment claim, he brings two other claims against HRS § 134-9. First, borrowing the doctrine of prior restraint from the First Amendment, Young argues that the chief of police's discretionary authority to deny carry-permit applications violated his Second Amendment right. He argues that § 134-9 is invalid because it vests chiefs of police "with unbridled discretion to determine whether a permit is issued," which imposes on his right to carry a firearm in public. The application of the prior restraint doctrine to a Second Amendment challenge hinges on Young's assumption that the right to keep and bear arms is similar enough to the right to free speech that preemptive firearm-licensing requirements are also presumptively invalid. Second, Young brings a due process challenge to the Hawai'i statute. He claims that § 134-9 lacks a mechanism for appealing a chief of police's denial of a carry application, and that due process requires some form of hearing. *See Mathews v. Eldridge*, 424 U.S. 319 (1976). Assuming that Young has a liberty or property interest in obtaining a license to carry a firearm, it is not clear that Hawai'i does not provide him with the process he seeks.

Young did not attempt to exhaust his remedies before bringing this suit. We do not find either of these arguments persuasive.

## A. *Prior Restraint*

We start with Young's prior restraint claim. A "prior restraint" is any law or judicial order that preemptively forbids certain speech before the speech occurs. *Alexander v. United States*, 509 U.S. 544, 550 (1993); *In re Nat'l Sec. Letter*, 863 F.3d 1110, 1127 (9th Cir. 2017). These restrictions generally break down into two classes: "censorship schemes and licensing schemes." *In re Nat'l Sec. Letter*, 863 F.3d at 1127. In the First Amendment context, the threat of preemptive censorship by a governing body is apparent enough in prior restraints to render such restrictions presumptively invalid. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). So, although a prior restraint is not unconstitutional per se, it "bear[s] a heavy presumption against its constitutional validity." *Id.* This makes sense in the speech context, given that "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand," which is "a theory deeply etched in our law." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

On the surface, it is easy to see why Second Amendment challenges to licensing schemes so often invoke First Amendment jurisprudence. *See, e.g.*, *Heller*, 554 U.S. at 582 (finding that the Second Amendment extends to modern firearms just as the First Amendment extends to "modern forms of communication"); *Jackson*, 746 F.3d at 961 (concluding that in the context of step two of *Heller*, "we are likewise guided by First Amendment principles"); *see also*

*Binderup v. Att'y Gen.*, 836 F.3d 336, 344 (3d Cir. 2016) (en banc) (finding that restrictions on Second Amendment rights are "subject to scrutiny in much the way that burdens on First Amendment rights are"); *Ezell v. City of Chicago*, 651 F.3d 684, 706–07 (7th Cir. 2011) (recognizing that courts have adopted First Amendment principles of scrutiny in Second Amendment cases). After all, the Bill of Rights explicitly protects both the freedom of speech and the right to keep and bear arms.

But when we look beneath the surface, the analogy to the prior restraint doctrine quickly falls apart. *See Pena v. Lindley*, 898 F.3d 969, 1008–09 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) ("The analogy to the First Amendment begins to break down, however, once we move beyond rules of general applicability."); *United States v. Marzzarella*, 614 F.3d 85, 96 n.15 (3d Cir. 2010) ("While we recognize the First Amendment is a useful tool in interpreting the Second Amendment, we are also cognizant that the precise standards of scrutiny and how they apply may differ under the Second Amendment."). To start, although the Bill of Rights protects both speech and the right to keep and bear arms, there are "salient differences between the state's ability to regulate" First and Second Amendment rights. *Kachalsky*, 701 F.3d at 92. Most notably, the inherent risk that firearms pose to the public distinguishes their regulation from that of other fundamental rights. *See Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015). Additionally, while everyone enjoys the right to speak, even under the most generous reading of the Second Amendment, not everyone enjoys the right to carry a firearm in public. *See Heller*, 554 U.S. at 626–27; *Berron v. Ill. Concealed Carry Licensing Rev. Bd.*, 825 F.3d 843, 847 (7th Cir. 2016). Where the public square is concerned, states have always

enjoyed broader authority to regulate firearms than speech. For these reasons, we think it "imprudent to assume that the principles and doctrines developed in connection with the First Amendment apply equally to the Second . . . ." *Kachalsky*, 701 F.3d at 92.

We are not alone in concluding that the prior restraint doctrine does not apply in the Second Amendment context. So far as we can tell, every court to address the question has declined to apply the prior restraint doctrine to firearm-licensing laws. *See id.* at 91–92; *Hightower v. City of Boston*, 693 F.3d 61, 80–81 (1st Cir. 2012); *Drake*, 724 F.3d at 435; *Woollard*, 712 F.3d at 883 n.11; *United States v. Focia*, 869 F.3d 1269, 1283–84 (11th Cir. 2017). We, therefore, join our sister circuits in holding that the prior restraint doctrine does not apply to Second Amendment challenges involving firearm-licensing laws.

B. *Procedural Challenge*

Young's due process argument fares no better. He claims that HRS § 134-9 does not provide adequate process to challenge the denial of his carry-permit application.

Young's procedural challenge is premature. Young claims that he was deprived of due process because HRS § 134-9 does not provide a mechanism for review of a chief of police's denial of a permit application. It is not clear that Young is correct. Hawaiʻi's administrative procedure act affords "all parties . . . an opportunity for hearing" in any "contested case." HRS § 91-9. A "contested case" is any "proceeding in which the legal rights, duties, or privileges of specific parties are required by law to be determined after an opportunity for agency hearing." HRS § 91-1. Following

such a hearing, "[a]ny person aggrieved by a final decision and order in a contested case . . . is entitled to judicial review." HRS § 91-14(a). It is not clear to us whether the denial of an open-carry application would fall under § 91-9's umbrella. But it is clear that Young did not pursue a hearing under § 91-9 and did not seek judicial review as provided by § 91-14 prior to bringing suit in federal court. Young's claim that § 134-9 lacks an opportunity for appellate review is based on his own speculation.

A claim that "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all" is not ripe for review. *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted); *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010). Young did not seek review under § 91-9 before bringing suit. So, Hawai'i has not yet denied him the opportunity for appellate review. Because Young has not actually been denied a hearing, his procedural due process claim is speculative, and we need not reach it. *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 779 (9th Cir. 2000) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)).

## V.  CONCLUSION

The judgment of the district court is **AFFIRMED**.

O'SCANNLAIN, Circuit Judge, with whom CALLAHAN, IKUTA, and R. NELSON, Circuit Judges, join, dissenting:

The Second Amendment to the United States Constitution guarantees "the right of the people to keep *and bear* Arms." U.S. Const. amend. II (emphasis added). Today, a majority of our court has decided that the Second Amendment does not mean what it says. Instead, the majority holds that while the Second Amendment may guarantee the right to *keep* a firearm for self-defense within one's home, it provides no right whatsoever to *bear—i.e.*, to carry—that same firearm for self-defense *in any other place*.

This holding is as unprecedented as it is extreme. While our sister circuits have grappled with—and disagreed over—the question of whether public firearms carry falls within the inner "core" of the Second Amendment, we now become the first and only court of appeals to hold that public carry falls *entirely* outside the scope of the Amendment's protections.

In so holding, the majority reduces the right to "bear Arms" to a mere inkblot. The majority's decision undermines not only the Constitution's text, but also half a millennium of Anglo-American legal history, the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and the foundational principles of American popular sovereignty itself.

I respectfully dissent.

I

A

George Young wishes to carry a handgun publicly for self-defense in the State of Hawaii. Twice in 2011, he applied for a license to carry a handgun, either openly or concealed. His application was denied each time by the County of Hawaii's Chief of Police because Young failed to satisfy the requirements set forth in section 134-9 of the Hawaii Revised Statutes ("H.R.S.").

Section 134-9 acts as a limited exception to the State of Hawaii's "Place[s] to Keep" statutes, which generally require that gun owners keep their firearms at their "place of business, residence, or sojourn." H.R.S. §§ 134-23 to -27. The exception allows citizens to obtain a license to carry a loaded handgun in public under certain circumstances. *Id.* § 134-9(a). For concealed carry, section 134-9 provides that "[i]n an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property, the chief of police of the appropriate county may grant a license to an applicant . . . to carry a pistol or revolver and ammunition therefor concealed on the person." *Id*. For open carry, the chief of police may grant a license only "[w]here the urgency or the need has been sufficiently indicated" and the applicant "is engaged in the protection of life and property." *Id.*

These baseline requirements limit who "*may*" be eligible to obtain a public-carry license but leave each county with discretion to impose even tighter restrictions. The County of Hawaii, where Young lives, has done just that. When it promulgated regulations implementing section 134-9, Hawaii County created an open-carry licensing regime that is

available only to "private detectives and security guards." Police Dep't of Cnty. of Haw., *Rules and Regulations Governing the Issuance of Licenses to Carry Concealed and Unconcealed Weapons* 1 (Oct. 22, 1997). Moreover, the county regulation allows open carry "only" when the license holder is "in the actual performance of his duties or within the area of his assignment." *Id.* at 10. Thus, for any person who is not an on-duty security guard, the only opportunity to carry a firearm for self-defense is via concealed carry. And even then, a citizen must demonstrate "an exceptional case" just to be *considered eligible* for a concealed-carry permit. H.R.S. § 134-9(a).

Absent a license under section 134-9, a person may only transport an unloaded firearm, in an enclosed container, to and from a place of repair, a target range, a licensed dealer, a firearms exhibit, a hunting ground, or a police station, *id.* §§ 134-23 to -27, and may use those firearms only while "actually engaged" in hunting or target shooting, *id.* § 134-5(a), (c).

## B

On June 12, 2012, Young filed this *pro se* civil-rights action against the State of Hawaii, its Governor, and its Attorney General (collectively, "the State"), as well as the County of Hawaii and its Mayor, Chief of Police, and Police Department (collectively, "the County"), under 42 U.S.C. § 1983. Young alleged, primarily, that the denial of his application for a handgun license violated his Second Amendment right to carry a loaded handgun in public for self-defense.

The State filed a motion to dismiss Young's claims under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and the County filed a motion to dismiss the claims under Rule 12(b)(6). The district court granted both motions. As to the State, the district court found that Young's claims (for both monetary and injunctive relief) were barred by sovereign immunity. Dismissing Young's claims against the County on the merits, the district court found that section 134-9 "does not implicate activity protected by the Second Amendment" because that Amendment "establishes only a narrow individual right to keep an operable handgun at home for self-defense." *Young v. Hawaii*, 911 F. Supp. 2d 972, 989–90 (D. Haw. 2012). In the alternative, the district court indicated that it would uphold section 134-9's open- and concealed-carry limitations under intermediate scrutiny. *Id.* at 990–91. Young timely appealed.

In 2018, a three-judge panel of our court reversed the district court's dismissal of Young's Second Amendment claim against the County, holding that he "has indeed stated a claim that section 134-9's limitations on the issuance of open carry licenses violate the Second Amendment." *Young v. Hawaii*, 896 F.3d 1044, 1074 (9th Cir. 2018). The panel dismissed Young's appeal as to the State. *Id.*

We then granted rehearing en banc, thus vacating the three-judge panel's decision. *Young v. Hawaii*, 915 F.3d 681 (9th Cir. 2019).

II

At the heart of this case is a straightforward question: Does the Second Amendment, as originally understood,

protect the right of an ordinary, law-abiding citizen to carry a handgun openly for self-defense outside the home?

The majority holds that it does not—and that a total ban on carrying a handgun outside the home does not implicate the Second Amendment right to bear arms *whatsoever*. The majority reaches this startling conclusion not because it finds that the text of the Second Amendment supports it, that early American cases interpreted the Amendment in this way, nor even that open public carry was regularly and uncritically subject to legislative prohibitions across our country's early history. Instead, the majority has declared that a state may constitutionally *forbid* all public carry of firearms, based on the utterly inconsequential fact that the lawful *manner* of open public carry has historically been subject to modest regulation (but never to outright prohibition).

Respectfully, the majority's opinion—and in particular, its extreme and bizarre reliance on the mere fact of *some* historical regulation of firearms—represents a gross misapplication of the textual and historical inquiries that *Heller* demands. Under appropriate inspection, the critical sources on the meaning of the Second Amendment—its text, its historical interpretations by the commentators and courts most proximate to the Founding, and its treatment by early legislatures—unequivocally demonstrate that the Amendment does indeed protect the right to carry a gun outside the home for self-defense, even if that right might be subject to some regulation at its edges.

A

To begin, as we must, with the text: The Second Amendment guarantees that "the right of the people to keep

and bear Arms, shall not be infringed." U.S. Const. amend. II. Critically, the Amendment protects not only the right to "keep" arms, but also the right to "bear" arms. Central to Young's challenge is the latter of these two verbs.

It is hornbook constitutional law that "to bear arms implies something more than mere keeping." Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 271 (1880). Indeed, the Supreme Court in *Heller* was clear about what it means to "bear" arms: "At the time of the founding, as now, to 'bear' meant to 'carry.'" 554 U.S. at 584. That the Constitution delineates a specific right to *carry* a firearm—as distinguished from the right simply to *keep* a firearm—strongly implies the right to take one's firearm *outside* the home in which it is kept.

The Founding-era dictionaries relied upon by the Court in *Heller* confirm this intuition, making clear that one would typically "bear" a firearm when carrying it in garments worn outside the home. *See* 1 Samuel Johnson, *Dictionary of the English Language* 161 (4th ed. 1773) (reprinted 1978) (defining "Bear" as "To *carry* as a mark of distinction. . . . So we say, to *bear* arms in a coat" (first emphasis added)), *cited in Heller*, 554 U.S. at 584; Noah Webster, *American Dictionary of the English Language* (1828) (unpaginated) (defining "Bear" as "To wear; to *bear* as a mark of authority or distinction; as, to *bear* a sword, a badge, a name; to *bear* arms in a coat"), *cited in Heller*, 554 U.S. at 584. Wearing one's firearm in a coat or carrying it in one's pocket are strong indicia of activity that would be expected to take place *outside* the home.

Moreover, to deny that the right to "bear Arms" protects at least some degree of public carry would render it mere

surplusage, coextensive with the separately enumerated right to "keep" a gun in the home. *Cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect . . . ."); *see also Drake v. Filko*, 724 F.3d 426, 444 (3d Cir. 2013) (Hardiman, J., dissenting) ("[Such a reading] would conflate 'bearing' with 'keeping,' in derogation of [*Heller*'s] holding that the verbs codified distinct rights . . . .").

The evidence that the Second Amendment's Framers and ratifiers understood the right to bear arms to encompass public carry is not only lexical, but *logical*. The Court in *Heller* observed that the right to "bear arms" historically referred to a right to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of *conflict with another person*." 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)) (alterations omitted and emphasis added). Such "conflict" or "confrontation" with another person is at least as apt to arise outside the home as it is inside the home—and perhaps even more so. *See Wrenn v. District of Columbia*, 864 F.3d 650, 657 (D.C. Cir. 2017) ("[T]he Amendment's core lawful purpose is self-defense, and the need for that might arise beyond as well as within the home." (internal quotation marks and citation omitted)); *Moore v. Madigan*, 702 F.3d 933, 941 (7th Cir. 2012) ("[T]he interest in self-protection is as great outside as inside the home."). Indeed, it would require a highly unnatural reading of the text to infer "that the Framers understood the Second Amendment to protect little more than carrying a gun from the bedroom to the kitchen" in case a conflict arose along the way. *Peruta v. California*, 137 S. Ct. 1995, 1998 (2017) (Thomas, J., dissenting from denial of certiorari).

The opinions in *Heller* and *McDonald* underscore this straightforward understanding of "bear." *Heller* described the "inherent right of self-defense" as "*most* acute" within the home, implying that the right *does* extend elsewhere, even if less "acutely." 554 U.S. at 628 (emphasis added). *McDonald* similarly described the right as "*most* notabl[e]" within the home, implying the right *does* extend elsewhere, even if less "notably." 561 U.S. at 780 (emphasis added). *Heller* also took pains to avoid "cast[ing] doubt" on "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626. But why bother clarifying the Second Amendment's application in *particularly sensitive* public places if it does not apply, at all, in *any* public place?

In short, the Second Amendment's text—understood by reference to the historical sources relied upon by *Heller* and *McDonald*—points toward the conclusion that public carry lies within the scope of the Amendment's protections. That the majority altogether declines to engage with textual analysis is telling.

B

Next, the history of the Second Amendment confirms what the text so strongly suggests: that the Amendment encompasses a general right to carry firearms openly in public.

1

As guided by *Heller*, the historical inquiry begins with the writings of "important founding-era legal scholars"—the

evidence most probative of how the Framers understood the right to bear arms. 554 U.S. at 605.

The plain textual understanding of "bear arms" finds unequivocal support in the most prominent, widely circulated legal treatises from throughout the Founding era. In an early American edition of Blackstone's *Commentaries on the Laws of England*—indeed, the "most important" edition, as *Heller* points out, *see* 554 U.S. at 594—St. George Tucker, a law professor at the College of William & Mary and an influential Antifederalist, insisted that the right to armed self-defense is the "first law of nature" and that "the right of the people to keep and bear arms" is the "true palladium of liberty."[1] 1 St. George Tucker, *Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States; and of the Commonwealth of Virginia* app. n.D, at 300 (Phil., William Young Birch & Abraham Small 1803); *see also McDonald*, 561 U.S. at 769 (treating Tucker's notes on Blackstone as heavily instructive in interpreting the Second Amendment); *Heller*, 554 U.S. at 606 (same). Even more explicitly, Tucker wrote that "[i]f . . . congress were to pass a law prohibiting any person from bearing arms, as a means of preventing insurrections, the judicial courts . . . would be able to pronounce decidedly upon the constitutionality of these means." 1 Tucker, *supra*, at app. n.D, at 289; *see also* Michael P. O'Shea, *Modeling the Second Amendment Right to Carry Arms (I): Judicial Tradition and the Scope of "Bearing Arms" for Self-Defense*,

---

[1] Hawaii bizarrely suggests that we should not focus too heavily on Tucker, whom Hawaii discounts as "a single nineteenth-century commentator." This is a strange attack, indeed, given the Supreme Court's direct reliance on Tucker's notes in both *McDonald*, 561 U.S. at 769, and *Heller*, 554 U.S. at 606. Tucker's notes deserve similar weight here.

61 Am. U. L. Rev. 585, 637–38 & n.262 (2012). Indeed, as Tucker explained, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 Tucker, *supra*, at app. n.B, at 14.

Blackstone himself espoused a similar view of the inviolability of an Englishman's right to bear arms, which was most notably codified in the 1689 English Declaration of Rights as the right of Protestants to "have Arms for their Defence suitable to their Conditions, and as allowed by Law." Bill of Rights 1689, 1 W. & M., ch. 2, § 7 (Eng.); *see also Alden v. Maine*, 527 U.S. 706, 715 (1999) (noting that Blackstone's works "constituted the preeminent authority on English law for the founding generation"). As Blackstone explained, the 1689 Declaration enshrined "the natural right of resistance and self-preservation" and "the right of having and using arms for self-preservation and defence." 1 William Blackstone, *Commentaries* *144.[2] It followed from Blackstone's premise that such a right—the predecessor to our Second Amendment—"was by the time of the founding

---

[2] Blackstone was far from alone in recognizing a natural right to self-defense "belong[ing] to [all] persons merely in a state of nature, and which every man is intitled to enjoy whether out of society or in it." 1 William Blackstone, *Commentaries* *123. Quite a few commentators of that era likewise championed such a right. *See* Leonard W. Levy, *Origins of the Bill of Rights* 140–41 (2001) (referencing a 1769 article in the prominent colonial newspaper *A Journal of the Times*, which described the English right as "a natural right which the people have reserved to themselves, confirmed by the Bill of Rights, to keep arms for their own defence"); David B. Kopel, *The Natural Right of Self-Defense:* Heller's *Lesson for the World*, 59 Syracuse L. Rev. 235, 242 (2008) ("The Anglo-Americans learned the language of natural rights, including the natural right of self-defense . . . .").

understood to be an individual right protecting against both *public* and private violence." *Heller*, 554 U.S. at 594 (emphasis added); *see also* 2 William Blackstone, *Commentaries* \*441 (Edward Christian ed. 1795) ("[E]veryone is at liberty to keep *or carry* a gun, if he does not use it for the [unlawful] destruction of game." (emphasis added)).

## 2

Following *Heller*'s historical imperative, the inquiry turns to nineteenth-century judicial interpretation of the right to bear arms, whether as part of the Second Amendment or analogous state constitutional provisions. *See* 554 U.S. at 610–14. For by analyzing "how the Second Amendment was interpreted . . . immediately after its ratification," we can "determine *the [original] public understanding* of [its] text." *Id*. at 605. Many of the same nineteenth-century cases marshaled in *Heller*, to prove that the Second Amendment secures an individual right to self-defense, reveal just as persuasively that the Amendment encompasses a right to carry a firearm openly outside the home.

### a

The first of these is *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822), *cited in Heller*, 554 U.S. at 585 n. 9, a decision "especially significant both because it is nearest in time to the founding era and because the state court assumed (just as [*Heller*] does) that the constitutional provision at issue codified a preexisting right," Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1360 (2009) (footnote omitted). Interpreting Kentucky's Second Amendment analogue—which provided

that "the right of the citizens to bear arms in defense of themselves and the state, shall not be questioned"—the state's highest court had no doubt that any law restricting the public carry of firearms would "import a restraint on the right of the citizens to bear arms." *Bliss*, 12 Ky. (2 Litt.) at 90, 92. The court then invalidated a restriction on the concealed carry of weapons, despite the availability of open carry, reasoning that "whatever restrains the full and complete exercise of [the right to bear arms], though not an entire destruction of it, is forbidden by the explicit language of the constitution." *Id*. at 91–92. Kentucky later amended its constitution to allow the legislature to "pass laws to prevent persons from carrying *concealed* arms," Ky. Const. art. XIII, § 25 (1850) (emphasis added), but left untouched the premise in *Bliss* that the right to bear arms protects *open* carry.

Tennessee's highest court offered its own, similar interpretation of the right to bear arms in *Simpson v. State*, 13 Tenn. (5 Yer.) 356 (1833), *cited in Heller*, 554 U.S. at 585 n.9, 603, 614. There, after Simpson was convicted of disturbing the peace by appearing armed in public, he faulted the indictment for failing to require clear proof of actual violence. *Id.* at 357–58. The high court agreed. *Id.* at 357–60. First, the court cast doubt on the State's argument that English law would have allowed conviction without proof of actual "fighting of two or more persons." *Id.* at 357–58 (quoting 4 William Blackstone, *Commentaries* \*145). Second, the court explained that *even assuming* English law had criminalized the carrying of weapons without proof of actual violence, the Tennessee "constitution ha[d] completely abrogated it." *Id.* at 360. No such prohibition could survive the state constitution's grant of "an express power . . . secured to all the free citizens of the state to keep and bear arms for

their defence, without any qualification whatever as to their kind or nature." *Id.*

In 1840, the Alabama Supreme Court offered a similar interpretation of its own state's constitution. *See State v. Reid*, 1 Ala. 612 (1840), *cited in Heller*, 554 U.S. at 585 n.9, 629. Construing the Alabama "right to bear arms, in defence of []self and the State," the court declared that an Alabamian must be permitted *some* means of carrying a weapon in public for self-defense. *Id*. at 616–17. The court ultimately upheld a restriction on "the evil practice of carrying weapons secretly," citing the legislature's power "to enact laws in regard to the *manner* in which arms shall be borne. . . . as may be dictated by the safety of the people and the advancement of public morals." *Id*. at 616 (emphasis added). But the court made clear where that legislative power ran dry:

> We do not desire to be understood as maintaining, that in regulating the manner of bearing arms, the authority of the Legislature has no other limit than its own discretion. A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.

*Id.* at 616–17.[3]

---

[3]   The majority curiously (and erroneously) suggests that, many decades later, the Alabama Supreme Court recognized a state power to impose "severe restrictions" on open public carry in a case that upheld a prohibition against carrying certain arms on private property owned by another. *See* Maj. Op. 77–78 (citing *Isaiah v. State*, 58 So. 53 (Ala.

The Georgia Supreme Court embraced precisely the same position in an opinion central to the Supreme Court's historical analysis in *Heller*. *See Nunn v. State*, 1 Ga. 243 (1846), *cited in Heller*, 554 U.S. at 585 n.9, 612–13, 626, 629; O'Shea, *supra*, at 627 ("No case, historic or recent, is discussed more prominently or positively in *Heller* than the Georgia Supreme Court's 1846 decision in *Nunn v. State*."). There, the court considered a Second Amendment challenge to a statute that criminalized carrying a pistol, either openly or concealed. *Nunn*, 1 Ga. at 245–46. Starting off with a clear statement of the constitutional guarantee, the court explained: "The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear arms of every description, and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree . . . ." *Id.* at 251 (emphasis omitted). With those Second Amendment lines properly set, the court held that Georgia's statute had gone too far:

> [S]o far as the act of 1837 seeks to suppress the practice of carrying certain weapons *secretly*, that it is valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms. But that so much of it, as contains a prohibition against bearing arms

---

1911)). Aside from relying on a *concurrence* rather than the majority opinion in that case, the majority fails to point out that the law specifically allowed open carry on public highways "or elsewhere other than upon the premises of another." *Isaiah*, 58 So. at 54. Accordingly, the court held that such a restriction was constitutional specifically because it "merely prevents the carrying of arms for offensive purposes, and does not deprive a person of the right to bear arms in defense of himself or the state." *Id.*

*openly*, is in conflict with the Constitution, and *void* . . . .

*Id*. We should afford *Nunn*'s understanding of the Second Amendment significant weight because, as *Heller* explains, "[i]ts opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause." 554 U.S. at 612.

The Louisiana Supreme Court soon followed the course set by Alabama and Georgia. *See State v. Chandler*, 5 La. Ann. 489 (1850), *cited in Heller*, 554 U.S. at 585 n.9, 613, 626. The high court first rejected Chandler's Second Amendment challenge to a Louisiana law prohibiting concealed carry, reasoning that the law was "absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons, and to prevent bloodshed and assassinations committed upon unsuspecting persons." *Id.* at 489–90. But, in precisely the same manner as the *Nunn* and *Reid* courts, the *Chandler* court drew the line which the legislature could not cross. The court explained that a prohibition on *concealed* carry could be held constitutional because it "interfered with no man's right to carry arms . . . 'in full open view,' which places men upon an equality. *This* is the right guaranteed by the Constitution of the United States . . . ." *Id.* at 490 (emphasis added); *see also Heller*, 554 U.S. at 613 (citing favorably *Chandler*'s holding that "citizens had a right to carry arms openly").

The majority largely rejects the lessons of these cases by first suggesting that only *Bliss* could support the view that open public carry was historically understood to be within the scope of the Second Amendment, then characterizing *Bliss* as an "isolated decision." *See* Maj. Op. 74–75, 86. While *Bliss*

may have gone farther than other nineteenth-century cases in holding that *any* restraint on "the full and complete exercise of th[e] right [to bear arms] . . . is forbidden by the . . . constitution," 12 Ky. (2 Litt.) at 91–92, it could hardly be described as an outlier for purposes of the issue before us here. Our question is not whether the Second Amendment was historically understood to foreclose *any and all* regulation of public carry. Rather, the question is and must be whether the right to "keep and bear Arms" was originally understood to *limit* states' power to restrict the freedom to carry a firearm in public for self-defense. And *Bliss* is far from the only nineteenth-century case to hold that extensive prohibitions on open carry would indeed infringe on a constitutionally protected right—even if the *manner* of open public carry could be regulated at its margins. *Simpson*, *Reid*, *Nunn*, and *Chandler* all stand for precisely that proposition.[4]

In short, the same nineteenth-century cases found instructive by the Supreme Court in *Heller* underscore what nineteenth-century legal commentator John Ordronaux (also cited in *Heller*) aptly summarized: Though "a State [might] enact[] laws regulating the manner in which arms may be carried," including "the carrying of *concealed* weapons," any "statute forbidding the bearing of arms openly would . . . infringe[]" the Second Amendment. John Ordronaux, *Constitutional Legislation in the United States: Its Origin, and Application to the Relative Powers of Congress, and of*

---

[4] And, just after the turn of the twentieth century, the Supreme Court of Idaho likewise struck down a robust territorial prohibition against the public carry of firearms, holding that it violated of the Second Amendment because "the legislature has no power to prohibit a citizen from bearing arms in any portion of the state of Idaho, whether within or without the corporate limits of cities, towns, and villages." *In re Brickey*, 70 P. 609, 609 (Idaho 1902).

*State Legislatures* 242–43 (1891), *cited in Heller*, 554 U.S. at 619.

b

The majority observes that there were some judicial proponents of a more limited right to bear arms during the nineteenth century. *See* Maj. Op. 79–84. But their reasoning rests on the untenable militia-based view of the right, which carries no interpretive weight after *Heller*.

Most prominent is the Arkansas Supreme Court's 1842 interpretation of the right in *State v. Buzzard*, 4 Ark. 18 (1842). There, a divided court upheld a prohibition on the concealed carry of "any pistol, dirk, butcher or large knife, or a sword in a cane," *id.* at 18, but each judge in the splintered majority appeared poised to go further. Chief Justice Ringo advocated the view that the Second Amendment did not bar the Arkansas legislature from prohibiting *any* carrying of firearms: "[N]o enactment on this subject, which neither directly nor indirectly so operates as to impair or render inefficient the means provided by the Constitution for the defense of the State, can be adjudged invalid on the ground that it is repugnant to the Constitution." *Id.* at 27 (opinion of Ringo, C.J.). Chief Justice Ringo believed this to be so specifically because such restrictions would not "detract anything from the power of the people to defend their free state and the established institutions of the country." *Id.* Justice Dickinson echoed this view, writing that the Second Amendment was nothing "but an assertion of that general right of sovereignty belonging to independent nations to regulate their military force," thus finding *no* individual right within its guarantee. *Id.* at 32 (opinion of Dickinson, J.); *but*

*see id.* at 34–36 (Lacy, J., dissenting) (viewing the Second Amendment as an individual right to self-defense).

Several other nineteenth-century courts hewed to *Buzzard*'s approach and upheld laws restricting public carry without emphasizing, as did courts in *Nunn*'s camp, the limits of legislative authority. *See Hill v. State*, 53 Ga. 472, 474–77 (1874) (upholding prohibition on carrying weapons "to any court of justice . . . or any place of public worship, or any other public gathering . . . except militia muster grounds"); *English v. State*, 35 Tex. 473, 474, 480 (1871) (upholding prohibition on carrying "pistols, dirks, daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives"); *State v. Workman*, 14 S.E. 9, 10–12 (W. Va. 1891) (upholding presumption of criminality "when a man is found going around with a revolver, razor, billy, or brass knuckles upon his person"). Like *Buzzard*, each decision was explicitly premised on a militia-focused view of the right to bear arms. *See Hill*, 53 Ga. at 475 ("In what manner the right to keep and bear these pests of society [dirks, bowie knives, and the like], can encourage or secure the existence of a militia, and especially of a well regulated militia, I am not able to divine."); *English*, 35 Tex. at 477 ("The terms dirks, daggers, slungshots, sword-canes, brass-knuckles and bowie knives, belong to no military vocabulary."); *Workman*, 14 S.E. at 11 ("So, also, in regard to the kind of arms referred to in the amendment, it must be held to refer to the weapons of warfare to be used by the militia . . . .").[5]

---

[5] Moreover, not even all the cases with militia-focused views of the right to bear arms took *Buzzard*'s approach to open public carry. Several such cases protected the right to bear arms in a way that supports, or is at least consistent with, a right to such carry. *See, e.g.*, *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 186–87 (1871) (holding that, if a pistol "is

With *Heller* on the books, cases in *Buzzard*'s flock offer little instructive value. That is because *Heller* made clear that the Second Amendment is, *and always has been*, an individual right centered on self-defense; it has never been a right to be exercised only in connection with a militia. *See* 554 U.S. at 592, 599, 616; *see also Wrenn*, 864 F.3d at 658 (reasoning that such cases are "sapped of authority by *Heller*"); *Moore*, 702 F.3d at 941 (treating "the historical issues as settled by *Heller*"); O'Shea, *supra*, at 653 ("Decisions like *English* . . . have little relevance to determining the scope of Second Amendment carry rights today . . . [because] the question presented by current carry litigation is whether firearms that are constitutionally protected, as *Heller* holds handguns to be, may be carried outside the home pursuant to a constitutional right to bear arms that is not a hybrid individual right [or] a fictive 'collective right' . . . , but instead is centrally concerned with self-defense."). Contrary to the majority's suggestion, Maj. Op. 116, recognition of this reality does not require one to believe that *Heller* directly *answered* the historical question before us. But *Heller* undeniably dictates *which* historical question we must now endeavor to answer: Was the right to bear arms for the purpose of *individual self-defense* historically understood to protect a person's right to carry common arms in public? Cases like *Buzzard* offer historical answers to a different question altogether—namely, whether open public carry of handguns was protected by a right to

---

adapted to the usual equipment of the soldier," then a statute that "forbids by its terms the carrying of the weapon publicly or privately, without regard to time or place, or circumstances . . . . violates the constitutional right to keep arms"); *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 160 (1840) ("In the nature of things, if they were not allowed to bear arms openly, they could not bear them in their defence of the State at all.").

bear arms for the specific purpose of facilitating the militia's "defen[se] [of the] free state and the established institutions of the country." *Buzzard*, 4 Ark. at 27 (opinion of Ringo, C.J.).[6]

Although ours is an historical inquiry, we are judges, not historians. And, bound as the inferior court that we are, we may not revisit questions of historical interpretation already decided in binding decisions of the Supreme Court, as the majority seems so keen to do. Rather, we may only assess whether the right to bear arms extends outside the home *on the understanding*—dictated by *Heller*—that the right is an individual one centered on self-defense. On such an understanding, cases like *Buzzard* only bear upon the entirely irrelevant question of whether open public carry was embraced by *state* constitutions' *militia-focused* provisions for keeping and bearing arms (or by erroneously militia-focused views of the Second Amendment). We, by contrast, are interested in whether open public carry is embraced by the *U.S.* Constitution's *individual* right to "keep and bear Arms."

---

[6] The majority dismisses *Heller*'s relevance on this point only by grossly understating its holding. The majority suggests that *Heller* left open the possibility that the Second Amendment protects gun rights only to the extent that such rights are relevant to a functional militia. *See* Maj. Op. 120–22. Nothing could be further from the truth. To be sure, *Heller* observed that "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the *reason* that right [to keep and bear arms]—unlike some other English rights—was codified in a written Constitution." *Heller*, 554 U.S. at 599 (emphasis added). But the Court made abundantly clear that the *substance* of the right that was so codified was *not* limited to militia-relevant firearms practices. Rather, even if it might be shown that individual "self-defense had little to do with the right's *codification*[,] it was the *central component* of the right itself." *Id.*

c

Setting aside those cases that rest on a militia-focused view of the right to bear arms, there remain only two nineteenth-century cases that might be read to allow severe deprivations of the right to open carry. Upon closer examination, neither is instructive on the meaning of the Second Amendment.

The first, *State v. Duke*, is an 1874 decision from the Supreme Court of Texas, which concluded that the legislature could confine the carry of pistols to specified places (at least if the bearer did not have reasonable grounds to fear an attack). 42 Tex. 455, 456–59 (1875). Why the departure from the *Nunn* line of cases? One need only peek at the Texas constitutional provision under which *Duke* was decided, which provided that "[e]very person shall have the right to keep and bear arms in the lawful defense of himself or the State, *under such regulations as the Legislature may prescribe*." *Id.* at 458 (emphasis added). While the Second Amendment surely tolerates some degree of regulation, its very text conspicuously omits any such regulatory caveat. We shouldn't pencil one in.[7]

The second case, *Walburn v. Territory*, is an 1899 decision from the Supreme Court of the Territory of Oklahoma, decided at the very end of the nineteenth century.

---

[7] And "even *Duke*, an outlier which marks perhaps the most restrictive interpretation that any nineteenth-century court gave to the defense-based right to bear arms, implicitly rejected no-carry laws as unconstitutional" when it reasoned that the Texas provision "was constitutional because it 'respected the right to carry a pistol openly when needed for self-defense.'" O'Shea, *supra*, at 655 (quoting *Duke*, 42 Tex. at 459).

*See* 59 P. 972 (Okla. 1899). Convicted of carrying a revolver on his person, Walburn challenged his conviction on several grounds, one being that Oklahoma's carrying prohibition was "in conflict with the constitution of the United States." *Id*. at 973. Beyond such a general assertion, however, "[n]o authorities [were] cited in support of this position, nor [was] the proposition very earnestly urged." *Id.* Accordingly, the court rejected the challenge: "*As at present advised*, we are of the opinion that the statute violates none of the inhibitions of the constitution of the United States, and that its provisions are within the police power of the territory." *Id.* (emphasis added). There is little reason to credit a decision that explicitly acknowledged a lack of due consideration. *Cf. Heller*, 554 U.S. at 623–24 (rejecting the dissent's reliance on *United States v. Miller*, 307 U.S. 174 (1939), in part because of the incomplete briefing in *Miller* and its lack of a thorough consideration of the history of the Second Amendment).

d

In sum, there are at least five nineteenth-century cases (plus another that came two years into the twentieth century) in which state supreme courts held that the individual right to bear arms for self-defense—*i.e.*, the right guaranteed by the Second Amendment—must encompass a right to open public carry. And the majority has not cited a *single* apposite case in which any nineteenth-century court held to the contrary.

3

Finally, *Heller*'s historical methodology leads us to the legislative scene following the Civil War. *See* 554 U.S. at 614–16.

Particularly relevant in this period are the efforts of many Southern states to disarm freedmen by adopting Black Codes.[8] For it was universally understood—by these odious laws' proponents and opponents alike—that the debates over the Black Codes were debates over freedmen's fundamental constitutional rights.

On the one side, "[t]hose who opposed these injustices frequently stated that they infringed blacks' constitutional

---

[8] Those freedmen who had fought for the Union Army during the war frequently returned home "to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks." *McDonald*, 561 U.S. at 771; *see also The Freedmen's Bureau Bill*, N.Y. Evening Post, May 30, 1866, at 2 ("In South Carolina and Florida the freedmen are forbidden to wear or keep arms."). These were part and parcel with the broader efforts of "those who sought to retain the institution of slavery . . . to eliminate more and more of the basic liberties of slaves, free blacks, and white abolitionists." *See McDonald*, 561 U.S. at 843–44 (Thomas, J., concurring in part and concurring in the judgment).

Emblematic of these efforts was an 1865 law in Mississippi that declared, "no freedman, free negro or mulatto . . . shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife." *Id.* at 771 (majority opinion) (quoting Certain Offenses of Freedmen, 1865 Miss. Laws 165, § 1, *in* 1 *Documentary History of Reconstruction* 289 (W. Fleming ed. 1950)). The law was vigorously enforced. As an 1866 letter from Rodney, Mississippi, to *Harper's Weekly* lamented, "[t]he militia of this county have seized every gun and pistol found in the hands of the (so called) freedmen. . . . They claim that the statute laws of Mississippi do not recognize the negro as having any right to carry arms." *The Labor Question at the South*, Harper's Weekly, Jan. 13, 1866, at 19. Seeking help from outside of the state, the letter emphasized that such Mississippi laws did "not protect, but insist[ed] upon infringing on their liberties." *Id.* Worse still, "[w]ithout federal enforcement of the inalienable right to keep and bear arms, . . . militias and mobs were tragically successful in waging a campaign of terror against [newly free slaves]." *McDonald*, 561 U.S. at 856 (Thomas, J., concurring in part and concurring in the judgment).

right to keep and bear arms." *Heller*, 554 U.S. at 614; *see also* Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 Kan. J.L. & Pub. Pol'y 17, 20 (Winter 1995) ("The various Black Codes adopted after the Civil War required blacks to obtain a license before carrying or possessing firearms . . . . These restrictive gun laws played a part in provoking Republican efforts to get the Fourteenth Amendment passed.").

As they witnessed the state governments of the former Confederacy turning a blind eye to mob violence against newly freed slaves, the Reconstruction Republicans came to recognize that "when guns were outlawed, only the Klan would have guns." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 266 (1998) [hereinafter *Bill of Rights*]. Yet such blatant injustices did not continue unnoticed by Congress, which established the Freedmen's Bureau to vindicate the constitutional rights of freedmen still suffering in the Reconstruction South. Working to fulfill its mandate, an 1866 report by the Bureau targeted a Kentucky law that sought to deprive freedmen of their Second Amendment rights: "[T]he civil law [of Kentucky] prohibits the colored man from bearing arms . . . . Their arms are taken from them by the civil authorities . . . . Thus, the right of the people to keep and bear arms as provided in the Constitution is *infringed*." H.R. Exec. Doc. No. 70, at 233, 236 (1866), *quoted in Heller*, 554 U.S. at 614–15. And Kentucky was far from the only state subject to scrutiny; a joint congressional report decried a South Carolina practice of "seizing all fire-arms found in the hands of the freedmen." J. Comm. on Reconstruction, H.R. Rep. No. 30, pt. 2, at 229 (1866) (Proposed Circular of Brigadier General R. Saxton), *quoted in Heller*, 554 U.S. at 615.

On the other side, even those congressmen who *opposed* federal action to protect the rights of freedmen understood the fundamental constitutional rights at stake. Senator Davis of Kentucky acknowledged, on equal footing with the writ of habeas corpus, the right "for every man bearing his arms about him *and* keeping them in his house, his castle, for his own defense," but argued that congressional action on the matter would usurp the role of Kentucky in caring for its citizens. Cong. Globe, 39th Cong., 1st Sess. 370–71 (1866) (Sen. Davis) (emphasis added), *cited in Heller*, 554 U.S. at 616.

Indeed, even *before* the Civil War, those who had sought to dispossess black Americans of the right to carry arms for self-defense understood that they were really seeking to dispossess black Americans of *fundamental constitutional rights*. This was made all-too-painfully clear by the Supreme Court's infamous decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), rendered four years before the first shots were fired at Fort Sumter. *See McDonald*, 561 U.S. at 807–08, 822–23, 849 (Thomas, J., concurring in part and concurring in the judgment) (looking to *Dred Scott* as necessary context for Reconstruction-era historical analysis). Writing for the Court, Chief Justice Taney—disgracefully—dismissed Dred Scott's suit for freedom after concluding that black men and women had never been a part of the sovereign "people" of the United States and therefore could find no recourse in an Article III court. *See Dred Scott*, 60 U.S. (19 How.) at 407. To hold otherwise, Chief Justice Taney wrote, would have "entitled [black Americans] to the privileges and immunities [*i.e.*, fundamental rights] of citizens" and thus granted them the rights he felt only whites could enjoy: "[I]t would give them the full liberty of speech in public and in private upon all subjects upon which [white] citizens might

speak; to hold public meetings upon political affairs, and *to keep and carry arms wherever they went*." *Id.* at 416–17 (emphasis added).

C

To summarize the history canvassed thus far: The important Founding-era treatises, the probative nineteenth-century case law, and the post–Civil War legislative scene all reveal a single American voice. The right to bear arms must include, at the least, the right to carry a firearm openly for self-defense. Perhaps surprisingly, the majority does not seriously dispute either the linguistic or historical evidence recounted above.

Instead—and in lieu of any apposite cases that actually *upheld* the constitutionality of severe restrictions on the open carry of firearms—the majority suggests that the clear lessons of this evidence are undermined by the mere fact that the public carry of firearms has historically been subject to *some* manner of regulation. While this is undoubtedly true, the evidence of such lesser restrictions on firearms carry does not come close to supporting the majority's view that *any restriction* upon public carry—even a *complete ban*—was understood to be immune to constitutional scrutiny.

1

For one, the majority argues that the *English* right to carry weapons openly was severely limited for centuries by the 1328 Statute of Northampton and suggests, in turn, that we should incorporate such an understanding of English rights into our Constitution's Second Amendment. Exploring

fourteenth-century English law books (after a thorough dusting) reveals no such thing.

a

The Statute of Northampton made it unlawful for an ordinary Englishman to "bring . . . force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." Statute of Northampton 1328, 2 Edw. 3, c. 3 (Eng.).[9] By its terms, the Statute appears to proscribe the mere act of riding armed, and in the immediate period after Parliament enacted the statute, it appears that some English constables indeed were ordered to enforce the statute literally. *See* Letter to the Mayor and Bailiffs of York (Jan. 30, 1334), *in* 3 *Calendar of the Close Rolls*, *Edward III*, at 294 (H.C. Maxwell-Lyte ed. 1898) [hereinafter *Close Rolls*]; *see also* John Carpenter & Richard Whitington, *Liber Albus: The White Book of the City of London* 335 (Henry Thomas Riley ed. & trans., 1862) (1419) ("[N]o one, of whatever condition he be, [may] go armed in the said city [of London] or in [its] suburbs . . . except the vadlets of the great lords of the land, . . . the serjeants-at-arms of his lordship the King, . . . and such persons as shall come in their company in aid of them . . . for saving and maintaining the said peace . . . ."). But not all English constables faced similar orders. Indeed, officers in Northumberland and at least twelve other counties or "ridings" (sub-counties) were ordered to arrest only "persons riding or going armed *to disturb the peace*." Letter to Keepers

---

[9] An "affray," derived from the French word "effraier" (meaning "to terrify"), is an act that disturbs the peace. *See* 1 William Hawkins, *A Treatise of the Pleas of the Crown* 134 § 1 (1716).

and Justices of Northumberland (Oct. 28, 1332), *in* 2 *Close Rolls*, *supra*, at 610 (emphasis added).

And in any event, looking only to Chaucer's fourteenth-century England provides little instructive force, particularly because "[c]ommon-law rights developed over time." *Wrenn*, 864 F.3d at 660. And over the next few centuries, a narrow interpretation of the statute—like that given to Northumberland constables in 1332—began to dominate the English legal landscape. Writing almost 300 years after the statute was enacted, Serjeant William Hawkins, an English legal commentator praised by Blackstone, explained that "no wearing of Arms is within the meaning of this Statute, unless it be accompanied with such Circumstances as are apt to terrify the People; from whence it seems clearly to follow, That Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons." 1 Hawkins, *supra*, at 136 § 9. Hawkins's narrow interpretation of the statute was in accord with that of the Court of King's Bench, which clarified that "the meaning of the [Statute of Northampton] was to punish people who go armed *to terrify the King's subjects*." *Sir John Knight's Case* (K.B. 1686), 87 Eng. Rep. 75, 76; 3 Mod. 117, 118 (emphasis added).[10]

---

[10] The majority erroneously asserts that *Chune v. Piott* (K.B. 1615), 80 Eng. Rep. 1161, eliminated from "the crime of unlawful carrying" the "element" of "*in terrorem populi Regis*" (*i.e.*, carrying "to the terror of the king's people"). *See* Maj. Op. 49. In actuality, *Chune* merely held that a valid arrest for "unlawful carrying" did not require the arresting sheriff to have *personally witnessed* the accused causing *terrorem populi Regis*. 80 Eng. Rep. at 1162. That is to say, King's Bench loosened the evidentiary standards by which the element of *in terrorem populi Regis* could be proven; it did not abandon the element itself.

To be sure, an untoward *intent* to terrorize the local townsfolk was not always needed to face arrest and imprisonment. But without malicious intentions or violent behavior, the carrying of weapons *alone* was prohibited only for such weapons that were specifically known to have a terrorizing effect. As Blackstone interpreted the statute—an interpretation credited by *Heller*, 554 U.S. at 627—"going armed, with *dangerous or unusual* weapons, is a crime against the public peace, by terrifying the good people of the land." 4 William Blackstone, *Commentaries* \*149 (emphasis added); *accord* Joseph Keble, *An Assistance to Justices of the Peace, for the Easier Performance of their Duty* 147 (1689); Francis Wharton, *A Treatise on the Criminal Law of the United States* 932 § 2497 (4th ed. 1857). Similarly, Hawkins wrote that "a Man cannot excuse the wearing [of] such Armour" even "by alledging that such a one threatened him." 1 Hawkins, *supra*, at 136 § 8; *accord* Wharton, *supra*, at 932 § 2497. But clearly not *all* weapons can be characterized as "dangerous or unusual." Indeed, *Heller* itself recognized that the Second Amendment might not preclude restrictions on weapons of that kind. 554 U.S. at 627. Such an exception would—inexplicably—swallow up the whole of the Amendment's protections if all firearms were defined as "dangerous or usual" *per se*. *See Moore*, 702 F.3d at 936 ("[T]he Court cannot have thought *all* guns are 'dangerous or unusual' and can be banned, as otherwise there would be no right to keep a handgun in one's home for self-defense.").

Consequently, there is little in the Statute of Northampton to suggest that it supports a ban on carrying common (not unusual) arms for defense (not terror).

b

More fundamentally, it would be misguided to accept Hawaii's invitation to import medieval English law wholesale into our Second Amendment jurisprudence.

While English law is certainly relevant to our historical inquiry insofar as the Second Amendment "codified a *pre-existing* right," *Heller*, 554 U.S. at 592, our aim here is not merely to discover the rights of the English. There is a scholarly consensus that the 1689 English right to have arms was *less protective* than its American counterpart. *See* Jonathan Meltzer, Note, *Open Carry for All:* Heller *and Our Nineteenth-Century Second Amendment*, 123 Yale L.J. 1486, 1500 (2014); Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 120–22 (1994). Illustratively, the English right was "not available to the whole population, given that it was restricted to Protestants, and like all written English rights it was held only against the Crown, not Parliament." *Heller*, 554 U.S. at 593. In keeping with that limited scope, it included a regulatory caveat of the type consciously spurned by the Framers of the Second Amendment, only guaranteeing the right of Protestants to have arms "as allowed by law." *See* Malcolm, *supra*, at 121, 162.

Unsurprisingly, then, not all laws that restricted Englishmen's right to have arms found a place across the Atlantic. For example, as St. George Tucker observed, it would have been strange to apply in the United States an English law that presumed any gathering of armed men was treasonous, because "the right to bear arms is recognized and secured in the [American] constitution itself." 5 Tucker, *supra*, at app. n.B, at 19; *see also* Cooley, *supra*, at 270

(noting that the Second Amendment "was adopted with some modification and enlargement from the English Bill of Rights"); William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) (writing that the English right, unlike the Second Amendment, "is allowed more or less sparingly, according to circumstances"). Thus, instead of stitching into the Second Amendment every odd law that hemmed in the rights of fourteenth-century Englishmen, we are to consider English laws only insofar as they inform the original public understanding of the Second Amendment.

To the extent that the Framers did consider the Statute of Northampton instructive of the preexisting right to bear arms, they took a narrow view of its prohibitions. *See* Eugene Volokh, *The First and Second Amendments*, 109 Colum. L. Rev. Sidebar 97, 101 (2009). For example, Justice James Wilson, a leading drafter of the Constitution, credited Serjeant Hawkins and construed the statute to prohibit arming oneself "with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 2 James Wilson, *Collected Works of James Wilson* 1138 (Kermit L. Hall & Mark D. Hall eds. 1967); *see also* Volokh, *supra*, at 101 ("American benchbooks for justices of the peace echoed [Wilson's observation], citing Hawkins . . . ."). William Rawle, a prominent member of the Pennsylvania Assembly that ratified the Constitution, likewise cited Hawkins and wrote that the right to bear arms would not rule out a law prohibiting "the carrying of arms abroad by a single individual" *if* such carry was "attended with circumstances giving [observers] just reason to fear that he purposes to make an unlawful use of them." Rawle, *supra*, at 126.

Justice Wilson and William Rawle's reading of the statute is confirmed by the various state regulations, adopted throughout the Founding era and beyond, that were expressly modelled after the Statute of Northampton. *See* Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J.F. 121, 129 (2015) ("[S]everal early American states expressly incorporated versions of the Statute of Northampton into their laws."). The state-enacted Northampton analogues sought to regulate particularly disruptive—more specifically, *terrifying*—arms carrying. For example, Massachusetts in 1794 enacted a law authorizing justices of the peace to arrest "all affrayers, rioters, disturbers, or breakers of the peace, and such as shall ride or go armed offensively, *to the fear or terror of the good citizens*." 1794 Mass. Acts 66, ch. 26 (emphasis added); *see also* 1786 Va. Acts 35, ch. XLIX (prohibiting going "armed by night []or by day, in fairs or markets, or in other places, in terror of the county").

The North Carolina Supreme Court offered a definitive interpretation of that state's Northampton analogue in 1843, providing us with the benefit of a more thorough discussion of its elements. *See State v. Huntly*, 25 N.C. (3 Ired.) 418 (1843). The court clarified:

> [T]he carrying of a gun *per se* constitutes no offence. For any lawful purpose—either of business or amusement—the citizen is at perfect liberty to carry his gun. *It is the wicked purpose—and the mischievous result—which essentially constitute the crime.* He shall not carry about this or any other weapon of death to terrify and alarm, and in

>such manner as naturally will terrify and
>alarm, a peaceful people.

*Id.* at 422–23 (emphasis added).

2

Next, the majority refers to a smattering of nineteenth-century gun regulations, most of which appear to have gone unchallenged in the courts. *See* Maj. Op. 65–73.

As a threshold matter, one should be wary of divining constitutional meaning from the existence of historical regulations that largely evaded constitutional scrutiny and for which the majority offers no enforcement history. This is especially true where, as here, as "[f]or most of our history[,] the question" of their constitutionality simply "did not present itself"—not least because for more than a century, "the Bill of Rights was not thought applicable to the States, and the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens." *Heller*, 554 U.S. at 625–26.

In any event, the nineteenth-century statutes relied upon by the majority simply do not say what the majority claims they say—much less what it *needs* them to say—which is that the Constitution was generally understood to allow states to "forcefully prohibit[] the mere act of carrying a firearm." Maj. Op. 66–67.

a

Principally, the majority refers to various "surety" laws, as pioneered by Massachusetts and then adopted in

Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, and West Virginia. The majority characterizes such laws as "a form of prior restraint," an ostensibly interchangeable "alternative to a broad ban on open carry," and asserts that they allowed individuals to carry weapons in public "only if they could demonstrate good cause." *Id.* at 109–10.

Not so.

Many states during the nineteenth century required people who carried weapons in a disruptive fashion to post a bond (or a "surety") to ensure their good behavior. *See, e.g.*, Mass. Rev. Stat. ch. 134, § 16 (1836). To enforce the surety requirement, such states commonly relied on a citizen-complaint mechanism. That is, if an arms carrier gave any observer "reasonable cause to fear an injury, or breach of the peace," the observer could complain to his local magistrate, who might then require the disruptive carrier "to find sureties for keeping the peace," generally "for a term not exceeding six months." *Id.* But if the disruptive carrier *also* had "reasonable cause to fear an assault or other injury," such person would be excused from posting sureties despite the complaint. *Id.* As an example of the pieces put together, Michigan's 1846 surety law provided that if any person went armed with an "offensive and dangerous weapon, without reasonable cause to fear an assault or other injury . . . he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace." Mich. Rev. Stat. tit. XXXI, ch. 163, § 16 (1846).

The majority erroneously characterizes surety laws as imposing a severe restriction on the public carry of weapons absent good cause to fear injury. But the majority focuses on

an *exception* to the surety requirement (for carriers with a specialized need for self-defense), while overlooking the clearly limited scope of the requirement in the first place: Only upon a well-founded complaint that the carrier had threatened "injury or a breach of the peace" did the burden to pay sureties even apply. Thus, individuals were *generally free* to carry weapons without having to pay a surety, unless they had been the subject of a specific complaint. Only then did the "good cause" exception come into play, "exempting even the accused" from the burden of paying sureties. *Wrenn*, 864 F.3d at 661. In short, "[a] showing of special need did not expand carrying for the responsible; it shrank burdens on carrying by the (allegedly) reckless." *Id.*

Even if these laws had required all arms carriers without good cause to post sureties (and they did not), they would not add much to the relevant historical analysis. *Heller* saw little weight in historical penalties that imposed only "a small fine and forfeiture of the weapon (or in a few cases a very brief stay in the local jail)." 554 U.S. at 633. Certainly, an obligation to post a surety fits that mold. Like a small fine, sureties are "'akin to modern penalties for minor public-safety infractions like speeding or jaywalking,' which makes them (in the Court's view) poor evidence of limits on the [Second] Amendment's scope." *Wrenn*, 864 F.3d at 661 (quoting *Heller*, 554 U.S. at 633–34). In fact, sureties seem even less noteworthy than small fines, since a disruptive carrier—once he posted a surety—"could go on carrying without criminal penalty." *Id.* And if he refrained from breaching the peace, of course, the money he posted as a surety would be returned in a matter of months. The majority's (unsupported) assertion that such sureties would "have been a severe constraint on anyone thinking of carrying a weapon in public" is therefore unconvincing. Maj. Op. 111.

b

Next, the majority observes that some states and federal territories restricted the particular places in which one could legally carry a gun. *See id.* at 69–70, 72. But that is hardly more helpful to the majority than the Statute of Northampton or the American surety statutes.

While these statutes (unlike surety laws) did impose some actual prohibitions on carrying firearms, they focused narrowly on restricting carry in specifically enumerated, particularly sensitive public places. *See, e.g.*, 1870 Tex. Gen. Laws 63, ch. XLVI, § 1 (prohibiting carry in "any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or in[] a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct . . . or any other public assembly"); 1889 Ariz. Laws 30, No. 13 §§ 1, 3 (adopting a version of the Texas statute). Such statutes establish nothing beyond the anodyne proposition—acknowledged in *Heller* and not disputed here—that the Second Amendment might have historically tolerated "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626.

The fact that such laws existed hardly shows that *general* prohibitions on public carry would have been understood to be constitutional at the time. On the contrary, the only reason to enact laws specifically prohibiting firearm carry in

sensitive places would be that carry was presumptively lawful everywhere else.[11]

c

Next, the majority identifies three U.S. territories—New Mexico, Oklahoma, and Wyoming—that enacted broad prohibitions against the public carrying of all manner of weapons toward the end of the nineteenth century. *See* Maj. Op. 70–72; 1860 N.M. Laws 94, §§ 1–2 (prohibiting the carry, "concealed or otherwise," of "any class of pistols whatever, bowie knife . . . Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon"); Okla. Stat. ch. 25, art. 47, § 2 (1890) (prohibiting "any person . . . to carry upon or about his person any pistol, revolver, bowie knife, dirk knife loaded cane, billy, metal knuckles, or any other offensive or defensive weapon"); 1876 Wyo. Laws 352,

---

[11] In a similar (though somewhat more colorful) vein, the majority cites in passing an 1880 treatise in which Benjamin Vaughan Abbott approved of regulations that would address the *particular* danger posed by careless individuals mishandling firearms as "fireworks" in public. *See* Maj. Op. 90 (citing Benjamin Vaughan Abbott, *Judge and Jury* 333 (1880)). First, Abbott recognized that the "Constitution secures the right of the people to keep and bear arms," including the right of a citizen to "keep[] a gun or pistol under judicious precautions" and to "practise[] in safe places the use of it." Abbott, *supra*, at 333. But, Abbott contended, a state could nonetheless enact restrictions against "keeping pistols for playthings; carrying them carelessly in the pocket; toying with them at picnics, on board steamers, and in saloons; exhibiting them to curious girls; lending them to boys; firing at random with them upon city sidewalks." *Id.*

As with restrictions against the carrying of firearms in particular *places*, Abbott's approval of restrictions against using firearms in a particularly careless *manner* suggests that one would indeed have a right to carry them in ordinary and responsible ways.

ch. 52, § 1 (prohibiting "bear[ing] upon [one's] person, concealed or openly, any fire arm or other deadly weapon, within the limits of any city, town or village"). There are several reasons to be cautious about ascribing much interpretive significance to these laws.

First, it would be exceedingly difficult to discern whether such laws were enacted with a proper understanding of the *individual* right to armed self-defense secured by the Second Amendment, as opposed to the militia-oriented view of the right that was common at the time. *See* O'Shea, *supra*, at 642–53; *see also, e.g.*, Cooley, *supra*, at 271 ("The arms intended by the Constitution are such as are suitable for the general defence of the community against invasion or oppression . . . ."); John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152–53 § 239 (1868) ("[A] militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons. . . . [But] [t]his constitutional inhibition is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . ."). Indeed, the Oklahoma statute included an exception that allowed the public carry of rifles or shotguns for use "in public muster or military drills," suggesting that it might have been enacted with a mistaken understanding of the nature of the right. Okla. Stat. ch. 25, art. 47, § 5 (1890).

Second, one should be hesitant to assume too much about the constitutional validity of laws that sought to disarm inhabitants of these Western territories, where the unique circumstances of life on the frontier might have motivated territorial legislatures to undertake more severe measures against the use of weapons than we have seen reflected in the

many state laws recounted above.**[12]** Indeed, just after the turn of the twentieth century, the Idaho Supreme Court struck down as unconstitutional a similarly restrictive measure that had been put in place by the territorial legislature there. *See Brickey*, 70 P. at 609. And, as with the Black Codes which sought to suppress the ability of freedmen to own guns following the Civil War, there may be reason to question whether similarly illicit goals may have inspired arms restrictions in these heavily Indian territories. *See generally* Angela R. Riley, *Indians and Guns*, 100 Geo. L.J. 1675, 1680 (2012) ("[T]he relationship of Indians and guns [in early America] developed in parallel to African-Americans and guns, with both groups situated at the bottom of a racial hierarchy that facilitated oppression, noncitizen status, and subjugation.").

Third, and most fundamentally, one can learn little about the general understanding of the Second Amendment from such isolated statutes, which were enacted so distant from the Founding and for which we have no record of enforcement. *Cf. Heller*, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law

---

**[12]** The majority cites only one *state* (as opposed to territorial) law that purportedly imposed such a broad prohibition. *See* 1881 Kan. Sess. Laws 80, 92, ch. 37, § 23 ("The [city] council shall prohibit and punish the carrying of firearms, or other dangerous or deadly weapons, concealed or otherwise . . . ."). But this provision did not actually impose a direct, statewide prohibition on carry. Rather, it was contained in the organic statute incorporating certain *cities* within the State of Kansas, which in turn directed their city councils to pass ordinances generally regulate potential nuisances ranging from "the carrying of firearms" to the mischief caused by "vagrants, tramps, [and] confidence men." *Id.* The majority presents no evidence of the nature of any municipal firearms regulations that were actually enacted pursuant to the Kansas statute.

. . . that contradicts the overwhelming weight of other evidence . . . ."). Three statutes of this kind certainly do not undermine the far more extensive historical evidence in support of a more robust view of public-carry rights at the time of our Founding and beyond.

d

Finally, the majority suggests the overall effect of this hodgepodge of state and territorial statutes is to show that the government may prohibit the public "carrying of *small arms capable of being concealed*, whether they are carried concealed or openly." Maj. Op. 97 (emphasis added). More specifically, the majority attempts to justify this conclusion by observing that many of the statutes in question imposed their restrictions on specifically "enumerated" weapons that "were capable of being concealed." *Id.* at 71. But this line of reasoning falters on three distinct levels:

First, the category of "weapons capable of being concealed" appears to be an invention of the majority's own creation or, at the very least, an historical anachronism. The oldest usage of that phrase the majority can conjure is from a 1923 California statute. *Id.* at 94 (citing 1923 Cal. Stat. 695, ch. 339). The nineteenth-century statutes themselves were certainly not written in terms of "concealability." And as the majority concedes, "[m]ost, *but not all*, of the weapons enumerated in these statutes were capable of being concealed." *Id.* at 71 (emphasis added). Rather—as often recognized by the very courts interpreting such statutes—the common thread seems to be that the enumerated weapons were more apt for use in person-to-person confrontation than in hunting or militia activity. *See, e.g.*, *English*, 35 Tex. at 474 (distinguishing a statute regulating "pistols, dirks,

daggers, slungshots, swordcanes, spears, brass-knuckles and bowie knives" from the regulation of arms "useful and proper to an armed militia"); *Hill*, 53 Ga. at 474 (same); *Workman*, 14 S.E. at 11 (same).

That leads right into the second flaw in the majority's reliance upon such enumerated lists: They again betray a view of the Second Amendment as being focused on militias or hunting—for which rifles and shotguns were most commonly used—rather than individual self-defense. For example, as discussed above, the Oklahoma statute expressly excepted from its list of prohibited weapons the public carry of rifles or shotguns for use "in public muster or military drills." Okla. Stat. ch. 25, art. 47, § 5 (1890). As already explained at length, *Heller* foreclosed any reliance on historical sources animated by such an erroneous view that would limit the right to "keep and bear Arms" to only its militaristic applications. Moreover, *Heller* made clear that restrictions on handguns are *especially* repugnant to the Second Amendment because handguns are the "quintessential self-defense weapon." 554 U.S. at 629. Indeed, to paraphrase *Heller*, "[i]t is no answer to say . . . that it is permissible to ban the [carry] of handguns so long as the [carry] of other firearms (*i.e.*, long guns) is allowed." *Id.*

Third, most of the statutes that included versions of the enumerated list of regulated weapons were not *prohibitions* on open carry at all. Most were surety statutes. *See* Mass. Rev. Stat. ch. 134, § 16 (1836); 1838 Wis. Laws 379, 381, § 16; Me. Rev. Stat. tit. XII, ch. 169, § 16 (1841); Mich. Rev. Stat. tit. XXXI, ch. 163, § 16 (1846); Minn. Rev. Stat. ch. 112, § 18 (1851); 1854 Or. Laws 218, 220, ch. XVI, § 17. Several others were focused on restricting carry in particularly sensitive places. *See* 1870 Tex. Gen. Laws 63;

1889 Ariz. Laws 30, No. 13, §§ 1, 3. The Georgia statute prohibiting *concealed* carry of the enumerated weapons expressly allowed for their open carry. *See* Ga. Code pt. 4, tit, 1, div. 9, § 4413 (1861). That leaves only two statutes containing versions of the enumerated weapons list: those adopted by the territories of New Mexico and Oklahoma. *See* 1860 N.M. Laws 94, § 1; Okla. Stat. ch. 25, art. 47, § 2 (1890). And—for reasons already discussed in the above analysis of those two, isolated, territorial statutes—they are incapable of bearing the analytical load required to establish that "the states broadly agreed that small, concealable weapons, including firearms, could be banned from the public square." Maj. Op. 72.

## D

In sum, the history extensively canvassed above leads to a straightforward conclusion: Beginning in England and throughout the development of the early American Republic, individuals maintained the general right to carry common firearms openly for their own self-defense in public, provided that they did not do so in a way that would "terrorize" their fellow citizens or intrude upon particularly sensitive places like churches or schools.

Of course, the majority arrives at a starkly different conclusion. Namely, the majority reads the history as showing that "the government"—above and beyond its ability to regulate which arms were legal to carry and which places they could be carried—"may . . . *even prohibit*, in public places[,] . . . the open carrying of small arms capable of being concealed, whether they are carried concealed or openly." *Id.* at 97 (emphasis added). Indeed, the majority denies that such an extensive prohibition would implicate "conduct [within]

the historical scope of the Second Amendment" *altogether*. *Id.* at 14–15. In the majority's words, there is simply "*no right* to carry arms openly in public." *Id.* at 112 (emphasis added).

This must seem strange, given that we are looking at the same historical record, and that—with the exception of certain points at the margins—we appear not to disagree significantly on the substance of what the historical sources actually *say*. (Indeed, the majority concedes that the "history is complicated, and the record . . . far from uniform[ly]" supports its conclusion. *Id.* at 40.)[13] Our disagreement, it seems, is not so much over what the history *says*, as it is over what the history would *need* to say in order to sustain the majority's atextual conclusion that the scope of the right to

---

[13] On this point, one should not be misled by the majority's baseless suggestion that the preceding historical review has cherry-picked favorable evidence or somehow been an exercise in something that is "not history." *See* Maj. Op. 116. That is flatly wrong. Once one pierces through the majority's theatrical language, the inescapable fact remains that the majority has identified *no* historical evidence that has been "discard[ed]," *see id.* at 115—let alone any that would undermine the conclusions articulated above.

The majority's fundamental gripe seems to be that the preceding analysis does not (as the majority has largely done) indiscriminately round up the sources cited in the parties' briefs, decline to consider whether some might merit greater weight than others, and then uncritically accept them all as equally instructive on the present question. It is precisely such an oversimplified view of "history" that ought to be avoided. Otherwise, we would risk falling into exactly the habit the majority wishes to avoid: practicing "law-office history," controlled by the parties' self-interested selection of historical evidence and analyzed without "proper evaluation of the relevance of the data proffered." Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 Sup. Ct. Rev. 119, 122 n.13, *cited in* Maj. Op. 39 n.7.

"keep and bear Arms" extends no further than the right to "keep" arms inside the home. In other words, our disagreement is not one of historical *exegesis*, but one of historical *synthesis*.

In order to establish its startling conclusion that the carrying of common arms for self-defense lies completely outside the Second Amendment, the majority surely must show that complete prohibitions on open public carry were historically understood to be lawful. Perhaps, one would think, the majority might have done so through evidence that the Founding generation had regular experience with such prohibitions and understood them to pose no problem to the new Constitution they were creating. Perhaps the majority might have marshaled evidence that such prohibitions had been commonly upheld against relevant legal challenges in early America. Or perhaps, at least, the majority might have found evidence that such prohibitions, where not subjected to judicial scrutiny, were historically widespread and uncontroversial.

But the majority has found none of the above. All the majority has managed to demonstrate is that the *manner* of open public carry has at times been regulated (by laws criminalizing the carry of especially dangerous or unusual weapons with the intent or effect of "terrorizing the people," surety laws, laws restricting carry in particularly sensitive public places, and the like), and that such narrow regulations have at times been upheld or otherwise left unchallenged. When all is said and done, there is a vast and undeniable chasm between these (largely uncontroverted) propositions about the historical presence of *some* firearms regulation and the far more troubling proposition that the majority today

pronounces: that public carrying of common arms could *generally* be banned.[14]

The majority is left to bridge this chasm by making logical leaps and critically shifting the goalposts in ways it fails to justify. It is utterly baffling for the majority to contend that, merely because the lawful *manner* of open public carry has historically been regulated in certain respects, we may conclude that the practice of public carry itself is not entitled to constitutional protection. What right enshrined in our Constitution has *not* historically been regulated to some degree? Surely, we would never hold (for example) that the right to speak publicly on political matters lies wholly outside the First Amendment merely because such speech has been subject to "longstanding, accepted regulation," *cf.* Maj. Op. 35, in the form of libel laws, defamation laws, and time-place-and-manner restrictions. Yet this is exactly how the majority appears to believe we must interpret the Second Amendment. The majority's invitation to interpret the right to bear arms "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," must be rejected. *McDonald*, 561 U.S. at 780 (plurality op.).

---

[14] The majority might object that it has sometimes "qualified" its analysis as to apply to prohibitions on the public carry of *handguns* specifically (though, sometimes, it has not, *see, e.g.*, Maj. Op. 112). As discussed above, any such qualification is of no moment, given that *Heller* made clear that protections for handguns are *especially* central to the Second Amendment because the handgun is the "quintessential self-defense weapon." 554 U.S. at 629. If, as the majority says, public carry of the "quintessential self-defense weapon" can be prohibited, what cannot?

E

One last line of argument to rebut: The majority, unavailed by text and history, relies on two ostensible—but in reality, untenable—principles of constitutional construction to buttress its assertion that an individual right to armed self-defense in public would somehow contradict the nature of our constitutional framework. Neither argument holds water.

1

First, the majority asserts that constitutional rights—across the board—inhere more strongly within the home than outside the home. *See* Maj. Op. 98–99. The majority cannot identify any case that actually establishes such a "principle." Instead, it opines that this lurking (and heretofore unidentified) notion is "reinforced . . . by the Third and Fourth Amendments," which guarantee, respectively, Americans' rights to be free from the quartering of soldiers and from unreasonable searches and seizures in their homes. *Id.* at 98.

To the extent they are even relevant to our question here, the lessons of the Third and Fourth Amendments cut in exactly the *opposite* direction of the majority's novel approach. The text of both the Third and the Fourth Amendments *explicitly* announces a focus on "houses." *See* U.S. Const. amends. III ("in any house"), IV ("in their . . . houses"). The Second Amendment, by contrast, does not mention *any* spatial limitations on the right to keep and bear arms whatsoever. *See* U.S. Const. amend. II. Our inference, then, should be that *unlike* the Third and Fourth Amendments, the Second Amendment's lack of any reference

to the home means its protections *are not* specifically focused there. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[Where a legal text] includes particular language in one section of [the document] but omits it in another section of the same . . . , it is generally presumed that [its drafters] act[ed] intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)). It would be odd, indeed, to infer (as the majority apparently does) that the express limitation of two constitutional rights to "houses" means that every other constitutional right is spatially limited by implication. We certainly would never assume as much about any other enumerated right in the Constitution.

In short, it is unnecessary to reach for the Third or Fourth Amendments when the Second Amendment's own text supplies a clear answer.

2

Second, the majority raises the structural argument that "the Second Amendment did not contradict the fundamental principle that the government assumes primary responsibility for defending persons who enter our public spaces." *See* Maj. Op. 99–107, 111–13. But this argument is foreclosed by *Heller* and, more fundamentally, is premised on deep misapprehensions of the first principles of American popular sovereignty.

a

At the outset, the majority's structural argument suggests that even if "keep[ing]" arms is an individual right, "bear[ing]" arms is a corporate right that belongs to the government alone, which has sole authority to ensure security

in public. Such a suggestion directly contradicts *Heller*, which emphatically rejected the argument that the right to "keep and bear Arms" was limited to the "militia." *See* 554 U.S. at 579–83, 585–86. This contradiction alone would be a sufficient reason to reject the majority's assertion that the Second Amendment encompasses no individual right to self-defense in public.

b

But the flaws of the majority's structural argument run deeper than its incompatibility with *Heller*.

The heart of the majority's argument is the proposition that "[t]he states, in place of the king, assumed primary responsibility" for "securing what was formerly known as 'the king's peace.'" Maj. Op. 101. The majority reasons that "maintaining the 'king's peace' was the king's duty and, in the English view, the carrying of weapons in public areas was an affront to the king's authority." *Id.* at 102. This entire line of reasoning overlooks our Constitution's profound departure from English ideas about the nature and locus of sovereignty. The great and enduring conceit of our Founders' political theory was their insistence on *breaking* any analogy between the king's sovereignty and that of the states.

What the majority overlooks is that our Constitution relocated the king's sovereignty not in American State *or* federal governments, but in "We the People of the United States." U.S. Const. pmbl. Indeed, copious volumes of scholarly ink have been spilled in showing that the Constitution's text, history, and structure converge on this

conclusion.[15] And it has been a bedrock principle of constitutional construction since the dawn of American constitutional jurisprudence. *See, e.g.*, *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 472 (1793) (opinion of Jay, C.J.) ("In Europe the sovereignty is generally ascribed to the Prince; here it rests with the people; there, the sovereign actually administers the Government; here, never in a single instance; our Governors are the agents of the people . . . ."); *id.* at 461 (opinion of Wilson, J.) (criticizing England's "haughty notions of . . . state sovereignty and state supremacy" as allowing "the state [to] assum[e] a supercilious preeminence above the people, who have formed it").

With a proper conception of American popular sovereignty, it should be easy to see the irrelevance of "the English view" that "the carrying of weapons in public areas was an affront to the king's authority" insofar as it "suggested that the king was unwilling or unable to protect the people." Maj. Op. 102. For an English *subject* to "carr[y] arms publicly . . . as a vote of no confidence in the king's ability to maintain [the public peace]" would be an affront to his sovereign. *Id.* But for an American *citizen* to carry arms publicly could be no such thing. The American citizen, in contrast with the English subject, is a constituent part of a free and sovereign people, whom state governments serve as agents. Indeed, the "principal object" of our Constitution was not to *grant* "new rights" from government to the people, but

---

[15] *See, e.g.*, Gordon S. Wood, *The Creation of the American Republic: 1776–1787*, at 344–89 (1998); Edmund S. Morgan, *Inventing the People: The Rise of Popular Sovereignty in England and America* 235–306 (1988); Bernard Bailyn, *The Ideological Origins of the American Revolution* 55–93 (1967); Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1429–66 (1987).

rather to "secur[e]" *against* the government "those rights" we already possess by nature. 1 Wilson, *supra*, at 1053–54. It is thus emphatically the prerogative of the American citizen to give a "vote of no confidence" in state governments' exercise of those powers delegated from the sovereign people themselves. *See, e.g.*, *Chisholm*, 2 U.S. (2 Dall.) at 472; 4 Jonathan Elliot, *The Debates of the Several State Conventions on the Adoption of the Federal Constitution* 9 (1888) ("The people are known with certainty to have originated [our government] themselves. Those in power are their servants and agents; and the people, without their consent, may new-model their government whenever they think proper . . . ." (statement of James Iredell)).

For the same reason, the majority's suggestion that the values of *federalism* somehow preclude the Second Amendment from guaranteeing an individual right to carry arms for self-defense in the public square is fundamentally misguided. The majority's argument is essentially this: *As between the federal government and the states*, the Constitution gave the states "primary responsibility" for "maintaining the public peace." Maj. Op. 100–01. And in turn, "[i]t would be anomalous in the extreme if, having gone to the trouble of spelling out the respective responsibilities of the new federal government and the states in 1789, the framers of the Bill of Rights undid that relationship with the Second Amendment (adopted in 1791)." *Id.* at 106. By "that relationship," the majority appears to refer to the ostensible principle that "it is peculiarly the duty of the states to defend the public square." *Id.* at 99.

The majority's argument begs the very question which must be answered. To be sure, the "general police power" is "retained by the States," to the exclusion of any *federal*

general police power. *United States v. Lopez*, 514 U.S. 549, 567 (1995). So we know that states generally have primacy *over the national government* for protecting the public peace. But the question here is whether the State governments were understood to exercise a "duty to protect [their] citizens," Maj. Op. 106, that *also* excludes the citizens' fundamental right *to protect themselves*. The relative division of governmental powers between the federal and State governments provides no answer to this question at all. And the majority's premise—that the states' constitutional power to protect the public was conferred to the *exclusion* of citizens' own right to self-defense—is unmoored from the text and structure of the Constitution; contravenes the lessons of *Heller*; is desperately ahistorical, for reasons already discussed at length; and cannot be squared with the first principles of American popular sovereignty.

## III

Accordingly, the majority is wrong to conclude that H.R.S. § 134-9 does not implicate the right to bear arms whatsoever. Because the statute clearly *does* tread upon conduct protected by the Second Amendment, the next step must be to analyze it under an "appropriate level of scrutiny." *Jackson v. City & County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014). In the framework developed by our court following *Heller*, the first question in determining the appropriate level of scrutiny is this: Does the right of an ordinary citizen to bear arms openly in public for purposes of self-defense fall within the "core" of the Second Amendment—or does it lie somewhere else, at the periphery of the Amendment's guarantees? *See id.* at 960–61.

The Second Amendment's text, history, and structure, and the Supreme Court's reasoning in *Heller*, all point squarely to the same conclusion: Armed self-defense in public is at the very core of the Second Amendment right. At the risk of repeating myself (though it does, apparently, bear repeating), the Second Amendment safeguards both the right *to keep* a firearm and the right *to bear*—or to carry—that firearm. Neither the text of the Amendment nor its historical interpretations suggests that either right has priority over the other. The obvious inference one should draw is that *there is no pecking order* between the "core" status of the Amendment's expressly enumerated guarantees.[16] The right to armed self-defense—*both* by keeping a gun at home *and* by carrying one elsewhere—lies at the heart of the Second Amendment.

Indeed, *Heller* made clear that the "central" purpose undergirding the Second Amendment is "the inherent right of self-defense." 554 U.S. at 628; *see also id.* at 599 (describing self-defense as "the *central component* of the right itself"). This is why, for instance, it was particularly troubling to the Court in *Heller* that the District of Columbia had banned handguns—"an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [of self-defense]." *Id.* at 628. To be sure, *Heller* addressed the application of this right to the home—and necessarily so, given that the case involved specifically a challenge to a ban

---

[16] By way of (illustrative) comparison, courts have been more willing to consider the non-"core" status of gun rights *other* than the expressly enumerated rights to "keep" (*i.e.*, to possess) and to "bear" (*i.e.*, to carry) arms, such as the rights to *sell* certain firearms, or to *manufacture* firearms with or without certain features. *See, e.g.*, *Pena v. Lindley*, 898 F.3d 969, 1009 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

on handgun possession *in the home*. *See id.* at 575–76; *see also Drake*, 724 F.3d at 445 (Hardiman, J., dissenting). But nothing in *Heller* remotely suggests that the core "inherent right of self-defense" was understood to *stop* at the walls of one's home. Rather, *Heller*'s (and subsequently *McDonald*'s) language suggests exactly the opposite, as it addresses the application of the right of self-defense to the home in *comparative* terms. In these cases, the Court described the "need for defense of self, family, and property" as "*most* acute" within the home, *Heller*, 554 U.S. at 628 (emphasis added), or "*most* notabl[e]" there, *McDonald*, 561 U.S. at 780 (plurality op.) (emphasis added)—suggesting of course that this same core right was felt (even if perhaps less "acutely") elsewhere.

More fundamentally, a great deal of *Heller*'s analysis reflects an abiding concern for the inherent right to defend one's *person*, not just one's *home*. For example, the Court cited (without reference to the home) "at least seven [state constitutional provisions that] unequivocally protected an individual citizen's right to self-defense," which is "strong evidence that that is how the founding generation conceived of the right." 554 U.S. at 603. Also without any reference to the home, *Heller* noted that "[a]ntislavery advocates routinely invoked the right to bear arms for self-defense." *Id.* at 609. Charles Sumner's famous "Bleeding Kansas" speech, quoted at length in *Heller*, can hardly be read without sensing its vociferous declaration that the Second Amendment's core reaches self-defense on the wide open spaces of the American frontier: "Never was this efficient weapon [the rifle] more needed in just self-defense, than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached." *Id.* (quoting Charles Sumner, The Crime Against Kansas,

May 19–20, 1856, *in American Speeches: Political Oratory from the Revolution to the Civil War* 553, 606–07 (T. Widmer ed. 2006)); *see also McDonald*, 561 U.S. at 775 ("[O]ne of the 'core purposes of the Civil Rights Act of 1866 and of the Fourteenth Amendment was to . . . affirm the full and equal right of every citizen to self-defense.'" (quoting Amar, *Bill of Rights*, *supra*, at 264–65)).

Perhaps most tellingly, the Court in *Heller* ultimately likened the *constitutional repugnance* of restrictions on keeping arms inside the home with that of restrictions on bearing arms outside the home. In striking down the District of Columbia's ban on handgun possession in the home, *Heller* observed that the only restrictions that had historically "come close" to such a "severe" measure were laws that unconstitutionally restricted the open carry of firearms *outside the home* in some states. 554 U.S. at 629 (citing *Nunn*, 1 Ga. at 251; *Andrews*, 50 Tenn. (3 Heisk.) at 187; *Reid*, 1 Ala. at 616–17).

Thus, there can be no avoiding *Heller*'s—and *McDonald*'s—admonition that the Second Amendment guarantees the individual right "to use handguns for the core lawful purpose of self-defense." *McDonald*, 561 U.S. at 768 (quoting *Heller*, 554 U.S. at 630 (alteration omitted)); *see also Wrenn*, 864 F.3d at 659 ("Whatever motivated the Amendment, at its core was the right to self-defense."). In turn, there can be no support for a cramped reading of the Second Amendment that renders to "keep" and to "bear" unequal guarantees. As recounted at length above, both the text of the Amendment and the relevant historical sources confirm this understanding. The right to carry a firearm openly for self-defense falls within the core of the Second Amendment.

IV

Because the right to carry a handgun openly for self-defense lies within the "core" of the Second Amendment, Hawaii faces a steep burden in its attempt to justify the constitutionality of section 134-9. Under our court's framework, if Hawaii's law "amounts to a destruction" of the core right, it must be held "unconstitutional under any level of scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016). And if it severely burdens (but does not destroy) the core right, it still "warrants strict scrutiny." *Id.*

Though it is doubtful whether Hawaii could prevail under *either* standard, the unavoidable reality is that Hawaii's severe deprivation of the core right to carry a firearm in public can only be understood as amounting to a total destruction of such right. It is thus *necessarily* unconstitutional.

A

Section 134-9 limits the open carry of firearms to people "engaged in the protection of life and property," H.R.S. § 134-9(a), *i.e.*, "private detectives and security guards," as defined by the County of Hawaii's implementing regulations, *see* Police Dep't of Cnty. of Haw., *Rules and Regulations Governing the Issuance of Licenses to Carry Concealed and Unconcealed Weapons* 1 (Oct. 22, 1997). Even those lucky few may carry firearms only when "in the actual performance of [their] duties." *Id.* at 10. There can be little question that the core Second Amendment rights of Hawaii residents are effectively destroyed by such severe restrictions on who may openly carry a firearm.

Because the Second Amendment protects the right of *individuals*, not *groups* of individuals, to keep and to bear arms, *Heller*, 554 U.S. at 595, the relevant question is the extent to which a law restrains the rights of a typical, law-abiding citizen. *Wrenn*, 864 F.3d at 665 ("[I]f the Amendment is for law-abiding *citizens as a rule*, then it must secure gun access at least for each *typical* member of that class."). And section 134-9 all but eliminates the right to open carry for such citizens. To restrict open carry to those whose job entails protecting life or property is, necessarily, to restrict open carry to a small and insulated subset of law-abiding citizens. Just as the Second Amendment does not protect a right to bear arms only as an on-duty militia member, it surely does not protect a right to bear arms only as an on-duty security guard. The typical, law-abiding citizen in the State of Hawaii is therefore all but foreclosed from exercising the core Second Amendment right to bear unconcealed arms for self-defense.

It follows that section 134-9, by its own terms, "amounts to a destruction" of a core right and is therefore infirm "[u]nder any of the standards of scrutiny." *See Heller*, 554 U.S. at 628–29. The County may not constitutionally enforce section 134-9's limitation on the open carry of firearms to those "engaged in the protection of life and property."

Hawaii resists this conclusion by arguing that section 134-9 does *not* in fact limit open carry to security guards and those similarly employed. Rather, Hawaii insists that "a private individual may be 'engaged in the protection of life and property,' even when it is not part of her job"—and thus the statute is open to everyone, at least in appropriate circumstances. In a vacuum, that might be a perfectly plausible—even natural—way to read the words in the

statute. But in the real world, it is not how the State of Hawaii or its constituent counties have actually interpreted and applied section 134-9.

Counsel for the County acknowledged as much at oral argument before the three-judge panel in this case, stating that, to his knowledge, no one other than a security guard—or someone similarly employed—had ever been issued an open-carry license. Hawaii's Attorney General, in a September 2018 Opinion Letter on this very subject, likewise failed to provide evidence that any of Hawaii's counties had ever issued an open-carry permit to even a single person not employed in the security profession. *See generally* State of Haw., Dep't of Att'y Gen., Opinion Letter No. 18-1, Availability of Unconcealed-Carry Licenses (Sept. 11, 2018) [hereinafter Opinion Letter 18-1]. And the State has not shown that it has taken any action to remedy the putatively "incorrect" interpretation of section 134-9 that continues to be enforced in Hawaii County and throughout the state. Indeed, it appears that *no* carry licenses have been issued to private, non-security guard citizens *anywhere* in the State since the issuance of the State's 2018 Opinion Letter. *See* State of Haw., Dep't of Att'y Gen., *Firearm Registrations in Hawaii, 2019*, at 9 (Mar. 2020), https://ag.hawaii.gov/cpja/files/2020/03/Firearm-Registrations-in-Hawaii-2019.pdf; State of Haw., Dep't of Att'y Gen., *Firearm Registrations in Hawaii, 2018*, at 9 (May 2019), https://ag.hawaii.gov/cpja/files/2019/05/Firearm-Registrations-in-Hawaii-2018.pdf.

In the County of Hawaii, the historical dearth of open-carry permits for private citizens is no mere "pattern or practice." It is a matter of official *policy*. Again, in its 1997 regulations implementing section 134-9's open-carry

permitting regime, the County created an application process that is open only to "private detectives and security guards." Police Dep't of Cnty. of Haw., *Rules and Regulations Governing the Issuance of Licenses to Carry Concealed and Unconcealed Weapons* 1 (Oct. 22, 1997).[17] Although the County now asserts that it does not "understand" the regulation to limit carry permits to such individuals, its 1997 Police Department regulation remains on the books. Further, as Young rightly notes, "[t]he County of Hawaii . . . has not [since] issued any new regulations or even created an application form for private citizens."

## B

In the face of this damning factual record, both Hawaii and the majority urge that we should simply look the other way.

No thanks!

## 1

For its part, Hawaii argues that its actual enforcement of the statute is irrelevant because "the meaning of a state statute is determined by its text, not by how a local government supposedly applies it." The case Hawaii cites for that contention, however, is wholly inapposite. In the cited passage, the Hawaii Supreme Court simply recited the

---

[17] Whereas the State now seeks to create ambiguity about whether its statute limits open carry to security guards and those similarly employed, there can be no such ambiguity that the County's 1997 regulation does exactly that. Accordingly, such a regulation is unconstitutional in its own right.

anodyne administrative-law maxim that when a court conducts *de novo* review of an agency's statutory construction, "the fundamental starting point for statutory interpretation is the language of the statute itself." *Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union, Local 142*, 146 P.3d 1066, 1076 (Haw. 2006) (internal quotation marks omitted). But ours is not an administrative-law case; it is a challenge to the constitutionality of Hawaii's severe restrictions on the right of individuals to carry firearms in public. The pertinent question is not whether the County's interpretation of H.R.S. § 134-9 is adequately faithful to the statutory text. Rather, the question is whether Hawaii's restrictions on open public carry are adequately faithful to the Second Amendment. And enforcement history illuminates whether the State's statute and the County's regulation are laws "which, under the pretence of regulating, amount[] to a destruction of the right." *Jackson*, 746 F.3d at 960 (quoting *Heller*, 554 U.S. at 629).

2

Similarly, the majority contends that we may not consider the enforcement history of H.R.S. § 134-9 because Young has supposedly forfeited any as-applied challenge to the statute, limiting our review "to the text of the statute itself." *See* Maj. Op. 25–31. This is simply wrong—and for several reasons.

For starters, the majority's premise that Young's complaint outlined only a "facial" challenge to the statute is dubious. Young's complaint challenged far more than the theoretical facial validity of section 134-9. Unlike in many facial challenges, here section 134-9 has actually been enforced against Young, and he claims that such enforcement—*i.e.*, the denial of his applications for an open-

carry permit—violated the Second Amendment. Indeed, Young alleged that his Second Amendment rights had been violated by the "[c]ombined" statutes, regulations, and actions of "the State of Hawaii, County of Hawaii[,] and the Hawaii County Police Department and its Chief of Police." More specifically, he alleged that the County had unconstitutionally denied his permit applications even though they "stat[ed] the purpose being for personal security, self-preservation and defense," and he contended that carry permits had been made available only to those who were "employed by a licensed private security company."[18] Thus, unlike a stereotypical facial challenge, Young's claim does not "rest on speculation" about how the statute *might* be enforced, nor does it ask our court to "short circuit" the State's "opportunity to implement [the statute] . . . [and] to construe the law in the context of actual disputes." *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008). Young's very point is that the State and County *have* construed and implemented the statute—against him—in a way that is unconstitutional.

---

[18] The majority's assertion that "Young did not set out [an as-applied] claim as an issue before our court in his panel appeal," Maj. Op. 28, is even more inaccurate. Young's opening brief, filed in 2013, plainly states: "[Hawaii County Police] Chief Kubojiri's failure to adopt policies which comport with constitutional guidelines has resulted in HRS § 134-9, *as applied to Mr. Young*, to be an unconstitutional deprivation of his constitutional rights. *In the alternative*, if no guidelines could make the statute constitutional then it is unconstitutional on its face." And it is of no moment that the panel opinion referred to "several . . . arguments" that Young had abandoned or waived on appeal. *Id.* (quoting *Young*, 896 F.3d at 1050 n.3). The panel expressly listed those claims that Young had forfeited; Young's as-applied challenge to Hawaii's restrictions on his ability to carry a handgun openly was not one of them. *See Young*, 896 F.3d at 1050 n.3.

Further, we cannot lose sight of the fact that Young filed his complaint *pro se*—and, as the Supreme Court has instructed, "[a] document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (citations omitted). Here, Young's *pro se* complaint stated clearly, if inartfully, his theory that his Second Amendment rights were violated by the combined effects of H.R.S. § 134-9 and the County's actual enforcement thereof. Such a claim is clearly sufficient to put the State and County's record of enforcement of section 134-9 at issue.

More fundamentally, the majority's contrary conclusion relies on the erroneous notion that there is a bright-line categorical distinction between facial and as-applied challenges. The Supreme Court has cautioned that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction . . . goes to the *breadth of the remedy* employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010) (emphasis added); *see also Bucklew v. Precythe*, 139 S. Ct. 1112, 1128 (2019) ("The line between facial and as-applied challenges can sometimes prove 'amorphous' and 'not so well defined.'" (citations omitted)); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1324 (2000) ("[T]here is no single distinctive category of facial, as opposed to as-applied, litigation. Rather, all challenges to statutes arise when a particular litigant

claims that a statute cannot be enforced against her. . . . [I]t is more misleading than informative to suggest that 'facial challenges' constitute a distinct category of constitutional litigation."). Indeed, whether a constitutional challenge is described as "facial" or "as-applied" "*does not speak at all* to the substantive rule of law necessary to establish a constitutional violation." *Bucklew*, 139 S. Ct. at 1127 (emphasis added). And, at least in the First Amendment context—which guides our analysis of "the extent to which a challenged prohibition burdens the Second Amendment right," *Jackson*, 746 F.3d at 961—even where the bare text of a statute is theoretically capable of competing constructions, we analyze a "facial" attack to the statute in light of how it has actually been interpreted and applied. *See, e.g.*, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating [a] facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."); *Gooding v. Wilson*, 405 U.S. 518, 524 (1972).

Regardless of its particular phrasing, the essence of Young's claim is unquestioned: He contends that the State and County of Hawaii have enacted and enforced against him sweeping prohibitions on ordinary, non-security-guard citizens' right to carry a firearm openly in public, in violation of the Second Amendment. That claim necessarily questions not only the nature of the statute that Hawaii enacted but moreover how that statute has been interpreted and enforced by the responsible government officials. And our analysis of such a claim surely does not turn on which ill-defined label one might now attach to it. *Cf. Bucklew*, 139 S. Ct. at 1128 ("To hold now, for the first time, that choosing a label changes the meaning of the Constitution would only guarantee a good deal of litigation over labels, with lawyers

on each side seeking to classify cases to maximize their tactical advantage.").

## C

So, at least as informed by the draconian enforcement history of section 134-9, such law unquestionably destroys ordinary Hawaiians' freedom to carry a handgun for self-defense in public. But that understates the point. For *even if* we chose to ignore the enforcement history showing that the County has never issued an open-carry permit to a non-security-guard citizen, section 134-9 would still be unconstitutional on its terms.

The Second Amendment protects "the right of *the people* to keep and bear Arms"—not the right of *a select group of "exceptional" people* to keep and bear arms. U.S. Const. amend. II (emphasis added). And in *Heller*, the Court left no doubt that "the people" refers to "all Americans." 554 U.S. at 580–81. "[I]f the Amendment is for law-abiding citizens *as a rule*, then it must secure gun access at least for each *typical* member of that class." *Wrenn*, 864 F.3d at 665. Indeed, although "certain weapons or activities [may] fall outside the scope of the" Second Amendment, "certain *people*" do not. *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting).

Thus, for Hawaii's measure to be constitutional, at the very least, it must not destroy the right of the typical, law abiding citizen to carry a gun in public for self-defense. By its very terms, section 134-9 plainly does just that—and does so even if we set aside its requirement that firearms carriers be "engaged in the protection of life and property." The language of the statute allows only those individuals who can

show "an exceptional case" or special "urgency" to be eligible to carry a gun. H.R.S. § 134-9(a).**[19]** The Hawaii Attorney General's 2018 Opinion Letter only exacerbated this

---

**[19]** To be sure, Hawaii argues—and the majority intimates—that history countenances such an approach. Young's interest in self-defense, they say, is merely "generalized," whereas the Second Amendment and its English forbearers protected a right to open carry only in service of a "*particularized*" need for self-defense. *See* Maj. Op. 54–55. This putative distinction, however, proves specious.

For example, the majority accepts the invitation of Hawaii's en banc brief to read Lord Coke as advocating the proposition "that the law did not allow public carry merely 'for doubt of danger.'" *See id.* at 54–55; Edward Coke, *The Third Part of the Institutes of the Laws of England* 161 (London, R. Brooke 1797). But what Hawaii would pass off as a *general* maxim of English law is in fact a comment on the very particular and unusual case of Sir Thomas Figett. There, "doubt of danger" was held an insufficient defense for Figett's going armed "*in the palace*," and "*before the justice[s] of the kings bench*." Coke, *supra*, at 161–62 (emphasis added). Ironically enough, Figett *did* assert a "particularized" threat in seeking to justify his carrying of a weapon, stating that he had concrete reason to fear an attack from one "Sir John Trevet knight." *Id*. The failure of Figett's defense, then, had nothing to do with how "generalized" or "particularized" his interests in self-defense were, and everything to do with the fact that he had gone armed in uniquely "sensitive places" where carry was *categorically* prohibited. *Cf. Heller*, 554 U.S. at 626.

Similarly, the majority reads Serjeant Hawkins as "recogniz[ing] that the . . . . desire for proactive self-defense was not a good enough reason to go armed openly." Maj. Op. 54. Yet this contradicts what Hawkins actually wrote. In the treatise relied upon by Hawaii and the majority, he expressly clarified that "no wearing of Arms is within the meaning of th[e] Statute [of Northampton]," *even if* "it be accompanied with such Circumstances as are apt to terrify the People," so long as one had "arm[ed] himself to suppress Rioters, Rebels, or Enemies" or "upon a Cry made for Arms to keep the Peace." Hawkins, *supra*, at 136 §§ 9–10. That is to say, Hawkins placed "generalized" and "particularized" interests in self-defense on equal footing.

problem by offering "illustrative examples" of *classes of persons* whom the Attorney General "believe[s] . . . could present a sufficient urgency or need for protection under the statute," such as political activists, state's witnesses, private security guards, psychiatrists, physicians, attorneys, business owners, entertainers, and bank employees. *See* Opinion Letter 18-1, *supra*, at 8–9. But no matter the particular categories of people who fall in or out of the State and County's favor, Hawaii's statute necessarily destroys the right to carry a firearm for self-defense for all "typical . . . law-abiding citizens" who are not deemed to be "exceptional." *Wrenn*, 864 F.3d at 665. That would be no less true if we were to set aside the ample factual record showing that Hawaii has *also further extinguished* the public-carry rights of those who are not security guards.

In short, no matter how much one cares to look to H.R.S. § 134-9's troubling and well-documented enforcement history, we cannot escape the conclusion that it is "unconstitutional under any level of scrutiny." *Jackson*, 746 F.3d at 961.

V

The Second Amendment's text, history, and structure—as interpreted in light of the Supreme Court's binding precedents—all converge on an unequivocal conclusion: At its core, the Second Amendment protects the ordinary, law-abiding citizen's right to carry a handgun openly for purposes of self-defense outside the home.

Despite an exhaustive historical account, the majority has unearthed nothing to disturb this conclusion. At most, and after great length, the majority arrives at the unexceptional

observation that the lawful *manner* of open carry has historically been regulated in varying and limited ways (for example, by prescribing particularly dangerous guns that may not be carried or particularly sensitive places into which guns may not be carried). But nothing in the history—both by my own read and as reported by the majority itself—suggests that the mere presence of *some* regulation of open carry was understood to negate the underlying status of the *right* to open carry, or to mean that such right could be altogether *extinguished* for the typical law-abiding citizen. The majority cites nothing that could justify such an extravagant interpretation of the record of gun regulation in this country, and I do not share the majority's eagerness to impart one by *ipse dixit*.

Most alarming is the conjunction of today's holding and our court's earlier holding that the *concealed* carry of firearms in public is not protected by the Second Amendment "in any degree." *See Peruta v. County of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc). For the more than 60 million people within the nine western states of this circuit, the combined effect of these two opinions is to remove *all* forms of public carry—whether open *or* concealed—from the protections of the Second Amendment. In so doing, our circuit has not merely demoted "the right of the people to . . . bear Arms," U.S. Const. amend. II, to the status of "a second-class right" but has extinguished its status as a right altogether. *See McDonald*, 561 U.S. at 780 (plurality op.). It is no badge of honor that we now become the first and only court of appeals to do so.

Accordingly, and for the reasons expressed above, I would hold that both H.R.S. § 134-9 and the 1997 County regulation destroy the core right to carry a gun for self-

defense outside the home and are "unconstitutional under any level of scrutiny." *Jackson*, 746 F.3d at 961.[20]

To be sure, I do not reach this conclusion without appreciation for the real and serious problem of gun violence—a problem which I do not take lightly, and which the State of Hawaii "has understandably sought to fight . . . with every legal tool at its disposal." *Wrenn*, 864 F.3d at 667. And nothing in my analysis would prevent the State from *regulating* the right to bear arms, for the Second Amendment leaves the State with "a variety of tools for combatting [the problem of gun violence], including some measures regulating handguns." *Heller*, 554 U.S. at 636. Yet, for better or for worse, the Second Amendment *does* protect a right to carry a firearm openly for self-defense in public—and Hawaii's near complete ban on the open carry of handguns cannot stand.

I cannot join an opinion that would flout the Constitution by holding, in effect, that "in regulating the manner of bearing arms, the authority of [the State] has no other limit than its own discretion." *Reid*, 1 Ala. at 616. While many respectable scholars and activists might find virtue in a firearms-carry regime that restricts the right to a privileged few, "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636.

I most respectfully dissent.

---

[20] Because I would reverse the district court on Second Amendment grounds, I would decline to reach Young's prior-restraint and due-process claims.

R. NELSON, Circuit Judge, with whom CALLAHAN and IKUTA, Circuit Judges, join, dissenting:

I concur with Judge O'Scannlain's dissent concluding that Hawaii Revised Statute 134-9 violates the Second Amendment. If the statute is facially unconstitutional, it is also unconstitutional as-applied. *See, e.g.*, *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1207 n.1 (9th Cir. 2010). The majority, however, errs not only in holding the statute facially constitutional, but also in rejecting Young's as-applied challenge. *See Hargis v. Foster*, 312 F.3d 404, 410, 412 (9th Cir. 2002) (noting the "inquiry does not end with [a] facial analysis" and reversing and remanding on the as-applied challenge).

The majority summarily dismisses Young's Second Amendment as-applied claim with far less respect than we have given other constitutional claims. *See McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion) (recognizing the Second Amendment is not a "second-class" constitutional right). Indeed, the majority's holding that Young failed to plead an as-applied challenge may be its longest lasting legacy, as it effectively reverses several of our prior cases. It will preclude a host of future as-applied constitutional challenges under the First, Fourth, Fifth, and Eighth Amendments previously recognized by this court—especially for *pro se* civil rights plaintiffs. The majority should have at least remanded for the district court to address Young's as-applied challenge or allow him to amend his complaint.

I also write separately to highlight the brazenly unconstitutional County of Hawaii ("County") Regulations applying H.R.S. § 134-9. There should be no dispute that any

law or regulation that restricts gun ownership only to security guards violates the Second Amendment. The County Regulations squarely present this issue. But the majority sidesteps it relying on a theory never briefed by the parties and not supported by Hawaii precedent. Because the County Regulations were the operative basis for denying Young a permit and remain legally enforceable, Young should be allowed on remand to challenge his denial under H.R.S. § 134-9. Accordingly, I respectfully dissent.

I

Young brought both a facial and an as-applied challenge to H.R.S. § 134-9 and the County Regulations. He sought general relief—asking to strike down the statute—but also personal relief—requesting to be granted a firearm permit. Moreover, he explicitly preserved his as-applied challenge in his complaint, opposition to the motion to dismiss, and on appeal.

The district court erred by dismissing Young's complaint with prejudice while mischaracterizing his separate as-applied claim and not allowing him to amend his complaint. And the majority errs in concluding Young failed to plead an as-applied challenge. Young's complaint pleaded that under H.R.S. § 134-9 and the County Regulations he was denied a firearm permit because he was not a security guard. The majority should have, at a minimum, vacated the district court's order and remanded for the district court to address the as-applied challenge in the first instance or to allow Young to amend his complaint.

As a threshold matter, Young was *pro se* when he litigated the motion to dismiss before the district court;[1] thus, this court liberally construes his filings. *Ross v. Williams*, 950 F.3d 1160, 1173 n.19 (9th Cir. 2020) (en banc). "The obligation to construe *pro se* filings liberally means courts must frequently look to the contents of a *pro se* filing rather than its form." *Id.*; *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam). This obligation to give the *pro se* complainant "'the benefit of any doubt'" is heightened "'particularly in civil rights cases,'" such as this one. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (quoting *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985) (en banc)).

This benefit of the doubt applies with even greater force when considering whether a claim raises a facial challenge, an as-applied challenge, or both. *See Real v. City of Long Beach*, 852 F.3d 929, 934 (9th Cir. 2017) (considering both facial and as-applied challenges even where appellant "did not clearly state to the district court whether his challenge was as-applied or facial");[2] *Read v. Haley*, 650 F. App'x 492, 494 n.1 (9th Cir. 2016) ("Mindful that we construe *pro se* pleadings liberally, we view [plaintiff's] claims as facial attacks that are not barred" even though plaintiff's "prolix"

---

[1] Young's counsel appeared on December 21, 2012, after the notice of appeal was filed.

[2] Indeed, we held the plaintiff in *Real*, represented by counsel, brought an as-applied challenge though he had never applied for a permit and his complaint never mentioned the words "as-applied." 852 F.3d at 934 (holding Real had standing to bring an as-applied challenge since he "alleged an intention" to undertake constitutionally protected activity but "ordinances proscribe[d] his intended conduct"). Just like Young, Real stated in his response opposing the motion to dismiss that he brought an as-applied challenge.

made it "understand[able] why the district court considered his Complaint to assert 'as applied' challenges" (emphasis added) (citation omitted)); *Morrison v. Peterson*, 809 F.3d 1059, 1062 (9th Cir. 2015) (considering both facial and as-applied challenges, though *pro se* litigant characterized his challenge as only as-applied);[3] *United States v. Kaczynski*, 551 F.3d 1120, 1124 (9th Cir. 2009) (recognizing an as-applied claim even though *pro se* appellant "characterize[d] his claim as a purely facial legal challenge"); *United States v. Kafka*, 222 F.3d 1129, 1130 (9th Cir. 2000) (considering an as-applied challenge even where "it [was] unclear whether Kafka [was] making only a facial challenge . . . or whether he [was] also asserting an 'as applied' challenge");[4] *Asselin v. Santa Clara Cnty.*, 185 F.3d 865 (9th Cir. 1999) (unpublished) (holding that the "complaint, charitably read, also allege[d] that the County's policy was unconstitutional as applied" where it asserted that the plaintiff had "merely discussed religion with the minor" and thus the "as-applied challenge [was] entitled to proceed past the pleading stage").

This benefit of the doubt has greater force because "[t]he line between facial and as-applied challenges can sometimes prove 'amorphous.'" *Bucklew v. Precythe*, 139 S. Ct. 1112,

---

[3] Morrison's complaint never used the words "as-applied" or "facial" and included only two sentences that could have raised a facial challenge. In his opposition to the motion to dismiss, Morrison only stated he was challenging the statute as-applied.

[4] The government's brief argued that Kafka brought only a facial challenge because "[t]he district court specifically inquired into the Defendant's wish to present a case purely as a matter of law, or if he wished to make a factual record" and Kafka had "declined to present any facts." Neither Kafka's Opening Brief or Reply Brief ever used the words "as-applied."

1128 (2019) (quoting *Elgin v. Dep't of Treasury*, 567 U.S. 1, 15 (2012)). "The label is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (noting whether the words "as-applied" were used in a complaint is not determinative). A claim can "obviously ha[ve] characteristics of both" types of challenges. *Id.* And "[a]s-applied challenges . . . may be coupled with facial challenges."[5] *Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998). Accordingly, "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).

Rather, the "distinction . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Id.* (citation omitted). A court should look at the "claim and the relief that would follow" to determine the type of claim brought. *See John Doe No. 1*, 561 U.S. at 194. And a court should consider different types of challenges as the "exercise of its judicial responsibility" demands. *See Citizens United*, 558 U.S. at 333. Thus, this court must look to the substance of the complaint and the remedy to identify what type of claims are brought. *See Isaacson v. Horne*, 716 F.3d 1213, 1230 (9th Cir. 2013). The majority effectively overturns our precedents and ignores Supreme Court direction to establish a new vague standard for pleading an as-applied challenge. *See* Maj. Op. at 27, 28–30.

---

[5] It is far different when a party, represented by counsel, specifically pleads only a facial challenge and affirmatively disclaims any as-applied challenge. *See Calvary Chapel Bible Fellowship v. Cnty. of Riverside*, 948 F.3d 1172, 1177 (9th Cir. 2020).

Under long-standing precedent, there is ample support that Young's *pro se* complaint alleges *both* a facial and an as-applied challenge. Young argues he was denied a permit and that this denial violated his constitutional rights. Crucially, he seeks multiple forms of relief: first, to strike down the statute as part of his facial challenge; and second, to be personally granted a firearm permit as part of his as-applied challenge. *See Citizens United*, 558 U.S. at 331. Furthermore, he refers to himself and his efforts to gain a firearm permit numerous times throughout the complaint. *See Foti*, 146 F.3d at 635 ("An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular . . . activity.").

As just a few examples, Young alleges:

- "Plaintiff, recently, on two occasions . . . applied for a personal permit . . . . On both occasions Plaintiff was denied a permit, by the Defendant Kubojiri, pursuant to H.R.S. 134-9, citing that '…only in exceptional cases or a demonstrated urgency…', which is yet to be defined, the Chief of Police '…may grant…' a permit, subject to his personal opinion."

- "Within the jurisdiction of Hilo County and according to its police administrator, it is a matter of routine procedure that a Concealed Carry Weapons (CCW) permit is not to be issued, but only upon demonstration of an actual menace and subjected to the discretion of the local county Chief of Police."

- "Plaintiff is denied and prohibited from exercising his individual second amendment right."

- He suffered "irreparable emotional and physical distress" as a result of the "present enforcement of H.R.S. 134-9 and H.R.S. 134-6."

- "Plaintiff has a clear and unambiguous claim of right to property in the Second Amendment of the Constitution of the United States."

And in his opposition to the motion to dismiss, Young explicitly challenged H.R.S. § 134-9 both "on its face and or the application thereof," showing his intent to bring both a facial and an as-applied challenge.  Young also argues on appeal:

- In his 2013 Opening Brief, "Chief Kubojiri's failure to adopt policies which comport with constitutional guidelines has resulted in HRS §134-9, as applied to Young, to be an unconstitutional deprivation of his constitutional rights."[6]

---

[6] As Judge O'Scannlain notes, the three-judge panel did not find Young forfeited his as-applied challenge.  O'Scannlain Dissent at 187 n.18.  To the extent that the majority believes otherwise, Maj. Op. at 29–30, "a party does not necessarily forfeit an issue by first raising it" in en banc proceedings.  *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1160 (9th Cir. 2014) (en banc).  Indeed, the "exercise" of our "judicial responsibility" dictates considering the as-applied challenge. *See*

- "Young challenged the law and regulations both facially and as-applied 'to the facts of' his case," citing *Citizens United*, 558 U.S. at 331.

- "At every stage of the proceedings," Young, proceeding *pro se*, raised an as-applied challenge, which has been preserved on appeal.

- "Mr. Young's claim that H.R.S. § 134-9 is unconstitutional both facially and as-applied by the County to Mr. Young."

Young thus "brings a paradigmatic as-applied challenge, arguing that it is unconstitutional to apply the [Hawaii statute and County Regulations] to him because, given all the circumstances, his ability to" exert his Second Amendment rights is "unduly constricted." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011).

---

*Citizens United*, 558 U.S. at 333. Particularly here, since "these arguments are intertwined with the validity of the claim." *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 996 n.5 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008).

Moreover, the majority makes much of the fact that the three-judge panel did not address Young's as-applied challenge. Maj. Op. at 28. But as the majority acknowledges, since the three-judge panel (rightfully) held the statute to be facially unconstitutional, the statute was "void *in toto*" and unconstitutional as-applied; thus, there was no need for the three-judge panel to address the as-applied challenge separately. *See* Maj. Op. at 26–27; *Powell's Books*, 622 F.3d at 1207 n.1.

Despite these plain and consistently detailed allegations and arguments, the majority asserts Young's as-applied challenge is "[a]t best . . . buried in his complaint and not well pleaded." Maj. Op. at 28. It holds that Young's arguments, presented repeatedly throughout Young's complaint, opposition to the motion to dismiss, and on appeal, are not "specific[] and distinct[]" enough to permit review.[7] Maj. Op. at 29–30. The majority's summary conclusion is belied by a plain reading of Young's complaint and his subsequent filings, as detailed above. And we have in numerous cases addressed as-applied challenges in much thinner vehicles. *See, e.g.*, *Real*, 852 F.3d at 934; *Kaczynski*, 551 F.3d at 1124. If nothing else, the fact that Young asked for a specific as-applied remedy in a firearm permit means he more than adequately alleged an as-applied challenge. *See Citizens United*, 558 U.S. at 331. The majority's contrary conclusion impermissibly "invites pleading games." *Bucklew*, 139 S. Ct. at 1128 (noting it "would only guarantee a good deal of litigation over labels, with lawyers on each side seeking to classify cases to maximize their tactical advantage").

The majority thus offhandedly establishes a new heightened pleading standard for *pro se* civil rights litigants that is both legally unfounded and practically concerning. Maj. Op. at 29–30. The 35-year old case it cites to support this proposition, *Miller v. Fairchild Industries, Inc.*, involved a *represented* party's appellate brief, not a *pro se* litigant's

---

[7] The majority also characterizes Young's *pro se* civil rights complaint as "lengthy and rambling." Maj. Op. at 25 n.3. On the one hand, the majority thus criticizes Young's *pro se* complaint for his verbose diction, and on the other, the majority faults Young for not alleging enough. Even besides this contradiction, such uncharitable characterizations are unhelpful to resolving this case.

first un-amended civil rights complaint.  797 F.2d 727, 738 (9th Cir. 1986).  Whether this heightened standard might be expected of seasoned counsel, we have never applied it to *pro se* citizens seeking to vindicate their constitutional rights.[8] *Erickson*, 551 U.S. at 94 ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (internal quotation marks and citations omitted)).   In any event, Young's voluminous as-applied pleadings are far more than the "bare assertion[s]" the majority characterizes them to be.  *See* Maj. Op. at 30.

Consider what this holding of the en banc court means: any time a government agency hides behind an opaque policy to deny someone a constitutional right, a *pro se* litigant is held to some rigorous yet herein undefined pleading standard to even have his challenge considered in the first place.  The majority holding thus overrules many prior panel opinions and ignores Supreme Court precedent.  If Young's pleadings here are insufficient even to warrant consideration in deciding a motion to dismiss, then a host of pleadings in our prior cases are now no longer sufficient either.  *See, e.g.*, *Real*,

---

[8] Though the majority pays lip service to the relaxed *pro se* pleading standard, the majority nevertheless applies *Miller*'s stringent "specific[] and distinct[]" standard—dealing with a represented party's appellate brief—to Young's *pro se* complaint. Maj. Op. at 28–30. And the majority exacerbates its error by inappositely relying on *Greenwood v. F.A.A.*, where the represented appellant raised an issue "for the first time on appeal." 28 F.3d 971, 977 (9th Cir. 1994). The majority ignores the consistently detailed allegations in Young's complaint. Moreover, it also ignores our duty to look at "the breadth of the remedy employed by the Court" as the "exercise of its judicial responsibility" demands. *Citizens United*, 558 U.S. at 331, 333; *see also Isaacson*, 716 F.3d at 1230.

852 F.3d at 934; *Kaczynski*, 551 F.3d at 1124; *supra* at 197–98.

Indeed, the district court itself recognized that Young challenged the statute as-applied, noting "Plaintiff requests an injunction against the enforcement of HRS Chapter 134." *Young v. Hawaii*, 911 F. Supp. 2d 972, 984 (D. Haw. 2012). But the district court "erroneously treated the as-applied challenge brought in this case as a facial challenge," *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009), concluding Young "is actually challenging the constitutional validity of Hawaii's Firearm Carrying Laws . . . ." *Young*, 911 F. Supp. 2d at 984. In reality, Young properly pleaded both an as-applied and a facial challenge.

The district court erred by dismissing Young's claim without considering whether he pleaded sufficient facts to support his as-applied challenge. *See La. Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016) ("[C]ourts ruling on a motion to dismiss 'must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss . . . .'" (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007))). "To the extent that the district court considered [Young's] complaint to rest on a facial, rather than an as-applied challenge, . . . it erred." *See Hoehne v. Cnty. of San Benito*, 870 F.2d 529, 534 (9th Cir. 1989).

Moreover, the majority faults Young, a *pro se* litigant, for not pursuing reconsideration instead of appeal. Maj. Op. at 27. Yet we have never required even a *represented* party, let alone a *pro se* party, to seek reconsideration to preserve an argument for appeal. The majority acknowledges that Young was not required to seek reconsideration, but nonetheless

faults him for choosing to immediately appeal. Maj. Op. at 27 & n.5.

The majority punishes Young for asking us to review de novo the district court's order viewing all allegations in the light most favorable to him, instead of first attempting to convince the district court his case fell under the "highly unusual circumstances" warranting reconsideration. *See Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1058 (9th Cir. 2020) (citation omitted). The majority thus suggests Young should have "relitigate[d] old matters" before appealing, or else risk forfeiting his as-applied challenge. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n.5 (2008) (citation omitted).

Again, consider what this holding means. A *pro se* plaintiff repeatedly raises an as-applied challenge in his complaint and opposition to a motion to dismiss; it is recognized by the district court, but then erroneously categorized only as a facial challenge upon final judgment. And we fault the *pro se* civil rights litigant for immediately appealing the final judgment instead of pursuing reconsideration. The majority's conclusion lacks both legal authority and equitable justification.

Additionally, it is not sensible here to affirm the dismissal of an as-applied challenge that the district court did not address in the first instance.[9] This court need only decide that

---

[9] The majority suggests it would "manufacture jurisdictional issues" to remand for the district court to consider the as-applied challenge erroneously labeled as a facial challenge. Maj. Op. at 28 n.6. Not so. Our court has appellate jurisdiction over final judgments of the district court, including ones that "erroneously treated the as-applied challenge brought

an as-applied challenge was properly raised and should not address whether Young's complaint met the 12(b)(6) standard in the first instance. *See, e.g.*, *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098, 1111 (9th Cir. 2015); *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1111 (9th Cir. 2020) ("An appellate court should usually wait for the district court to decide in the first instance."); *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1110 (9th Cir. 2016) (remanding for consideration of a pending as-applied challenge which "should be addressed in the first instance by the district court"); *Henry v. Cnty. of Shasta*, 132 F.3d 512, 522 (9th Cir. 1997), *opinion amended on denial of reh'g*, 137 F.3d 1372 (9th Cir. 1998) (remanding an as-applied challenge erroneously dismissed by the district court because the challenge "depend[ed] on questions of fact and law . . . that the district court did not address, [and thus] we prefer not to decide it initially on appeal" (citation omitted)).

But the majority apparently did reach the issue, holding that Young "never pleaded facts to support an as-applied challenge." Maj. Op. at 27. The majority's holding again disregards Supreme Court precedent.

Young's complaint alleged "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

. . . as a facial challenge." *See Stormans, Inc.*, 586 F.3d at 1140; *CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098, 1111 (9th Cir. 2015) (remanding where district court did not address crucial part of as-applied challenge); *Foti*, 146 F.3d at 635, 640–42 (recognizing plaintiffs' as-applied challenge even though the district court considered only the facial challenge and expressly declined to consider the as-applied challenge).

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Young challenged how the County applied the statute to deny his permit application in June 2012.  His allegations were plausible based on the County Regulations and legal grounds as reasonably understood at the time he filed his complaint—alleging he had applied but was not granted a permit because he was not a security guard, as required by the County Regulations.  For example, Young:

- Challenged the denial of his permit due to the "engaged in the protection of life and property" clause because "as used, [it] implies a person must currently be a member of a law enforcement agency or employed by a private security company, licensed to do business in the State of Hawaii, and engaged in the employment of protecting a paying third party's life and property."

- Stated that county police have "unbridle[d] discretionary authority to decide whether an applicant possesses an 'exceptional case' or 'sufficient urgency' to qualify for a permit to carry a concealed or unconcealed firearm, without further identifying the parameters of the additional requirement to the point where Plaintiff knows whether or not he is within the boundaries of the law."

- Argued "since Defendants collectively enforce H.R.S. 134 and 134-9 the irreparable injury claimed was both

threatened at time of Plaintiff's filing of complaint and continues to occur in the present instance."

- Questioned "[h]ow does the Hawaii County Chief of Police Harry Kubojiri apply and enforce H.R.S. 134-9?"

Young pleaded he met the requirements of H.R.S. § 134-9 in all other respects, including the provision of being "engaged in protection of life and property," H.R.S. § 134-9, because he "applied for a personal permit, in accordance with Hawaii Revised Statute (H.R.S.) 134-9(a)(c), . . . stating the purpose being for personal security, self-preservation and defense, and protection of personal family members and property."[10]

Even under the majority's view, we should have—at a minimum—remanded to allow Young to amend his complaint. *See* Fed. R. Civ. P. 15 (courts "should freely give leave [to amend] when justice so requires"). Indeed, Hawaii specifically suggested this court remand to allow Young to amend his complaint. "Rule 15's policy of favoring amendments to pleadings should be applied with extreme liberality," *Price v. Kramer*, 200 F.3d 1237, 1250 (9th Cir. 2000) (internal quotation marks and citation omitted),

---

[10] This court should not decide in the first instance to dismiss Young's complaint based on a failure to plead according to the non-binding Hawaii Attorney General's Opinion ("AG Opinion") issued over six years after his complaint was filed—in response to the panel opinion upholding his facial challenge. Such positions taken purely for the sake of litigation are entitled to little, if any, weight. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 & n.6 (2019).

"guided by the underlying purpose of Rule 15—to facilitate decision on the merits rather than on the pleadings or technicalities," *Eldridge v. Block*, 832 F.2d 1132, 1135 (9th Cir. 1987) (internal quotation marks and citation omitted).

Thus, "a district court should grant leave to amend *even if* no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (emphasis added) (internal quotation marks and citations omitted). Indeed, a "*pro se* litigant [is] entitled to procedural protections, including [the] right to amend [a] complaint unless futile." *Eldridge*, 832 F.2d at 1136 (emphasis added) (citation omitted); *see also Houghton v. South*, 865 F.2d 264 (9th Cir. 1988) (unpublished) (holding that the "policy of liberality under Rule 15 for *pro se* plaintiffs" means "the district court should have allowed Houghton to supplement his complaint . . . on remand from the first appeal" to "allege[] an 'as applied' challenge"). Remand is particularly warranted here since Young has challenged the operative County Regulations. Given the changed legal circumstances, including Hawaii's recent AG Opinion, Young is more than entitled to amend his complaint.

Young's as-applied challenge should not have been ignored by the district court or the majority to "foreclose a future as applied challenge."[11] *See Nordyke v. King*, 319 F.3d

---

[11] Without remand, Young could suffer claim or issue preclusion if this court affirms the dismissal of his complaint with prejudice. *See Littlejohn v. United States*, 321 F.3d 915, 919–20 (9th Cir. 2003) ("Claim preclusion prevents the relitigation of claims previously tried and decided." (citation omitted)); *Scafidi v. Las Vegas Metro. Police Dep't*,

1185, 1190 n.3 (9th Cir. 2003). Indeed, the First, Third, Fourth, Seventh, Eighth, and D.C. Circuits have held that a litigant may be able to raise an as-applied challenge even to presumptively lawful firearms prohibitions. *Binderup v. Att'y Gen. U.S.*, 836 F.3d 336, 343–48 (3d Cir. 2016) (en banc); *Schrader v. Holder*, 704 F.3d 980, 988–89 (D.C. Cir. 2013); *United States v. Moore*, 666 F.3d 313, 316–17 (4th Cir. 2012); *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011); *United States v. Williams*, 616 F.3d 685, 691–92 (7th Cir. 2010); *see also United States v. Woolse*y, 759 F.3d 905, 909 (8th Cir. 2014) (hearing as-applied challenge to § 922(g)(1) but not mentioning *Heller*).

The district court's failure to consider the as-applied challenge separately, even after dismissing the facial challenge, was error. The majority compounds this error by refusing to remand the case to allow consideration—or amendment—of an as-applied challenge. *See Norse v. City of Santa Cruz*, 629 F.3d 966, 970 (9th Cir. 2010) (en banc) (noting we have rejected a facial challenge but remanded the as-applied challenge); *Menotti v. City of Seattle*, 409 F.3d 1113, 1156 (9th Cir. 2005) (rejecting the facial challenges but reversing and remanding the as-applied challenge). In doing so, the majority errs by not "exercis[ing] . . . its judicial

966 F.3d 960, 963 (9th Cir. 2020) ("Issue preclusion, or collateral estoppel, bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." (internal quotation marks and citations omitted)). Thus, it is unclear whether he could bring his complaint anew given the current disposition of the case. *See Outdoor Media Dimensions Inc. v. Crunican*, 202 F.3d 278 (9th Cir. 1999) (unpublished) (affirming a facial challenge but "remand[ing] so that the judgment can be amended to state that it is without prejudice as to an 'as applied challenge'").

responsibility" and considering the as-applied challenge. *See Citizens United*, 558 U.S. at 333.

II

Though consideration of the as-applied challenge is better left to the district court, the plain unconstitutionality of the County Regulations governing Young's application for a firearm permit warrants mention.   In 1997, the County promulgated its Regulations governing its issuance of firearm licenses under H.R.S. § 134-9.   Police Dep't of Cnty. of Haw., *Rules and Regulations Governing the Issuance of Licenses* 10 (Oct. 22, 1997).  Hawaii does not dispute that the County Regulations remain on the books.  The County may choose to enforce them at any time.

Hawaii's counsel at en banc oral argument argued the AG Opinion (issued six years after Young filed his complaint) controls to the extent the County Regulations are inconsistent with the AG Opinion.  And Hawaii asserts that this court should defer to the County's interpretation of its own Regulations.

There has been no preemption under Hawaii state law here and the non-binding AG Opinion does not control, despite the majority's suggestion to the contrary.  *Contra* Maj. Op. at 19–22.   "[A] municipal ordinance may be preempted pursuant to HRS § 46–1.5(13) if (1) it covers the same subject matter embraced within a comprehensive state statutory scheme disclosing an express or implied intent to be exclusive and uniform throughout the state or (2) it conflicts with state law." *Richardson v. City & Cnty. of Honolulu*, 868 P.2d 1193, 1209 (Haw. 1994).   There is no express preemption clause in the state statute at issue here, nor any

clear intent to preempt regulations such as the County's. *See generally* H.R.S. § 134 *et seq.*; *see also Syngenta Seeds, Inc. v. Cnty. of Kauai*, 842 F.3d 669, 675 (9th Cir. 2016) ("[T]he Hawaii Supreme Court has presumed that a county's exercise of police power is within its delegated authority so long as the legislature did not 'clearly intend[ ] to preempt the field of regulation.'" (quoting *Haw. Gov't Employees' Ass'n v. Maui*, 576 P.2d 1029, 1038 (Haw. 1978))).

The parties do not argue such preemption exists either.[12] And because the AG Opinion is legally non-binding, it cannot preempt the County Regulations as "state law." *See Cedar Shake & Shingle Bureau v. City of Los Angeles*, 997 F.2d 620, 625–26 (9th Cir. 1993).

Furthermore, deferring to the County's interpretation of its own Regulations advanced in its amicus brief is not warranted under the "limits inherent" in administrative law doctrine. *See Kisor*, 139 S. Ct. at 2415. Deference is proper only when an agency's interpretation of its own regulations survives a gauntlet of conditions. First, the regulations must be "genuinely ambiguous." *Id.* (citations omitted). Second,

---

[12] Hawaii did not address this position in any of its briefs; it merely stated in response to questioning at oral argument that the County Regulations are inconsistent with the AG Opinion's reading of the statute. It did not specify whether or how supposed inconsistency with a non-binding legal opinion meets the preemption requirements under H.R.S § 46–1.5(13). In any event, arguments regarding statutory questions "raised for the first time at oral argument" are waived. *Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075 n.4 (9th Cir. 2016). "That course seems doubly wise because, based on oral argument, it appears that the government knew of this potential argument, but may have deliberately chosen not to raise it." *Ctr. for Investigative Reporting v. United States Dep't of Justice*, 982 F.3d 668, 686 (9th Cir. 2020).

the agency's interpretation must be "reasonable." *Id.* (citation omitted). Third, "a court must make an independent inquiry into whether the character and context of the agency interpretation entitles it to controlling weight." *Id.* at 2416 (citations omitted). Fourth, "the agency's interpretation must in some way implicate its substantive expertise." *Id.* at 2417. "Finally, an agency's reading of a rule must reflect fair and considered judgment . . . ." *Id.* (internal quotation marks and citations omitted). An interpretation that is a "convenient litigating position" or a "*post hoc* rationalizatio[n]" does not merit deference. *Id.* (internal quotation marks and citation omitted). "The general rule, then, is not to give deference to agency interpretations advanced for the first time in legal briefs." *Id.* at 2417 n.6 (citation omitted). The County's interpretation does not meet any of these requirements. Thus, the County's interpretation, "advanced for the first time" in its amicus brief, is not worthy of any deference. *See id.*; *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–56 (2012).

An independent review of how the County Regulations have "been interpreted and applied by local officials" demonstrates the County unconstitutionally enforces H.R.S. § 134-9 through its Regulations. *See Calvary Chapel*, 948 F.3d at 1177. The County Regulations were promulgated to govern "the granting of authorization for the carrying of weapons as provided by section 134-9, Hawaii Revised Statutes." And the County Regulations' title, "Rules and Regulations Governing the Carrying of Concealed Weapons and the Carrying of Weapons by Private Detectives and Security Guards," explicitly applies H.R.S. § 134-9 only to certain occupations. Under the County Regulations, then, open carry is proper only when the license-holder is "in the actual performance of his duties or within the area of his

assignment."[13]   The Second Amendment "surely does not protect a right to bear arms only as a security guard." *Young v. Hawaii*, 896 F.3d 1044, 1071 (9th Cir. 2018), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019).   Thus, the County Regulations are "infirm [u]nder any of the standards of scrutiny."   *Id.* (internal quotation marks and citation omitted).    The County Regulations are facially unconstitutional, and Young alleges they have been unconstitutionally applied to deny him a permit under H.R.S. § 134-9.  The majority's failure to grapple with the County Regulations in any meaningful way suggests an unwillingness to apply the Second Amendment with the respect it deserves.

### III

Even if the Hawaii statute were facially constitutional as the majority holds, Young's challenge should be remanded to address or develop the as-applied challenge.   Therefore, I respectfully dissent.

---

[13] Hawaii defends the County Regulations only with a conclusory assertion that the "regulation does not limit open-carry licenses to security guards," because "[t]he language of the County's regulation mirrors the language of the state statute."  This interpretation is flatly contradicted by the plain language of the County Regulations.  The statute does not include the regulatory language cited here, nor is the phrase "security guards" included in the statute's title, as it is in the County Regulations' title.